# IN THE UNITED STTES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiffs,

vs.                                         No. CR 21-1826 JB

MANUEL JONATHAN ULIBARRI,

      Defendant.

## **MEMORANDUM OPINION**[1]

**THIS MATTER** comes before the Court on the Motion to Suppress, filed September 26, 2022 (Doc. 50)("MTS").  The Court held an evidentiary hearing on July 17, 2023.  See Clerk's Minutes, filed July 17, 2023 (Doc. 88).  The primary issue is whether the Court should suppress evidence that Albuquerque Police Department ("APD") officers found in Defendant Manuel Jonathan Ulibarri's vehicle after a traffic stop because, as Ulibarri argues, the stop, Ulibarri's subsequent arrest, his vehicle's impoundment, and the vehicle's search that unveiled evidence of criminal activity violated Ulibarri's rights under the Fourth Amendment to the United States Constitution.  The Court will not suppress the evidence, because the Court concludes that neither the traffic stop, Ulibarri's arrest, the vehicle's impoundment, nor the vehicle's search were unlawful under the Fourth Amendment.  Accordingly, the Court will deny the MTS.

---

[1]On July 26, 2023, the Court entered an Order denying the Motion to Suppress, filed September 26, 2022 (Doc. 50)("MTS Order").  See Order at 1-2, filed July 26, 2023 (Doc. 87).  In the Order, the Court stated that it would "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  MTS Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

**FINDINGS OF FACT**

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress.  The United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[2]("[T]he Supreme Court

---

[2]United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

has made it clear hearsay is admissible in suppression hearings . . . . As a result, the restriction in

the Confrontation Clause against admission of testimonial statements . . . is not implicated here."

(citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d

910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).  The

Court makes the following findings of fact:

> **1.      APD Officers Pull Ulibarri's Vehicle Over.**

1.      On May 13, 2021, APD officers, Lucas Perez and Neill Elsman were conversing

with one another on a city street in downtown Albuquerque, New Mexico, within city limits, when

they heard the sound of a very loud vehicle from what sounded like two or more blocks away.  See

Transcript of Hearing at 8:22-13:5, taken July 17, 2023 (Fontanez, Perez)("Tr.").[3]

2.      The officers went in search of the vehicle that was producing the loud noise,

because it sounded like it violated an Albuquerque city ordinance against excessive vehicular

noise.  See Tr. at 87:22-89:24 (Fontanez, Elsman).

3.      The officers identified the car making the noise, a white sedan that Ulibarri was

driving.  See Tr. at 87:22-89:24 (Fontanez, Elsman).

---

with respect to a material issue in a case and would assist the court in its disposition,
we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United
States v. Lopez-Carillo, United States v. Andas-Gallardo, 3 F. App'x 959 (10th Cir. 2001), United
States v. Cunningham, 630 F. App'x 873 (10th Cir. 2015), United States v. Sanchez, 720 F. App'x
964 (10th Cir. 2018), and United States v. Sitlington, 527 F. App'x 788 (10th Cir. 2013), have
persuasive value with respect to a material issue, and will assist the Court in its disposition of this
Memorandum Opinion and Order.

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

4.     Perez and Elsman had non-mechanical training and experience with identifying cars with modified exhaust mufflers and had experience stopping cars that violated Albuquerque city ordinances against modified mufflers that produce sound louder than originally manufactured. See Tr. at 7:16-8:10 (Fontanez, Perez); id. at 84:9-87:21 (Fontanez, Elsman).

5.     At the time, the APD officers did not know what Ulibarri's car, as originally manufactured, sounded like, and they did not know whether the loud noise it produced was not the sound it produced in its unmodified state.  See Tr. at 60:6-62:18 (Juarez, Perez).

6.     Perez could not have visually observed whether the vehicle had a modified exhaust pipe before pulling it over, and Perez relied on his experience instead of on specialized mechanical training in recognizing the sound of cars with modified mufflers.  See Tr. at 71:10-74:13 (Fontanez, Perez).

7.     The officers put on their sirens and emergency lights and pulled over the vehicle. See Tr. at 12:1-13:24 (Fontanez, Perez).

8.     When Ulibarri's vehicle came to stop on Third Street between Tijeras Avenue and Copper Avenue, it parked next to a sidewalk curb and was situated such that it straddled the lines of two metered sidewalk parking spots and therefore would prevent either parking spot from being utilized by other drivers.  See Tr. at 13:17-15:24 (Fontanez, Perez); id. at 91:15-92:17 (Fontanez, Elsman); 11 Axon_Body_3_Video_2021-05-13_2330 at 01:01-30, filed March 27, 2022 (Doc. 69-11)("Perez Bodycam Video"); 12 Axon_Body_3_Video_2021-05-13_2330-2 at 00:01-50, filed March 27, 2022 (Doc. 69-12)("Elsman Bodycam Video").

9.     Given how Ulibarri's vehicle was parked, it would not be subject to immediate towing if left unattended but may be subject to parking citations because it occupied partially two metered parking spots, although a small vehicle could have occupied one of the two partially

occupied spots.  See Tr. at 107:12-108:22 (Rivas, Elsman); Perez Bodycam Video at 00:01-01:05; Elsman Bodycam Video at 00:01-50.

10.     At the time, there was little to no traffic and the car, as Ulibarri parked it, did not obstruct the flow of traffic of any car that might traverse Third Street between Tijeras Avenue and Copper Avenue.  See Tr. at 61:19-63:9 (Juarez, Perez); Perez Bodycam Video at 00:01-01:05; Elsman Bodycam Video at 00:01-50.

11.     Ulibarri's vehicle was the only car in the immediate vicinity: no other vehicle was parked on the same block or the next block over.  See Perez Bodycam Video at 00:01-01:05 (showing view north on Third Street); Perez Bodycam Video at 02:55-03:05 (showing view south on Third Street); Elsman Bodycam Video at 00:01-50 (showing view north on Third Street); Elsman Bodycam Video at 02:45-50 (showing view south on Third Street).

12.     Before Perez and Elsman approached Ulibarri's vehicle, another APD officer, Zachary Herbst, had arrived in a patrol car, as had an APD police service aide.[4]  See Tr. at 77:3-79:6 (Fontanez, Perez); Perez Bodycam Video at 00:01-1:05; Elsman Bodycam Video at 00:01-50; 13 Axon_Body_3_Video_2021-05-13_2332 at 00:01-1:00, filed March 27, 2022 (Doc. 69-13)("Herbst Bodycam Video").

13.     Perez and Elsman approached the vehicle and spoke to Ulibarri and told him that they had stopped him because of his exhaust pipe's volume.  See Tr. at 15:17-16:19 (Fontanez,

---

[4]A police service aides are "unarmed and assist with traffic control, property crime report writing and other non-sworn public service duties." City to Welcome 18 New Police Service Aides, City of Albuquerque, https://www.cabq.gov/police/news/city-to-welcome-18-new-police-service-aides (last visited February 8, 2024).

Perez); Perez Bodycam Video at 01:30-55 (Perez, Ulibarri); Elsman Bodycam Video at 01:15-30 (Perez, Ulibarri).

14.     Herbst and the police aide remained in their respective vehicles while Perez and Elsman spoke to Ulibarri.  See Perez Bodycam Video at 01:30-55; Elsman Bodycam Video at 01:15-40; Herbst Bodycam Video at 00:01-02:00.

15.     During the stop, Ulibarri did not state that his car did not have a modified exhaust. See Tr. at 16:5-17:5 (Fontanez, Perez, Juarez, Court).[5]

16.     Elsman observed unspent firearm rounds scattered on the backseat of the vehicle. See Tr. at 17:11-19:6 (Fontanez, Perez); id. at 92:18-95:2 (Fontanez, Elsman); Elsman Bodycam Video at 01:20-30.

17.     Elsman asked if Ulibarri had any weapons; Ulibarri said there was not a firearm in the vehicle, but he acknowledged that there were bullets in his vehicle and said his son had been playing with them.  See Tr. at 17:11-19:6 (Fontanez, Perez); id. at 92:18-95:2 (Fontanez, Elsman); id. at 94:19-95:2 (Fontanez, Elsman); Perez Bodycam Video at 01:40-50 (Elsman, Ulibarri); Elsman Bodycam Video at 01:45-50 (Elsman, Ulibarri)

18.     The officers asked for the Ulibarri's identification, and he produced it.  See Tr. at 19:4-6 (Fontanez, Perez); Perez Bodycam Video at 01:30-45 (Perez, Ulibarri).

   **2.     APD Officers Decide to Arrest Ulibarri Based on Two Bench Warrants.**

---

[5]Ulibarri objected to the line of questioning about whether he denied that his exhaust was modified.  He argues that he cannot be faulted for not denying that his exhaust was modified, on the ground that to do so would violate his right to silence -- what Ulibarri calls his right to "precustody silence."  Tr. at 16:20-24 (Juarez).  For the purposes of the Court's Findings of Fact, the Court finds that Ulibarri did not deny to Perez and Elsman that his car had a modified exhaust.

19.     The officers returned to their vehicle, ran a check on Ulibarri in their database, and learned that he had two outstanding bench warrants.  See Tr. at 19:12-23:24 (Fontanez, Perez); Bench Warrant at 1, filed March 27, 2023 (Doc. 69-1)("April 22 Bench Warrant"); Bench Warrant at 1, filed March 27, 2023 (Doc. 69-3)("April 28 Bench Warrant"); Perez Bodycam Video at 02:55; Elsman Bodycam Video at 02:50.

20.     One outstanding bench warrant was for failure to appear for a court date in a pending criminal case, in which the State of New Mexico charged Ulibarri with reckless driving and negligent use of weapons.  See April 22 Bench Warrant at 1; Case No. T-4-CR-2021-001332 at 1, filed March 27, 2023 (Doc.  69-2)("Criminal Case History A").

21.     The second outstanding bench warrant was for failure to appear for a court date in a separate pending criminal case, in which the State of New Mexico charged Ulibarri with reckless driving and failure to obey a traffic sign.  See April 28 Bench Warrant at 1; Case No. T-4-CR-2020-004083 at 1, filed March 27, 2023 (Doc. 69-4)("Criminal Case History B").

22.     The April 22 Bench Warrant provided that Ulibarri could post a $100.00 bond and be released from custody; the April 28 Bench Warrant provided that Ulibarri could post an $25.00 bond and be released from custody.  See April 22 Bench Warrant at 1; April 28 Bench Warrant at 1.

23.     Officer Perez confirmed with APD dispatch that the two warrants on Ulibarri were valid and that they were a basis upon which to arrest Ulibarri.  See Tr. at 23:17-25:9 (Fontanez, Perez).

24.     Perez and Elsman did not come to believe, from checking the database, that Ulibarri had a felony conviction such that Ulibarri could not possess lawfully a firearm.  See Tr. at 108:21-110:25 (Rivas, Elsman).

25.     Perez and Elsman did not have any basis to believe that Ulibarri could not possess lawfully a firearm.  See Tr. at 108:21-110:25 (Rivas, Elsman).

26.     Perez indicated to Elsman that Ulibarri had two valid arrest warrants.  See Tr. at 25:19-26:1 (Perez, Fontanez).

27.     Perez stated to Elsman, regarding Perez' decision to arrest Ulibarri, "I think I'm just gonna do it anyway, I'm gonna take [Ulibarri] out.  There were bullets in the car so he might have something."  Perez Bodycam Video at 06:30-45 (Perez); Elsman Bodycam Video at 06:15-30 (Perez).

28.     Perez believed that Ulibarri potentially possessed "something" -- contraband or other items illegal to possess -- either on Ulibarri's person or in his vehicle.[6]

_____

[6]The Court makes this finding -- that Perez believed Ulibarri possessed illicit contraband either on his person or in his vehicle -- for the following reasons.  Perez indicated to Elsman that Ulibarri "might have something," Perez Bodycam Video at 06:30-45 (Perez); Elsman Bodycam Video at 06:15-30 (Perez), and, given the context, the Court finds that Perez meant illicit contraband when he used the word "something,"  Perez Bodycam Video at 06:30-45 (Perez); Elsman Bodycam Video at 06:15-30 (Perez).  Perez did not indicate whether he believed the contraband he suspected Ulibarri possessed was on Ulibarri's person, e.g., in the pockets of Ulibarri's clothes, or whether Perez suspected that the contraband was in Ulibarri's vehicle.  Because the bullets that sparked Perez' suspicions were seen through the window of Ulibarri's vehicle, see Perez Bodycam Video at 06:30-45 (Perez); Elsman Bodycam Video at 06:15-30 (Perez)("There were bullets in the car so he might have something."), the best reading of Perez' statement is that Perez suspected Ulibarri had contraband either on his person or inside his vehicle, or both.

Perez testified that he did not have an investigatory motive for the arrest, but the Court does not credit this assertion.  Perez testified that he meant by his statement only that he was warning Elsman that Ulibarri might have a weapon, so to be careful when arresting Ulibarri.  See Tr. at 26:4-27:15.  But the Court does not credit Perez' explanation, because Perez' statement frames the fact that Ulibarri "might have something" as a reason to arrest Ulibarri, not as a reason to use caution in the arrest; i.e., that Ulibarri "might have something" is why "I'm gonna do it [and] I'm gonna pull him out."  Perez Bodycam Video at 06:30-45 (Perez); Elsman Bodycam Video at 06:15-30 (Perez).  Accordingly, the Court finds that Perez' decision to arrest partly was motivated by a subjective investigatory interest.

29.    Perez' subjective intentions both were to arrest on the basis of the two bench warrants for Ulibarri's arrest and to investigate what "something" Ulibarri might have on his person and in his vehicle upon Ulibarri's arrest.  See Tr. at 27:12-29:12 (Fontanez, Perez).

30.    APD Standard Operating Procedures present two options, and makes it a matter of officer discretion, when officers arrest a person with outstanding misdemeanor arrest warrants: (i) officers can arrest the person and take him or her to jail for booking; or (ii) the officer can bring the person to the bonding window, a facility at the Bernalillo County Metropolitan Court where persons can post bond instead of being detained in jail, in which event the person leaves of his or her own will after paying off the bond.  See Tr. at 33:23-35:16 (Fontanez, Perez); id. at 98:3-99:2 (Fontanez, Elsman).

31.    To this effect, APD SOP § 2-80-2(C) at the time provided that "[o]fficers will use the bonding window at Metropolitan Court . . . to post a bond . . . or to resolve or quash a warrant in lieu of taking an arrested person to the . . . Metropolitan Detention Center . . . when feasible." 2-80: Arrests, Arrest Warrants and Booking Procedures at 2-3; Tr. at 130:24-25 (Court)(admitting document into evidence).

32.    Perez and Elsman walked back to Ulibarri's vehicle and told Ulibarri that two arrest warrants were issued for him, and asked him to step out of the vehicle, at which time Perez placed handcuffs on Ulibarri.  See Tr. at 10:5-25 (Fontanez, Perez); id. at 31:21-24 (Fontanez, Perez). Perez Bodycam Video at 07:10-45 (Perez, Ulibarri); Elsman Bodycam Video at 06:35-07:30 (Perez, Ulibarri); Herbst Bodycam Video at 05:00-06:15 (Perez, Ulibarri).

33.    Ulibarri indicated that he knew about the bench warrants, because he acknowledged that he had knowingly missed his court dates, and he asked how much they were for.  See Tr. at

31:21-24 (Fontanez, Perez); Perez Bodycam Video at 07:25-45 (Ulibarri, Perez); Elsman Bodycam Video at 07:45-08:10 (Ulibarri, Perez).

34.    Ulibarri asked if he could pay his bond for the warrants at the bonding window, and Perez told him that would be possible.  See Tr. at 31:1-33:5 (Fontanez, Perez); Perez Bodycam Video at 07:50-08:10 (Ulibarri, Perez); Elsman Bodycam Video at 07:45-08:10 (Ulibarri, Perez).

35.    Ulibarri told the officers that he had enough money to pay the bond, although the officers were not certain that Ulibarri did have the necessary funds.  See Tr. at 107:9-11 (Rivas, Elsman); id. at 110:7- 111:15 (Fontanez, Elsman); Perez Bodycam Video at 07:50-08:10 (Ulibarri, Perez); Elsman Bodycam Video at 07:45-08:20 (Ulibarri, Perez).

36.    The bonding window for the Bernalillo County Metropolitan Court is not far from where the officers had stopped Ulibarri's car, so it would have been a short trip there.  See Tr. at 106:18-107:11 (Rivas, Elsman).

37.    As Perez and Elsman walked Ulibarri to the patrol car, Elsman again asked Ulibarri if there was a firearm in the vehicle, and, contrary to Ulibarri's earlier representation, Ulibarri stated that there was a firearm under the seat.  See Tr. at 37:10-21 (Perez, Fontanez); Elsman Bodycam Video at 08:25-35 (Elsman, Ulibarri); Herbst Bodycam Video 06:20-30 (Elsman, Ulibarri).

38.    Perez and Elsman placed Ulibarri in the back of their patrol car.  See Tr. at 30:5-25 (Fontanez, Perez); Perez Bodycam Video at 08:50-09:10; Elsman Bodycam Video at 08:40-55.

39.    Ulibarri did not show any resistance throughout this encounter.  See Perez Bodycam Video at 07:10-09:10 (Perez, Ulibarri, Elsman); Elsman Bodycam Video at 06:55-08:55 (Perez, Ulibarri, Elsman).

**3.    APD Policies Speak to Impoundments and Inventory Searches.**

40.     APD Standard Operating Procedure ("SOP") § 2-48-4(A) states:

1.     Department personnel may order the impoundment of any vehicle within the municipal county limits, without prior notice to the owner or operator of the vehicle, when certain criteria are met, including, but not limited to:

a.     The vehicle is being driven unsafely under the City's ordinances, consistent with ROA 1994, § 8-5-2-4;

b.     The vehicle driver has been incapacitated, hospitalized, or arrested;

c.     The vehicle cannot be released to the co-owner who is listed in the Motor Vehicle Division (MVD) vehicle registration or the vehicle's Certificate of Title;

d.     The vehicle has been abandoned, vandalized, or involved in a collision and damaged to the extent that it is inoperable;

e.     The vehicle is in violation of the City of Albuquerque's Traffic Code and documented attempts to contact the owner have failed; or

f.     The vehicle is needed for evidence processing in a criminal investigation.

See 2-48 Towing Services, filed March 27, 2023 (Doc. 69-9)("SOP § 2-48").[7]

41.     APD SOP § 2-48 also requires inventorying towed vehicles and allows for canceling an impoundment in some circumstances:

1.     When it becomes necessary to tow a vehicle, Department personnel shall:

a.     Contact the Emergency Communications Center (ECC) to request for the on call tow services using the on-call tow service rotation list only;

---

[7]The Court notes that the APD SOP § 2-48 that the United States provides is not the one that was applicable during the events at issue. The SOP provided went into effect on May 10, 2022. See APD SOP § 2-48, at 1. The Court has not been able to identify the SOPs applicable during the events at issue, so it will proceed with an analysis using the provided SOPs.

        i.      Personnel may allow the owner or vehicle operator to call a tow truck of their choice based on response time and current traffic conditions.

        ii.      Personnel shall have sole discretion when to allow an owner's tow request.

        b.      Document the justification for the towing of the vehicle in a Uniform Incident Report and on the Tow-in report unless the tow is at the owner's request;

        i.      Department personnel shall complete the Tow-In Report in TraCS and validate the form.

        ii.      The tow truck driver's signature shall be included on the Tow-in Report.

        iii.      In all cases when personnel have a vehicle towed, and the owner/responsible party cannot be contacted, Department personnel shall complete the Towed Vehicle Notification form in TraCS and validate the form.

        c.      Inventory the property in the vehicle to be towed and list it on the Tow-In Report. Department personnel who complete the inventory shall list their name on the Tow-In Report;

        d.      Inventory the entire vehicle, including the vehicle trunk, glove box, truck bed, truck boxes, and all sealed and locked containers within, except when:

        i.      There are many containers to be searched, which may monopolize an employee's time; or

        ii.      It appears that attempts to access a locked container may cause damage to the container resulting in a significant liability to the City . . .

        6.      Cancellation of Towing Services: Department personnel have the discretion to cancel a tow truck if circumstances so dictate, for certain situations, including, but not limited to, if the tow truck is not properly equipped for the job, or if the tow truck cannot arrive within thirty (30) minutes.

See APD SOP § 2-48-4(B)(6), at 5.

42.    Another APD policy provides greater detail on inventory searches of impounded

vehicles:

> 1.    When Department personnel request that a vehicle is towed under state law or City ordinance, an inventory search of the vehicle shall be conducted to protect an individual's property, the officer, and others, as well as the Department from claims of lost or damaged property resulting from the seizure of the vehicle or items. Sworn personnel shall use the following criteria when an inventory search is conducted:
>
> > a.    The vehicle(s) must be in lawful police custody;
> >
> > b.    The tow must be reasonable and conducted in good faith;
> >
> > c.    It shall be conducted by sworn personnel or Police Service Aides (PSA) consistent with their training and Department SOP(s);
> >
> > d.    Inventory searches shall be conducted at or near the time the vehicle was lawfully placed within police custody, and include the entire passenger compartment, glove box, trunk, and containers without damaging the property. Containers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is consistent with Department SOP; and
> >
> > e.    An inventory search shall be documented and become part of the Uniform Incident Report.
> >
> > i.    If the vehicle is towed, an inventory search shall be conducted and shall be documented on the Tow-In Report.

Albuquerque Police Department Procedural Orders 2-71 Search and Seizure Without a Warrant

§ 2-71-4(E), at 6-7, filed March 27, 2023 (Doc. 69-10)("APD SOP § 2-71").[8]

---

[8]The Court notes that the APD SOP § 2-71 that the United States provides is not the one that was applicable during the events at issue.  The SOP provided went into effect on April 11,

4.      **APD Officers Decide to Impound Ulibarri's Vehicle and Perform an Inventory Search**.

43.      Knowing that the vehicle contained a firearm, Perez and Elsman did not feel they could leave the vehicle unsecured and unattended on the street.  See Tr. at 81:25-82:18 (Perez); id. at 96:11-20 (Elsman).

44.      Before he was placed in the patrol car, Ulibarri asked Perez if Perez would let Ulibarri call his mother to have her retrieve his vehicle instead of having the vehicle towed.  See Tr. at 41:12-16 (Fontanez); Perez Bodycam Video at 12:10-25 (Ulibarri, Perez).

45.      Perez did not know Ulibarri's mother, nor how long it would take her to arrive to retrieve the car and whether, when she arrived, she could legally and safely drive away the vehicle.  See 41:17-43:24 (Perez, Fontanez); Tr. at 99:3-101:11 (Fontanez, Elsman).

46.      Perez told Ulibarri that the decision to impound Ulibarri's vehicle was within Perez' discretion.  See Perez Bodycam Video at 12:30-40 (Perez, Ulibarri).

47.      Perez decided the car needed to be towed because the modified exhaust violation made permitting it to drive away a hazard, and because the vehicle contained a firearm and could not safely be left unattended and unsecured on the street, although there also existed a subjective investigatory motive as to the vehicle's contents.  See Tr. at 37:20-41:11 (Perez, Fontanez); id. at 95:20-98:22 (Fontanez, Elsman); n.6 supra (discussing subjective investigatory motivation).

48.      Elsman called for a tow truck to retrieve Ulibarri's vehicle.  See Tr. at 49:1-5 (Perez); Tr. at 101:14-19 (Elsman).

---

2022.  See APD SOP § 2-71, at 1.  The Court has not been able to identify the SOPs applicable during the events at issue, so it will proceed with an analysis using the provided SOPs.

49.     While Perez and Elsman placed Ulibarri in their patrol car, Herbst and the police service aide open the doors to Ulibarri's car and began searching it.  See Herbst Bodycam Video at 06:45-08:00.

50.     Elsman returned to search Ulibarri's vehicle, while Perez remained with Ulibarri in the patrol car.  See Perez Bodycam Video at 12:30-18:00.

51.     The officers looked under the driver's seat of the vehicle and found a pistol.  See Elsman Bodycam Video at 10:15-40 (PSA, Elsman); PSA Bodycam Video at 00:50-01:10 (PSA, Elsman).

52.     The officers found a backpack resting on the floor behind the passenger seat and unzipped it, revealing a rifle and ammunition magazine, a large stack of cash totaling more than $10,000.00, and a clear Ziploc bag containing a white substance that appeared to be narcotics in an amount consistent with drug distribution.  See Tr. at 51:16-53:6 (Fontanez, Perez); id. at 101:11-103:10 (Fontanez, Elsman); Elsman Bodycam Video at 10:45-12:45 (Herbst, Elsman); Herbst Bodycam Video at 08:30-10:30 (Herbst, Elsman).

53.     While Ulibarri and Perez waited in the patrol car, Ulibarri again asked if he could call his mother to retrieve the car, but Perez informed Ulibarri that, while Ulibarri was being arrested for the warrants, the situation was "developing," so Ulibarri could not call his mother to retrieve the vehicle.  Perez Bodycam Video at 13:15-35 (Ulibarri, Perez).

54.     While Elsman, Herbst and the police service aide continued searching Ulibarri's vehicle, Perez drove Ulibarri to the police station.  See Perez Bodycam Video at 15:00-19:00.

55.     Elsman looked in the trunk of Ulibarri's vehicle, but he spent only a short time searching the trunk because a speaker system occupied most of the space within the trunk.  See Elsman Bodycam Video at 15:00-30.

56.     Elsman lifted up one of the backseats of the vehicle and also looked under the vehicle's hood.  See Elsman Bodycam Video at 14:00-35 (showing view under seat), 18:00-30 (showing view under hood).

57.     During their search, Elsman and other officers did not write down the contents of what they found in Ulibarri's car.  See Elsman Bodycam Video at 10:30-20:30.

58.     When Perez arrived with Ulibarri at the police station, Ulibarri asked what Perez was arresting him for, and Perez told him it was "obviously the warrants," but Perez also informed Ulibarri that the officers had "found some drugs."  Perez Bodycam Video at 19:48-55 (Ulibarri, Perez).

59.     Ulibarri's vehicle's search took, in total, approximately twelve minutes.  See Elsman Bodycam Video at 09:00-20:30.

60.     Ulibarri's mother arrived after the car had been inventoried, but officers would not permit her to drive it away because the tow truck was already present and preparing to tow Ulibarri's vehicle.  See Tr. at 51:8-16 (Fontanez, Perez); id. at 104:19-105:6 (Fontanez, Elsman); 15  Axon_Body_3_Video_2021-05-13_2355  at  00:01-04:00,  filed  March  27,  2022 (Doc. 69-15)(Elsman, Ulibarri's Mother)("Elsman Bodycam Video A").

61.     APD officers did not determine ultimately whether Ulibarri's vehicle had any kind of exhaust modification that Albuquerque ordinances prohibit specifically.  See Tr. at 59:24-62:18 (Juarez, Perez).

62.     APD officers prepared a report for the impoundment and inventorying of Ulibarri's vehicle that lists the location the impoundment occurred, Ulibarri's name, and the make of the vehicle, and states that that "ARREST" was the "reason" for impoundment.  See State of New Mexico Tow-In Report at 1; Tr. at 56:19-20 (Court)(admitting into evidence the Tow-In Report).

- 16 -

63.     The Tow-In Report listed Ulibarri's vehicle as containing only the following items:
"1 LOADED HANDGUN LOCATED UNDER THE DRIVER SEAT . . . 1 LOADED RIFLE
LOCATED ON THE REAR PASSENGER SEAT . . .  [and] PARAPHERNALIA [sic]
COLLECTED BY OFFICER ON SCENE."  Tow-In Report at 1.

64.     Ulibarri's vehicle also contained other personal effects, such as items of clothing,
and more than $10,000.00 in cash, but the Tow-In Report does not list these items.  See Tow-In
Report at 1.

65.     Before towing Ulibarri's vehicle, APD did not seek Ulibarri's consent to tow it,
although Ulibarri also did not explicitly say he did not want his car towed.  See Perez Bodycam
Video at 00:00-18:00; Elsman Bodycam Video at 00:00-18:00.

## PROCEDURAL HISTORY

The United States charged Ulibarri with drug trafficking and firearm offenses based on the
evidence that APD found in his car.  In the MTS, Ulibarri moves the Court on constitutional
grounds to suppress the evidence found during the traffic stop.  See MTS at 1.  After the Court
denied the MTS in its Order, Ulibarri changed his plea from not guilty, to guilty, and sentencing
is set for March 4, 2024.  Order Granting Motion to Continue Sentencing Hearing, filed January
16, 2024 (Doc. 106).

### 1.     **Procedural History Before the MTS.**

After APD arrested Ulibarri on May 13, 2021, the United States issued a Criminal
Complaint against Ulibarri several months later on September 9, 2021, for two offenses:
(i) 21 U.S.C. §§ 841(a)(1), (b)(1)(B), for possession with intent to distribute 40 grams and more
of a mixture and substance containing a detectable amount of fentanyl; (ii) 18 U.S.C.
§§ 924(c)(1)(A)(i), for possession of a firearm in furtherance of a drug trafficking crime.  See

Criminal Complaint, filed September 9, 2021 (Doc. 1)("Criminal Complaint").  The Grand Jury later indicted Ulibarri for those same charges: (i) 21 U.S.C. §§ 841(a)(1), (b)(1)(B), based on the May 13, 2021, conduct where he possessed with intent to sell 40 grams and more of a mixture containing fentanyl;  and  (ii) 18 U.S.C.  § 924(c)(1)(A)(i),  based  on  the  May  13,  2021 conduct, knowing possession of a firearm in furtherance of drug trafficking crime.  See Indictment at 1, filed December 8, 2021 (Doc. 18).  The Indictment also sought forfeiture from Ulibarri based on 21 U.S.C. § 841 and 21 U.S.C. § 853, and also on 28 U.S.C. § 2461(c) and 18 U.S.C. § 924(d), specifically of two firearms, two sets of rounds of ammunition, and $10,655.00.  See Indictment at 2.  Ulibarri pled not guilty.  See Clerk's Minute Sheet, filed December 17, 2021 (Doc. 21).

**2.      Ulibarri's MTS.**

Ulibarri filed his MTS on September 26, 2022.  See MTS at 1.  Therein, he argues that APD violated his constitutional rights under the Fourth Amendment by illegally stopping and searching him.  See MTS at 1.  Specifically, he alleges that for two reasons the APD violated his rights: (i) APD effected an investigatory stop that was not based on reasonable suspicion of illegal activity, and for this reason was an unreasonable search and seizure, see MTS at 5-6; and (ii) APD impounding and then inventorying his vehicle was illegal because it was not based on a non-investigatory, community-caretaking rationale, see MTS at 6-12.  For these reasons, Ulibarri urges the Court to suppress the evidence found on his person and in his car.

The first argument which Ulibarri offers is that the stop of Ulibarri's car was not based on reasonable suspicion.  See MTS at 5-6.  He argues that the stop of his vehicle and the detention of him as its occupant was a Fourth Amendment seizure and concedes that the stop would be valid if "'based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  MTS at 5 (quoting United

States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995), and citing United States v. Walker, 933 F.2d 812, 815 (10th Cir. 1991)).  Ulibarri asserts that "there is no evidence that the officers had reasonable suspicion to execute the stop," because "[alt]hough the officers alleged that Mr. Ulibarri was driving with a modified exhaust pipe, . . . there is no video footage of the car before the stop."  MTS at 5.  On the basis of this lack of video footage, he argues, therefore, that APD officers Lopez and Elsman lacked sufficient justification to effect the stop and so the stop is unlawful and the Court should suppress all evidence found subsequently.  See MTS at 5-6.

The bulk of the MTS, however, is devoted to the second argument that Ulibarri offers, namely that APD's impounding and inventorying his vehicle subsequent to the arrest is unlawful because it lacks a neutral, non-investigatory rationale.  See MTS at 6-12.  Ulibarri notes that when a vehicle is impounded that is resting on public property, it comes under the Tenth Circuit's test that it must be "justified by a 'reasonable, non-pretextual community-caretaking rationale.'"  MTS at 6 (quoting United States v. Sanders, 796 F.3d 1241, 1248 (10th Cir. 2015)("Sanders"), and citing United States v. Venezia, 995 F.3d 1170, 1178 (10th Cir. 2021)).  Ulibarri argues that the context of his vehicle's impounding is improper under the factors that counsel the propriety of impounding, namely

> "(1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment."

MTS at 6 (quoting Sanders, 796 F.3d at 1250).

He argues first that the first factor is not satisfied.  Noting that courts, including the Supreme Court of the United States, have held that one rationale for impounding a vehicle on a public street is that the vehicle obstructs or otherwise causes a hazard to traffic, he asserts that

because the "vehicle was safely parked in a parking spot on a public street[,] . . . . [t]here is no evidence that leaving it would . . . have obstructed or presented a hazard to traffic."  MTS at 7 (citing South Dakota v. Opperman, 428 U.S. 364, 369 (1976)("Opperman"); United States v. Venezia, 995 F.3d at 1178; United States v. Trujillo, 993 F.3d 859, 864 (10th Cir. 2021)).  At length, he argues that APD did not attempt to consider an alternative to impoundment, although there were alternatives, which cuts against the factor that there should not be other alternatives.  See MTS at 7.  He notes that APD did not attempt to inquire whether the vehicle safely could be left on the public street where it was parked.  See MTS at 8.  Moreover, he states that APD "ignored Mr. Ulibarri's repeated requests to either pay his ticket on the spot or have his mom come and move the car.  He asked if he could call his mother or pay at the window at least six different times."  MTS at 8.  He points to APD protocol that asserts that "[o]fficers will use the bonding window . . . to post a bond, pay a fine, or to resolve or quash a warrant in lieu of taking an arrested person to the Prisoner Transport Center (PTC) or the Metropolitan Detention Center (MDC) when feasible."  MTS at 8 (quoting Albuquerque Police Dep't, Standard Operating Procedures § 2-80(2)(C)).[9]  He emphasizes that his mother could have driven the car away, obviating the need for impounding.  See MTS at 9.  Thus, he argues that APD ignored three opportunities -- by leaving

_____

[9]The language that Ulibarri quotes is no longer part of APD's protocol; the APD procedures that went into effect on November 1, 2022, contain slightly different language, but to similar effect. See Albuquerque Police Dep't, Albuquerque Police Department Procedural Orders: Arrests, Arrests Warrants, and Booking Procedures § 2-80-4(K)(1)(b), at 9 (2022), https://public.powerdms.com/COA/tree/documents/97 (providing that, if "an individual is being booked on bench warrants only and has the cash on hand to post their bond . . . [t]he arresting officer shall escort the individual to the bonding window where the individual can post their bond [and] clear the bench warrant"); id. § 2-80-5(C)(1)(a)-(b), at 13 (providing that, if an officer arrests a person on a "valid misdemeanor warrant," then the officer "shall . . . [u]se the Bernalillo County Metropolitan Courthouse bonding window to allow individuals to post bond, pay fines, or resolve the warrant").

the car there, by having him pay his bond, or by having his mother drive the car away -- that would have obviated the need to impound the car.  See MTS at 9.  He adds that the fourth and fifth factors also counsel against impounding: (i) the vehicle was not implicated in any crime other than the supposed traffic violation," MTS at 9; and (ii) he did not consent to having the car impounded, see MTS at 9.

At length, Ulibarri argues that "[e]ven if the decision to impound the car was 'reasonable,' it was not 'non-pretextual.'"  MTS at 9 (no citations given for quoted material).  Noting that impounding is impermissible if the impoundment is undertaken in bad faith or for the sole purpose of investigation, Ulibarri asserts that APD's officers' actions betray that their sole purpose for impounding his vehicle was investigation.  See MTS at 9-10 (citing United States v. Taylor, 595 F.3d 1104, 1108 (10th Cir. 2010)(quoting Colorado v. Bertine, 479 U.S. 367, 374-75 (1987))).  He points to the fact that, although APD officers initially were uncertain that they would arrest him based on his outstanding misdemeanor warrants, Perez' statement: "'I think I'm just gonna do it anyway, I'm gonna take him out, there were bullets in the car so he might have something,'" indicates "that the purpose of the arrest, impoundment, and inventory search was to search the car for evidence of another crime."  MTS at 10 (quoting Perez Bodycam Video at 3:12-15 (Perez)).  Instead, he emphasizes, the officers merely stated that they had to do an inventory of the vehicle; this inventory, Ulibarri avers, was not according to any routinized procedure, resulting in a constitutional problem.  See MTS at 11 (citing Florida v. Wells, 495 U.S. 1, 4 (1990); United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992); United States v. Edwards, 242 F.3d 928, 938 (10th Cir. 2001)).  Averring that this warrantless inventory search was done in a "slipshod manner," Ulibarri concludes that "[t]he two criteria ensuring a search . . . does not violate the Fourth Amendment, that it be conducted according to 'standard police procedures' and for the purpose of

'protecting the car and its contents' are missing here."  MTS at 12 (quoting United States v. Lugo, 978 F.2d at 636).  For these reasons, he asserts that APD's stop is unconstitutional, and the Court should suppress evidence it discovered.

        3.        **The United States' Response.**

        The United States responds, arguing that the traffic stop was constitutionally justified and that the Court should not suppress the evidence.   See United States' Response in Opposition to Defendant's Motion to Suppress Evidence, filed March 27, 2023 (Doc. 69)("Response").   The United States notes that the test for a traffic stop's constitutionality turns, first, on whether the stop was justified at its inception, and, second, whether the detention was reasonably related to the scope of the initial justification for the stop and explains that this standard is objective and not subjective.   See Response at 6 (citing United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009); United States v. Valenzuela, 494 F.3d 886, 890 (10th Cir. 2007); United States v. Johnson, 364 F.3d 1185, 1189 (10th Cir. 2004)).  The United States notes that circumstances justify APD's stop: the United States asserts that, although there is no lapel camera footage of the car before the stop that captured the sound of Ulibarri's car's exhaust, Perez' testimony demonstrates that Ulibarri violated a state statute because of his modified exhaust system which increased the engine noise that the car made.  See Response at 7 (citing N.M.S.A. § 66-3-844).  The circumstances, the United States asserts, satisfy the reasonable suspicion standard that the stop required:

>        [T]he stop was valid because Officer Perez observed Defendant's vehicle traveling southbound on 3rd St NW/ Copper Ave NW when he heard an unusually loud exhaust system which he knew was not native to the vehicle. The United States notes that Defendant's modified exhaust was so loud that it is difficult to hear the conversation between Defendant and Officer Perez recorded on the lapel cameras of the officers. Officer Perez's observations support an objective, reasonable suspicion, if not probable cause, that Defendant operated a vehicle with an illegally modified exhaust in violation of New Mexico Stat. Ann. § 66-3-844.

Response at 7 (citing <u>United States v. Orduna-Martinez</u>, 561 F.3d 1134, 1137 (10th Cir. 2009);

<u>United States v. Gregoire</u>, 425 F.3d 872, 876 (10th Cir. 2005)).  Even if the officers were incorrect

about the requisite volume, a reasonable mistake of fact can still supply a basis for the requisite

reasonable suspicion.  <u>See</u> Response at 8-9  (citing <u>United States v. Tibbetts</u>, 396 F.3d 1132, 1138

(10th Cir. 2005)).  The United States notes that the breadth of actions in which police officers are

authorized to engage is not de minimis when engaged in a traffic stop: Perez and Elsman were

empowered to order Ulibarri out of the car, to request Ulibarri's ID and to check for warrants, and

to take steps to protect their personal safety and maintain the status quo.  <u>See</u> Response at 10 (citing

<u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 (1977)(per curium); <u>United States v. Hensley</u>, 469

U.S. 221, 224 (1985); <u>United States v. Soto</u>, 988 F.2d 1548, 53 (10th Cir. 1993); <u>United States v.</u>

<u>Shareef</u>, 100 F.3d 1491, 1502 (10th Cir. 1996); <u>United States v. Neff</u>, 300 F.3d 1217, 1220 (10th

Cir. 2002)).  Perez and Elsman's actions thus were related reasonably to the scope of the

justification for the investigative detention, and so satisfy the standard set forth in <u>Terry v. Ohio</u>,

392 U.S. 1, 20 (1968).

The United States argues next that the evidence seized was incident to a lawful arrest under

<u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969).  <u>See</u> Response at 10-11.  According to the

United States, because Ulibarri had an outstanding misdemeanor warrant, the APD officers

lawfully arrested him on that basis and validly "inventoried and impounded the vehicle

contemporaneously with Defendant's arrest for outstanding warrants."  Response at 11.  The

United States maintains that the warrantless inventory search of the vehicle is justified.  Noting

that "[a]n inventory search of a lawfully impounded automobile is reasonable even if it is

conducted without a warrant and in the absence of probable cause to believe that criminal evidence

will be discovered," the United States argues that that standard is satisfied here.  Response at 11

(citing Opperman, 428 U.S. 364; United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003)).

Noting that the officers need not effect an impoundment according to "'standardized criteria'"

when the car impounded is on public, not private, property, Response at 12 (quoting United States

v. Venezia, 995 F.3d at 1178), the United States maintains that the impounding and inventorying

of the vehicle was valid here, because it was on public property and was justified by a "'reasonable,

non-pretextual community-caretaking rationale,'" Response at 12 (quoting Sanders, 796 F.3d at

1243, and citing United States v. Kendall, 14 F.4th 1116, 1122-23 (10th Cir. 2021)).

The United States maintains that the inventory search here satisfies the larger analytical

framework in Sanders, 796 F.3d at 1243, for whether there exists a non-pretextual community-

caretaking rationale, namely:

> (1) whether the vehicle is on public or private property; (2) if on private property,
> whether the property owner has been consulted; (3) whether an alternative to
> impoundment exists (especially another person capable of driving the vehicle); (4)
> whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner
> and/or driver have consented to the impoundment.

Response at 13 (quoting Sanders, 796 F.3d at 1250).  As noted, the United States maintains that

the first inquiry is inapplicable, and because the vehicle was on public property, it need only satisfy

the remaining four factors.  See Response at 13.  It first notes that factors (4) and (5) are either

undisputed or relatively straightforward.  See Response at 13.  As to factor (4), the United States

asserts that the vehicle was implicated in the crime for which the officers stopped the car, namely

N.M.S.A. § 66-3-844, see Response at 13; as to factor (5), the United States notes that "Defendant

never unequivocally told the officers that he did not consent to the tow,"  Response at 13.

The United States asserts that it addresses at length the third factor, namely whether "an

alternative to impoundment exists," Response at 13 (quoting Sanders, 796 F.3d at 1250), but then

takes a different, broader tack, turning to precedent not from the Tenth Circuit that falls under the

Sanders framework, but instead looks to  precedent from the Supreme Court of the United States. See Response at 13-14.  They assert that the United States can "'seize and remove from the streets vehicles impeding traffic or threatening public safety,'" and that such a circumstance exists here, because, based on the lapel footage, it is clear that Ulibarri's vehicle was parked on a public street imperfectly between two designated parking spots such that both were unavailable for public use, and, "[a]s such, Defendant's vehicle created a parking hazard," Response at 15 (quoting Opperman, 428 U.S. at 369).  Without noting the proposition's relation to whether "'an alternative to impoundment exists,'" Response at 13 (quoting Sanders, 796 F.3d at 1250), and, despite having asserted that, because the car was impounded from a public street, the officers do not need to demonstrate that the impoundment was conducted according to standardized criteria, see Response at 12, the United States maintains that the search was constitutionally reasonable because "the officers followed the department's standardized criteria," Response at 15 (citing APD SOP § 2-48-4(A)(1)(b) and (A)(4), § 2-71-4(E)).  Regarding the feasibility of not impounding Ulibarri's vehicle, the United States maintains that the car need not be blocking traffic and that concerns about vandalism can justify impounding.  See Response at 16 (citing Opperman, 428 U.S. at 368; United States v. Johnson, 734 F.2d 503, 505 (10th Cir. 1984); United States v. Romero, No. CR 21-559 JH, 2022 WL 168475, at *10 (D.N.M. Jan. 19, 2022)(Herrera, J.)).  Again, apparently diverging from discussion of the third factor, the United States notes that, because officers saw ammunition in the backseat of Ulibarri's car, a community caretaking function justified the warrantless inventorying of the vehicle as in Cady v. Dombrowski, 413 U.S. 433 (1973)("Cady"), where a warrantless search of a vehicle's trunk that likely contained a firearm was permissible on community caretaking grounds.  See Response at 18.  The United States argues, as to the feasibility of permitting Ulibarri's mother to drive the car away instead of impounding it, that APD need not

have permitted this option: because the offense concerned the car's exhaust muffler, to permit Ulibarri's mother to drive off with the vehicle would be to permit an ongoing offense.  See Response at 18.  The United States emphasizes that police officers are not required "to contact a third party to take custody of the vehicle, and then wait and see if the third party arrives."  Response at 13 (citing United States v. Andas-Gallardo, 3 F. App'x 959, 963 (10th Cir. 2001); United States v. Agofsky, 20 F.3d 866, 873 (8th Cir. 1994)).

The United States asserts, moreover, that, as part of a valid, protocol-compliant inventory search, APD was free to look in the backpack -- and the United States maintains that, because APD followed protocol, that "undercuts any allegation that they were merely searching for additional evidence."  Response at 18 (citing United States v. Jacquez, 409 F. Supp. 2d 1286, 1297 (D.N.M. 2005), United States v. Maestas, 416 F. Supp. 3d 1278, 1287 (D.N.M. 2019)(Herrera, J.)).  So long as an inventory search objectively can be justified, an officer's "subjective desire to uncover criminal evidence" will not invalidate such an inventory search.  Response at 19 (citing United States v. Cecala, 203 F.3d 836 (10th Cir. 2000); United States v. Frank, 864 F.2d 992, 1001 (3d Cir. 1988); United States v. Judge, 864 F.2d 1144, 1147 (5th Cir. 1989); United States v. Lewis, 3 F.3d 252, 254 (8th Cir. 1993)).

A last line of defense against the MTS that the United States offers is that the evidence inevitably would have been discovered, despite the improper tow report.  Caselaw supports the proposition, the United States avers, that where a defendant is arrested on a warrant, then inevitable discovery will prevent suppression despite irregularities in the inventory search.  See Response at 20 (citing United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992); United States v. Haro-Salcedo, 107 F.3d 769, 770 (10th Cir. 1997)).  Accordingly, the United States urges the Court to reject the MTS' argument that suppression is appropriate because "officers were rummaging

through the vehicle in a 'slipshod manner, rifling through everything in the car,' for a purely investigatory purpose." Response at 21 (quoting MTS at 12). On all these grounds, the Response argues that the evidence was not obtained in a constitutionally deficient manner and that accordingly the Court need not suppress the evidence.

    **4.**    <u>**Ulibarri's Reply**</u>.

    Ulibarri replies to the United States' Response. <u>See</u> Defendant's Reply to Response to Motion to Suppress Evidence, filed April 10, 2023 (Doc. 70)("Reply"). Ulibarri argues that the United States mischaracterizes the Tenth Circuit's test in <u>Sanders</u>, 796 F.3d at 1249, and specifically the inquiry whether the inventory search was "'justified by a reasonable, non-pretextual community care-taking rationale,'" which Ulibarri argues the United States improperly minimizes in analytical importance by "[b]y shoehorning the broad consideration that drives the entire analysis into a single factor . . . ." Reply at 2 (quoting Response at 13). He argues that his bad parking job -- <u>i.e.</u>, that he was parked occupying two metered parking spaces when the police pulled him over -- did not create a public hazard justifying impounding his car, and that Supreme Court precedent authorizing impounding when a hazard arises or a public ordinance was violated is not at issue here. <u>See</u> Reply at 3 & 3 n.1 (citing <u>Opperman</u>, 428 U.S. 364; <u>Sanders</u>, 796 F.3d 1249; <u>People v. Sullivan</u>, 272 N.E.2d 464, 465 (N.Y. 1971).

    Ulibarri disputes the applicability of <u>Cady</u>, 413 U.S. at 443-46, to which the United States cites. <u>See</u> Reply at 4. There, Ulibarri contends, the mere presence of a firearm or ammunition was not what justified impounding the vehicle -- rather, it was that the vehicle was stopped along the side of the highway. <u>See</u> Reply at 4 (citing <u>Cady</u>, 413 U.S. at 442-43). Accordingly, <u>Cady</u>, 413 U.S. 433, cannot support the decision to tow his vehicle merely because officers observed ammunition in the backseat and suspected there may be a firearm in it. <u>See</u> Reply at 4.

Ulibarri also resists the proposition that APD officers could tow the vehicle solely because to permit it to drive off would be to sanction an ongoing traffic violation.  See Reply at 4.  "Officers do not impound vehicles on the spot anytime the driver has committed a traffic violation, even if that violation interferes with the car's safety.  For example, officers would not prevent someone from driving home in a car with a missing taillight or headlight, . . . likely . . . a greater safety violation."  Reply at 4.  Indeed, Ulibarri asserts, the Tenth Circuit has suggested that such a policy would be unreasonable: "'a standardized policy of impounding all vehicles whose owners receive traffic citations' would be unreasonable."  Reply at 4 (quoting Sanders, 796 F.3d at 1249-50).

He argues, moreover, that Sanders' third factor -- the existence of alternatives to impoundment -- urges against finding Fourth Amendment reasonableness.  Where, as here, there is possible that someone could come retrieve the car, then officers' unexplained refusal to permit another person to retrieve the car is inappropriate.  See Reply at 5 (citing United States v. Woodard, 5 F.4th 1148, 1156 (10th Cir. 2021), for the proposition that "the third factor [] points to pretext" where 'the police had an alternative to impoundment: letting Mr. Woodard call someone to get the car' and '[h]e had asked, and the police refused' without explaining why").

The argument that the United States offers as to how the fourth factor of Sanders -- the implication of Ulibarri's vehicle in a crime -- is satisfied, Ulibarri contends, makes too much of a broad rule.  The United States' contention that Ulibarri's vehicle is implicated in a crime, justifying impoundment, because of its modified muffler is inapposite for the Sanders test: "by [the United States'] logic, impoundment would be appropriate after any arrest subsequent to a suspected moving violation."  Reply at 5.  Moreover, Ulibarri argues, he was not arrested or cited for the modified exhaust pipe, so the car could not be impounded solely to obtain "evidence for a minor traffic violation."  Reply at 6.  Ulibarri's argument against the fifth Sanders factor -- his consent

- 28 -

to APD's towing his car -- is that, although he may not have unequivocally refused consent to towing, it is not his burden to show that he refused consent.  See Reply at 6.  Instead, "it is the government's burden to prove that he consented, not Mr. Ulibarri's burden to show that he denied consent."  Reply at 6.  He asserts also that the officers' "conduct throughout the encounter" suggests pretext.  Reply at 7 (citing United States v. Woodard, 5 F.4th at 1158-59).  Ulibarri asserts moreover that mere compliance with standard protocols for inventory searches does not preclude a finding of unconstitutionally pretextual behavior: "'[T]he existence of and compliance with such a policy does not by itself establish a reasonable community-caretaking rationale.'"  Reply at 7-8 (quoting United States v. Braxton, 61 F.4th 830, 837 (10th Cir. 2023)).  And Ulibarri argues that the officers did not actually effect an inventory search, but rather "hurriedly rummaged through its contents, stopping only when they discovered potentially incriminating evidence."  Reply at 8.

Ulibarri argues that the United States cannot draw on the inevitable discovery doctrine, as it aims to do.  Quoting United States v. Ibarra, 955 F.2d 1405, 1410 (10th Cir. 1992), he states that "'no inventory of the contents of defendant's vehicle could have been conducted but for the unlawful impoundment of the vehicle.'"  Reply at 8 (quoting United States v. Ibarra, 955 F.2d at 1410).  Another case, United States v. Haro-Salcedo, 107 F.3d 769, 770 (10th Cir. 1997), upon which the United States relies, is inapt, Ulibarri maintains.  See Reply at 8-9.  According to Ulibarri, in that case, inevitable discovery doctrine was available because, although the inventory search was pretextual, the evidence suggested the defendant's car likely was stolen so towing the car from the side of the road would be the proper course of action.  See Reply at 9.  On all these grounds, Ulibarri urges the Court to reject the arguments that the United States' response offers and to suppress the evidence that APD officers found in his vehicle.

    5.    **The July 17, 2023, Suppression Hearing.**

The Court held a hearing on the MTS on July 17, 2023.  See Clerk's Minutes at 1.  At the hearing Perez and Elsman testified about their version of the events underlying the stop.  See Clerk's Minutes at 1-2.  At the hearing, Ulibarri and the United States reinforced arguments in their briefing.

Ulibarri asserted that the officers lacked a sufficient basis to stop him because they did not know what kind of engine his car had, and so they did not know the engine was modified to produce a sound louder than originally manufactured, in violation of local law.  See Tr. at 114:25-115:21 (Rivas).  Ulibarri accuses them instead of "act[ing] on a hunch," that "something was up," when they saw bullets in his vehicle, but that this observation gave them no basis for further police intrusion, because the officers had no reason to believe Ulibarri's possession of a firearm was unlawful.  Tr. at 115:21-116:15 (Rivas).  There was no community-caretaking rationale for towing his vehicle, he argues, because the officers failed to consider alternatives to impoundment and feasibly could have let him pay off his bond and drive away.  See Tr. at 116:15-118:6 (Rivas).  Because, Ulibarri contends, the officers' decision to impound was based in part on what they found in his vehicle, i.e., the drugs, guns and cash, the officers "put the [cart] before the [horse]."  Tr. at 118:6-7 (Rivas).  Moreover, he points to mistakes and omissions in the inventory report the officers produced -- it fails, for example, to record the $10,000.00 found in his vehicle.  See 120:10- 123:3 (Rivas).  These report-drafting problems, he argues, belie the putative rationale for an inventory search, namely safekeeping his belongings until he could retrieve them, and instead suggest an underlying, roving search-for-criminal-activity purpose.  See 120:10-123:3 (Rivas).  Ulibarri did, however, concede that the police need not tow first, and then inventory, but insisted that APD's "inventory . . . search must not be a ruse for general rummag[ing] in order to discover incriminating evidence."  124:3-6 (Rivas).  What should have happened, Ulibarri argues, is that the officers

should have simply taken him to the bonding window to pay off the warrants, and then he should have been on his way; it was pretextual to not let him pay off the bonds, which he could have done two blocks from where APD stopped him.  See Tr. at 141:19-145:14 (Rivas); id. at 148:5-149:1 (Rivas, Court). Ulibarri suggested, moreover, that the muffler violation is not even one for which he can be arrested.  See Tr. at 151:24-153:16 (Rivas, Court).

In response, the United States maintained that the officers first had reasonable suspicion and probable cause based on the vehicle's noise-violation, then they had ground to arrest him based on the warrants.  See Tr. at 125:8-25 (Fontanez).  The United States maintains that the volume of the muffler violated both local ordinance and state law.  See Tr. at 140:12-141:16 (Fontanez, Court).  According to the United States, the officers were not required to permit Ulibarri to pay his bond, but had discretion -- moreover, there was no alternative to towing in this situation, and the vehicle was implicated in a crime.  See Tr. at 126:1-21 (Fontanez); id. 133:7-135:1 (Fontanez). The officers need not have used the bonding window here because to do so was not feasible -- all that their protocols required of them, the United States asserts.  See Tr. at 153:22-157:9 (Fontanez, Court).  "There is nothing in this record that suggest[s] that the officer decided to arrest the defendant to get into his vehicle."  Tr. at 161:14-16 (Fontanez).

The Court indicated it thought that there was reasonable suspicion as to the muffler violation.  See Tr. at 163:8-22 (Court).  Although the Court thought that this "may have been aggressive policing, . . . it falls within constitutional standards."  Tr. at 164:8-10 (Court). Accordingly, the Court denied the MTS based on the stop.  See Tr. at 164:10-12 (Court).

### 6.    Procedural History After the Suppression Hearing.

After the hearing at which the Court denied the MTS, the United States filed an Information against Ulibarri, charging him with drug trafficking offenses.  See Information, filed September

29, 2023 (Doc. 95)("Information").   The Information charged Ulibarri with possession of a mixture containing fentanyl with intent to distribute, under 21 U.S.C. § 841(a)(1), (b)(1)(C), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1)(A)(i).   See Information at 1-2. The Information also sought forfeiture of firearms, ammunition, and $10,655.00 from Ulibarri.  See Information at 2.  When the United States filed the Information, Ulibarri waived the right to an indictment as to these offenses and agreed to proceed based on the Information.  See Waiver of an Indictment at 1, filed September 29, 2023 (Doc. 96).

The United States and Ulibarri entered into a plea agreement.  See Plea Agreement, filed September 29, 2023 (Doc. 98)("Plea Agreement").  The Plea Agreement was executed pursuant to rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and it recommended a proposed sentence of 72 months imprisonment for Ulibarri.  See Plea Agreement at 1, 6.  Ulibarri admitted to the conduct underlying the offenses, namely that

> On May 13,2021, an Albuquerque Police Department (APD) Officer pulled me over for a traffic stop. During the traffic stop, the officer learned I had two outstanding misdemeanor warrants and told me I was under arrest. While inventorying my vehicle prior to towing it an officer discovered my backpack. Inside my backpack were blue fentanyl pills stamped with "M30," United States currency in the amount of $10,655.00, and a Century Arms AK-47 firearm, (Serial # RAS47104174). Under the driver seat of the vehicle, I had a Herstal 9 mm handgun, (Serial #GKSO180724). I possessed the fentanyl because I intended to distribute it. I possessed the firearms to protect the fentanyl that I intended to distribute. I am guilty of the crime charged.

Plea Agreement ¶ 10, at 5-6.  Ulibarri waived the majority of his appellate rights, but he did expressly reserve the right to challenge the Court's denial of his MTS:

> Notwithstanding this waiver, the Defendant, under Federal Rule of Criminal Procedure 1l(a)(2), specifically reserves his right to appeal, on any grounds argued by the Defendant in district court, the district court's July 26, 2023, Order Doc. 87

denying the Defendant's Motion to Suppress Evidence (Doc. 50) and the later
issued Memorandum Opinion detailing the rationale for the Court's decision as
referenced in Doc. 87. The United States expressly reserves its right to contest any
appeal on any grounds.

Plea Agreement ¶ 29, at 11.  Following execution of the Plea Agreement, Ulibarri pled

guilty to the charges in the Information.  See Plea Minute Sheet, filed September 29, 2023

(Doc. 99).

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be

seized."  U.S. Const. amend. IV.   In determining whether a Fourth Amendment violation has

occurred, courts must "assur[e] preservation of that degree of privacy against government that

existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406

(2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31

(2001)(Scalia, J.)).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is

reasonableness."    United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M.

2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he

ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (quoting Brigham City, Utah

v. Stuart, 547 U.S. 398, 403 (1978))).  "In the criminal context, reasonableness usually requires a

showing of probable cause.  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M.

2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v.

Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.    Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." (quoting United States v. Knights, 534 U.S. 112, 118 (2001))).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848

(quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States,

490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable:  "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring) (quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Florida v. Jardines, but not in Georgia v. Randolph).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, noted:  "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

        2.        **Consensual Searches**.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States

v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219). The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'" United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances. See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d at 1314 (citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419, 2010 WL 965743, at *12 (D.N.M. February 19, 2010)(Browning, J)(alterations in United States v. Sedillo, but not in United States v. Ledesma or United States v. Anderson). See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010). The inquiry is an objective one. See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband,

would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances. For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary. See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "'should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way.'" United States v. Drayton, 536 U.S. 194, 205 (2002)(quoting Imm. & Naturalization Serv. v. Delgado, 466 U.S. 210, 219 (1984)). Additionally, "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205. Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words. "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as

they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d at 789-90.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'" (quoting United States v. Guerrero, 472 F.3d at 789-90)).  For example, in United States v. Ringold, the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See United States v. Ringold, 335 F.3d at 1175.

In United States v. Gordon, 173 F.3d 761 (10th Cir. 1999), the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag.  See 173 F.3d at 765.  The officer asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage and the suspect gave his consent.  See 173 F.3d at 765.  She asked him whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765.  When the officer encountered the suspect's locked bag, she asked him if he could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]." 173 F.3d at 766.  The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage.  See 173 F.3d at 766.  The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include.  See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search

remains within the boundaries of the consent given based on the totality of the circumstances.  See
United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect that
the object of the search and the suspect consents to a search for that object within a certain area,
the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a
search of any area within the confines of the officer's request where the object may be found.
United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search
for drugs, he consented to a search of any area in the motel room where one might hide drugs").
See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not
exceed the scope of consent given when the suspect gave the officers consent to search his
vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States
v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a
search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29
F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding
down the carpet which covered the metal compartment containing the packages of cocaine" did
not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227
(10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for
another person, he consented to the search of any area large enough to accommodate that
individual).

        Notably, if the suspect does not object to the officer's search, it indicates that "the search
was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v.
Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the
suspect gave consent to search the car for weapons, but failed to object when the officer began to
search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon,

the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked

bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing Florida v. Jimeno,

500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search

to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have

held a defendant's failure to limit the scope of a general authorization to search, and failure to

object when the search exceeds what he later claims was a more limited consent, is an indication

the search was within the scope of consent."  173 F.3d at 766.

### LAW REGARDING COMMUNITY-CARETAKING VEHICLE IMPOUNDMENTS UNDER THE FOURTH AMENDMENT

Police officers, in exercising a non-investigatory, community-caretaking function,[10] may

impound vehicles; the doctrinal framework for such impoundments in the Tenth Circuit is

---

[10]Because the impoundment cases rely on the existence of a "community-caretaking rationale," Sanders, 796 F.3d at 1250, the doctrinal foundations of these rules are uncertain given the Supreme Court's recent holding that there is no "standalone doctrine" based on a caretaking function, or at least not one which authorizes warrantless entry into the home, Caniglia v. Strom, 593 U.S. at 196.  In Caniglia v. Strom, the petitioner Caniglia expressed a desire to commit suicide, and his wife and police officers feared he would use firearms in his house to harm himself; after police helped Caniglia into an ambulance to seek treatment, police entered the home on the asserted basis of a community caretaking exception to the warrant requirement.  See Caniglia v. Strom, 593 U.S. at 196.  The Supreme Court rejected such a rule, holding that there is no freestanding community-caretaking warrant exception that authorized the entry into Caniglia's home and the seizure of his firearms; the Supreme Court, however, emphasized that it did not disturb the result of Cady v. Dombrowski, 413 U.S. 433 (1973):

> Neither the holding nor logic of *Cady* justified [the lower court's] approach. True, *Cady* also involved a warrantless search for a firearm. But the location of that search was an impounded vehicle -- not a home -- "'a constitutional difference'" that the opinion repeatedly stressed. 413 U.S. at 439; see also *id.,* at 440-442. In fact, *Cady* expressly contrasted its treatment of a vehicle already under police control with a search of a car "parked adjacent to the dwelling place of the owner." *Id.*, at 446–448, (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)).

> *Cady*'s unmistakable distinction between vehicles and homes also places into proper context its reference to "community caretaking." This quote comes from

complex.  It appears to the Court that the Tenth Circuit has identified least eight factors that go

into analyzing whether the Fourth Amendment authorizes a particular decision to impound.  The

pertinent considerations, however, are not merely factors mixed together into a totality-of-the-

---

        a portion of the opinion explaining that the "frequency with which . . . vehicle[s] can become disabled or involved in . . . accident[s] on public highways" often requires police to perform noncriminal "community caretaking functions," such as providing aid to motorists. 413 U.S. at 441. But, this recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere. . . . What is reasonable for vehicles is different from what is reasonable for homes.

Caniglia v. Strom, 593 U.S. at 198-99.  The Tenth Circuit acknowledged shortly after the Supreme Court decided Caniglia v. Strom that that case introduces potential tensions for its impounds framework:

        The Supreme Court recently stated in Caniglia v. Strom that caretaking duties do not "create[ ] a standalone doctrine" justifying warrantless searches of a home.    In . . . Sanders, . . . we  arguably  recognized  a  stand-alone  doctrine authorizing  impoundments  on  private  property  that  would  otherwise  have  been impermissible. . . . Interpreted this way, Sanders could conceivably run afoul of Caniglia.

Woodard, 5 F.4th at 1152 n.2 (quoting Caniglia v. Strom, 593 U.S. at 198).  Nonetheless, three years later, the Tenth Circuit has not again addressed the issue, and indeed has more recently stated that there is a "community-caretaking exception to the Fourth Amendment's warrant requirement," Ramos, 88 F.4th at 867, which suggests an incorrect description of today's Fourth Amendment landscape, see Ramos, 88 F.4th at 867 ("The community-caretaking exception to the Fourth Amendment's warrant requirement operates differently depending on the nature of the property from which the vehicle is impounded."); United States v. Chavez, 985 F.3d 1234, 1242-43 (10th Cir. 2021)("This court has recognized that some police encounters are "wholly unrelated to the desire to prosecute for crime." (quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993)))
        Despite this uncertainty, the Court concludes that Caniglia v. Strom does not necessitate a drastic overhaul of the rules governing vehicular impoundments and inventories.  Caniglia v. Strom intones that it does not disturb Cady v. Dombrowski's holding, and Caniglia v. Strom takes pains to emphasize the constitutional difference between vehicles and homes when it comes to warrantless searches and seizures.  See Caniglia v. Strom, 593 U.S. at 198-99.  Although it is possible that the Tenth Circuit's doctrines cannot survive in precisely the same form after Caniglia v. Strom, still something similar likely could.  Irrespective of these considerations, the Court is bound to apply the Tenth Circuit's rules that apply currently.

circumstances pudding, but instead represent a procession of inquiries, some of which are redundant with one another, that the court painstakingly should trot through.  Although the Tenth Circuit has suggested that <u>Sanders</u> states the framework applicable to impoundment cases, <u>see</u> <u>United States v. Ramos</u>, 88 F.4th 862, 868 (10th Cir. 2022)("[B]oth <u>Sanders</u> requirements must be satisfied for a community-caretaking impoundment to pass Fourth Amendment muster . . . ." (citing <u>United States v. Braxton</u>, 61 F.4th at 835 & n.3), that case does not actually state the whole of the applicable rules -- the Tenth Circuit has stated rules that precede and exist outside of that case's analytical framework.  The Tenth Circuit, moreover, carefully polices the boundaries of its analytical categories.  <u>Cf.</u>, <u>e.g.</u>, <u>Ramos</u>, 88 F.4th at 875 ("[C]oncerns relating to possible vandalism, and the municipal liability that could flow therefrom, are properly considered at the third <u>Sanders</u> factor."  (citing <u>Venezia</u>, 995 F.3d at 1179)).

### 1.    <u>The Two Threshold Inquiries.</u>

As far as the Court can tell, the doctrinal framework for impounding vehicles is as follows. First, the inquiry is whether or not the car to be towed is obstructing traffic or threatening public safety; if either condition obtains, then there is no need to do either prong of the <u>Sanders</u> two-prong inquiry.

> We have recently held that our two-prong inquiry under <u>Sanders</u> does not apply to impoundments where there is a 'threat to public safety or traffic.'  Because the government asserts that the impoundment here was justified exclusively by the risk of theft or vandalism, as opposed to a safety- or traffic-related interest, we apply <u>Sanders</u>.

<u>Venezia</u>, 995 F.3d 1170, 1175 n.1  (quoting <u>Trujillo</u>, 993 F.3d at 872).  If the vehicle either "impede[es] traffic or threat[ens] public safety," then the inquiry ends, and the Fourth Amendment permits impoundment.  <u>Trujillo</u>, 993 F.3d at 869 (quoting <u>Opperman</u>, 428 U.S. at 368-69).  This threshold inquiry is itself not free of tension, for four reasons: (i) it is unclear what the difference

is between the impedes-traffic prong and the threatens-public-safety prong;[11] (ii) it is unclear whether the public safety threat must be immediate;[12] (iii) although the Tenth Circuit has suggested this issue is a threshold inquiry that may terminate the inquiry, the Tenth Circuit has elsewhere stated that courts must always proceed to a separate inquiry, the second Sanders prong;[13] and

_____

[11]It is not clear what goes into the "threat[ens] public safety" inquiry that distinguishes that inquiry from whether vehicle "imped[es] traffic." Trujillo, 993 F.3d at 869. The former inquiry could entail: (i) the vehicle threatening public safety by the way it is positioned on the road or the side thereof, such as threatening safety by jutting out into the path other cars will take; or (ii) on the other hand, the threatens-public-safety consideration could be based on, e.g., the contents of the car, such as if the vehicle contains some chemical material that could explode, or the vehicle is in a dangerous condition, e.g., it has caught on fire. It seems more likely that the threatens-public-safety factor obtains based on these latter conditions than the car's position vis-à-vis the roadway, because this former condition would be redundant with the "obstructs traffic" factor. The Tenth Circuit, however, suggests the first option, so that whether a vehicle threatens public safety turns on where the vehicle is positioned:

> [E]ven if some cars could have passed by the Mustang, that does not mean that the Mustang was not "impeding traffic or threatening public safety and convenience." Opperman, 428 U.S. at 368-69 . . . . If passing by the Mustang would have been a tight squeeze, the necessary maneuver would slow progress and might lead to minor damage. And since incoming drivers would not be expecting a vehicle in the driveway, there was opportunity for a more serious collision with the dark Mustang parked to the side even if there was ample room for the other vehicle to pass it. The Mustang also would have made it difficult, if not impossible, for wider-bodied emergency vehicles such as ambulances or firetrucks to pass if needed within the complex.

Trujillo, 993 F.3d at 869-70. The Court notes that this approach seems to collapse the two inquiries into one another.

[12]United States v. Woodard suggests that the threat should be immediate, but Trujillo disclaims that the threat must be immediate. Compare United States v. Woodard, 5 F.4th at 1152 (stating the public-safety threshold inquiry as whether "the car is posing an imminent threat to public safety" (emphasis added)), with Trujillo, 993 F.3d at 871-72 (stating that impoundments under the authority of Opperman, i.e., impoundments of vehicles "impeding traffic or threatening public safety and convenience" do not "requir[e] . . . immediacy or imminence" (quoting Opperman, 428 U.S. at 368-69)).

[13]It is unclear how this threshold inquiry interfaces with the Tenth Circuit's statement that "[t]he factors describing community-caretaking functions under the second prong of Sanders,

- 44 -

(iv) this obstructing-traffic-or-threaten-public-safety inquiry is redundant with what otherwise are later parts of the analysis, specifically the third "alternatives to impoundment" factor of <u>Sanders</u>' second prong,[14] and the additional considerations that <u>Trujillo</u> offers, namely the existence of an

---

however, apply to 'all community-caretaking impoundments.'" <u>Venezia</u>, 995 F.3d at 1178 (quoting <u>Sanders</u>, 796 F.3d at 1249)(emphasis in <u>Venezia</u>, not in <u>Sanders</u>).  <u>See Venezia</u>, 995 F.3d at 1178 ("A legitimate rationale is always required, whether on private or public property. . . . Thus, <u>Sanders</u> applies to both private and public property impoundments to the extent it describes when impoundment is consistent with a reasonable and legitimate, non-pretextual community-caretaking rationale.").  It may be that the Tenth Circuit in <u>Venezia</u> only emphasizes that, in contrast to the first <u>Sanders</u> prong, which applies to only private property impoundments, that the second prong applies to both private and public property impoundments.  <u>See Venezia</u>, 995 F.3d at 1178 ("The first prong of <u>Sanders</u> is indeed specific to private property impoundments.").  Nonetheless, this analysis does not squarely address whether -- for impoundments from public property that satisfy <u>Trujillo</u>'s impeding-traffic-or-threatening-public-safety threshold inquiry -- the district court must analyze such impoundments under <u>Sanders</u>' second prong.

    The Court's best interpretation of the interaction between these rules is that if, at <u>Trujillo</u>'s threshold inquiry, the court holds that the vehicle obstructs traffic or threatens public safety, then, of necessity, a "reasonable and legitimate, non-pretextual community-caretaking rationale" justifies impoundment, <u>Venezia</u>, 995 F.3d at 1178, which satisfies the inquiry for which the second <u>Sanders</u> prong provides guidance.  That is, to hold either that the impounded vehicle obstructs traffic or threatens public safety is to say that a "reasonable and legitimate, non-pretextual community-caretaking rationale" exists justifying the impoundment, <u>Venezia</u>, 995 F.3d at 1178, -- the only difference being that, in such circumstances, the district court need not trot through each of the second <u>Sanders</u> prong's five factors.

    [14]This apparent threshold inquiry whether the impounded vehicle "imped[es] traffic or threatens public safety and convenience," <u>Trujillo</u>, 993 F.3d at 869 (quoting <u>Opperman</u>, 428 U.S. at 368-69), is redundant with an inquiry that should appear at an analytically later stage, namely, the third inquiry of the second prong of <u>Sanders</u>' "reasonable and legitimate, non-pretextual community-caretaking rationale" inquiry.  <u>Sanders</u>, 796 F.3d at 1250.  That third prong asks "whether an alternative to impoundment exists (especially another person capable of driving the vehicle)." <u>Sanders</u>, 796 F.3d at 1250.  Often, parties litigate under the third <u>Sanders</u> factor whether the impounded vehicle could instead have been left safely where it was instead of getting impounded.  <u>Cf. Venezia</u>, 995 F.3d at 1180 ("[T]here is no reasonable explanation for why the vehicle could not remain in the motel parking lot until Cuello was reached, or why the vehicle needed to be impounded immediately following Venezia's arrest.").  Police officers may argue that the car could not be left where it was and therefore did not represent a reasonable alternative to impoundment, because either it obstructed traffic or threatened public safety.  Accordingly the considerations pertinent to this threshold issue can be redundant with the third <u>Sanders</u> factor.

unsecured gun in the car.[15]    Nonetheless, insofar as this obstructs-traffic-or-threatens-public-

safety inquiry represents a threshold inquiry, then if either the vehicle "imped[es] traffic or

---

Because United States v. Venezia suggests that Sanders applies when only at issue regarding leaving a vehicle parked in its spot are vandalism and theft concerns, the third factor of Sanders can speak only to theft and vandalism concerns.  See United States v. Ramos, 88 F.4th 862, 875 (10th Cir. 2023)("Ramos")("[T]his court has concluded concerns relating to possible vandalism, and the municipal liability that could flow therefrom, are properly considered at the third Sanders factor."  (citing Venezia, 995 F.3d at 1179)).  If Sanders' factor three considers only vandalism and theft impediments to leaving a car where it is, then this limitation would avoid the redundancy with Trujillo's the obstructing-traffic-and-threatening-public-safety threshold inquiry.

[15]There, the Trujillo court holds that weapons visible to the public through a vehicle's windows could be searched and seized, and that this rule represents a different species of search-and-seizure justification from the Opperman rationale permitting impoundments of vehicles "impeding traffic or threatening public safety and convenience," Trujillo, 993 F.3d at 869 (quoting Opperman, 428 U.S. at 368-69):

> In addition, the search of the Mustang was permissible for a proper reason other than the *Opperman* rationale.  Even if the Mustang could have safely been left parked in or around the entryway, under *Dombrowski* and *Johnson* the deputies would have still been entitled to remove the firearms visible from outside the car and to search for others, lest they "fall into untrained or perhaps malicious hands." *Dombrowski*, 413 U.S. at 443, 93 S.Ct. 2523; *see Johnson*, 734 F.2d at 505.  The district court rejected this rationale on the ground that Deputy Skroch had decided to impound Defendant's vehicle before noticing the firearms within it.  *See Trujillo II*, 418 F. Supp. 3d at 876.  But the Fourth Amendment does not govern unrealized *intentions* to search or seize, and Skroch certainly was concerned about the firearms by the time he commenced the impoundment.

Trujillo, 993 F.3d at 873.
    This doctrine does not per se authorize impoundment; Trujillo suggests that the search-and-seizure could occur if the car were left where it is, i.e., not impounded.  Nonetheless, this rule may overlap with many impoundment cases, and provide for a search-and-seizure of items inside a vehicle that precedes and prompts an impoundment.  Trujillo places this justification outside of its impeding-traffic-or-threatening-public-safety framework, a framework itself outside the Sanders two-prong framework, so this gun-in-a-car consideration represents yet another waystation in the Tenth Circuit's impoundment doctrine.
    This consideration could just as easily be grouped, however, under the threatening-public-safety heading -- i.e., that the car contains an unsecured gun subject to vandalism could just as easily be deemed a reason that the vehicle "threatens public safety and convenience."  Trujillo, 993 F.3d at 869 (quoting Opperman, 428 U.S. at 368-69).  Nonetheless, instead of holding that the unsecured gun subject to vandalism informs whether the un-impounded vehicle threatens public

threatens public safety and convenience," Trujillo, 993 F.3d at 869, then the inquiry ends and the Fourth Amendment authorizes impoundment.

After determining that Trujillo threshold, the district court then asks whether the vehicle, at the time of impoundment, is located on public or private property, e.g., either on a public roadway or street, or else located in a private driveway or the parking lot of a business.  If the vehicle at the time of impoundment is located on public property, then the analysis skips ahead to the second prong only of the Sanders inquiry.  See Venezia, 995 F.3d at 1178 ("The first prong of Sanders is indeed specific to private property impoundments. . . . The factors describing community-caretaking functions under the second prong of Sanders, however, apply to 'all community-caretaking impoundments.'" (quoting Sanders, 796 F.3d at 1249")).   Under that second-prong inquiry, the Court asks whether the impoundment is justified by a "reasonable and legitimate, non-pretextual community-caretaking rationale," Sanders, 796 F.3d at 1250, and to justify the impoundment, the Court runs the through five factors that Sanders articulates, see Sanders, 796 F.3d at 1250.  If, on the other hand, the vehicle at the time of impoundment is located on private property, then the Court does both prongs of the Sanders inquiry, asking first whether the impoundment is "guided by standardized criteria" and then asking whether there exists a

_____

safety, Trujillo instead makes clear that this gun-in-the-car issue represents a separate and distinct reason to search the car, i.e. a separate analytical heading.  See Trujillo, 993 F.3d at 873 (stating that its gun-in-the-car rationale is a basis for search-and-seizure "other than the Opperman rationale"); id. at 869 ([O]fficers were entitled to search the car, not only on the basis of the impoundment and accompanying inventory, but also on the ground that the officers needed to secure any additional firearms.").  In this way, Trujillo's gun-in-the-car concern is redundant with that case's own public-safety concern.

"reasonable and legitimate, non-pretextual community-caretaking rationale." Sanders, 796 F.3d at 1250.[16]

The third inquiry -- necessary only if the police impound the vehicle from private property -- is whether the impoundment complies with department policy, which is probably the most straightforward of all the inquiries. Sanders' policy-compliance prong is an exercise in quasi-statutory interpretation, where the Court parses the relevant language of the impounding officers' departmental policy. Cf. Woodard, 5 F.4th at 1152-55 (analyzing in depth whether police procedural policy permitted a private-property impoundment); id., 5 F.4th at 1154 ("[T]he first sentence proceeds from the general rule that the vehicle must be on a public way. . . . The second sentence adds that a vehicle left on private property may be impounded if the traffic stop had been based on an offense occurring on a public way."). If the impoundment complies with policy, then good; if the impoundment fails to comply with policy, it is unclear whether that alone ends the inquiry, so that the impoundment violates the Fourth Amendment. That result seems unlikely, given that, as a general matter, police actions that violate departmental policy do not, per se,

---

[16]It is unclear whether, if the vehicle is impounded from public property, the fact that the impoundment complied with department policy moves at all the analytical needle. The Tenth Circuit clearly has held that the first Sanders prong does not apply to public-property impoundments. The issue, however, is whether it makes it more likely constitutional if the impoundment was authorized by policy. Intuitively, that police complied with department policy in towing a vehicle from a public roadway would seem to make those actions more likely "reasonable" under the Fourth Amendment, if one of the constitutional concerns is problems with unfettered officer discretion. Cf. Sanders, 796 F.3d at 1248-49 ("Bertine makes the existence of standardized criteria the touchstone of the inquiry into whether an impoundment is lawful." (citing Bertine, 479 U.S. 367 (1987)); Woodard, 5 F.4th at 1159 n.8 (suggesting that police would possess "a proper motive" if their "standardized policy . . . appl[ied]"); Kendall, 14 F.4th at 1122 n.2 (taking the time to analyze Sanders' first, compliance-with-policy prong despite noting that it is not strictly required). The Tenth Circuit, however, has not said clearly that compliance or lack thereof matters outside the private-property impoundment context.

constitute Fourth Amendment violations.   Nonetheless, after the compliance-with-policy first prong of Sanders, the court turns to the second, "reasonable and legitimate, non-pretextual community-caretaking rationale" policy prong.   Sanders, 796 F.3d at 1250.

### 2.      The Sanders Factors.

Under the second Sanders prong, the court undertakes a five-factor inquiry and residual, catchall inquiry: Sanders explicitly enumerates five factors, but, noting that those five are "non-exclusive," Sanders, 796 F.3d at 1250, it leaves open a final, catchall category.   The five inquiries under this second prong are as follows: (i) whether the vehicle is on public or private property;[17] (ii) whether, if on private property, the owner of the property, e.g., a business owner, wants the vehicle towed away; (iii) whether there exists an alternative to impoundment; (iv) whether the driver consented to having the vehicle towed;[18] and (v) whether the vehicle is implicated in a

---

[17]Although the Tenth Circuit has emphasized that district courts must ask this question, it is fairly clear that the question will have been asked at an analytically prior stage, because Sanders' first, compliance-with-policy prong only applies if the vehicle is impounded from private property, see Venezia, 995 F.3d at 1178, then the district court, having arrived at Sanders' second prong, presumably will have asked and answered already this question.   Nonetheless, per the Tenth Circuit's instructions, the district court again must ask the question, as part of the second Sanders' grab-bag prong of factors.

[18]Although this inquiry -- whether the driver of the impounded vehicle consented thereto -- is relatively clear cut, it is not clear why this factor should matter much for determining whether the search is impermissible under the Fourth Amendment.   If the concern about impoundments is that they improperly can be "a ruse for a general rummaging in order to discover incriminating evidence," United States v. Edwards, 632 F.3d 633, 644 (quoting United States v. Haro-Salcedo, 107 F.3d at 772-73), that the driver of an impounded vehicle would not consent is not much of a bulwark against such a situation.   That is, impoundment creates headache and expense for all drivers, regardless of the possibility that the impoundment will reveal evidence of crime inside the car.   It is the rare driver who wants his or her vehicle towed, so this fourth, consent-of-driver factor seemingly should not carry much weight in determining whether police's decision to tow is improper.   The Court doubts the wisdom of requiring, in every impoundment analysis, consideration of this factor and questions how much it should weigh in the final analysis.

crime.[19]  The third factor -- whether a reasonable alternative to impoundment exists -- typically is

the most contested issue, with defendants arguing often that the police could have opted to simply

leave the car parked where it was at the time of impoundment or that the police could have allowed

a third person to drive the car from the site.  Cf. Sanders, 796 F.3d at 1251 ("[P]olice impounded

Sanders' vehicle without [allowing] her . . . to make alternative arrangements, even though she

[sought] to have someone pick up the vehicle on her behalf. . . . [Moreover, the police possessed]

reasons to be assured that the vehicle would not be abandoned [if left where it was.]"); Woodard,

5 F.4th at 1156 ("[T]he police had an alternative to impoundment: letting Mr. Woodard call

someone to get the car.  He had asked, and the police refused.").  Whether another person could

retrieve the vehicle does not present analytical redundancies, but whether police could have left

the vehicle parked where it is presents many considerations that reappear elsewhere.[20]

---

[19]Tenth Circuit case law inconsistently applies the fifth factor in two ways: (i) it is unclear
whether the "crime" in which the vehicle is implicated must be the crime of arrest, if the vehicle's
driver is arrested; and (ii) whether the "crime" in which the vehicle is implicated can be merely a
traffic violation.  It is unclear whether the applicable crime must be the one for which police arrest
the vehicle's driver, if there is an arrest.  Cf. Venezia, 995 F.3d at 1182 ("The fourth Sanders factor
weighs against impoundment because impounding Venezia's vehicle would not have provided
further evidence of the traffic violations or outstanding warrant for which Venezia was arrested.").
The Tenth Circuit's cases send mixed signals also whether the implicated-in-a-crime factor can
obtain based alone on a traffic violation: some cases suggest that if only traffic offense are involved
then this fourth factor does not obtain, see Kendall, 14 F.4th at 1123-24 (noting that the fourth
Sanders factor favors the defendant where "the vehicle was not implicated in any crime other than
traffic offenses"); other cases suggest that, if there is a traffic violation arrest, then the traffic
violation can in some situations satisfy this factor, if the vehicle might contain further evidence,
cf. Venezia, 995 F.3d at 1182 ("The fourth Sanders factor weighs against impoundment because
impounding Venezia's vehicle would not have provided further evidence of the traffic violations
or outstanding warrant for which Venezia was arrested.").

[20]Where courts consider, under the third factor, whether the car could be left where it is at
the time of impoundment, the analysis overlaps with considerations pertinent to two other analyses
in ways that may lead to confusion.  First, whether the car can be left where it is, in large part, is
the same question whether the car obstructs traffic or threatens public safety, and thus this inquiry

As noted above, Sanders provides that its five factors are "non-exclusive," Sanders, 796

F.3d at 1250, so there exists a sixth, residual category under this second, community-caretaking

rationale prong, cf. Woodard, 5 F.4th at 1158 ("Not only does every factor point toward pretext,

but other powerful evidence of pretext exists.").  Indeed, the Tenth Circuit has sent mixed signals

whether the above five enumerated factors must be taken as addressing a community caretaking

rationale's reasonableness or pretextual character, or both.  For example, in Venezia, the Tenth

Circuit determines that the impoundment from a private parking lot, though it complied with

---

necessarily rehashes, to some extent, Trujillo's threshold, impeding-traffic-or-threatening-public-
safety inquiry.  Cf. Trujillo, 993 F.3d at 864 ("When an unoccupied vehicle would impede traffic
and the registered owner cannot readily arrange for someone to drive it away, law-enforcement
officers may impound the vehicle.").  Second, the third factor may also rehearse an additional
consideration that appears at a later analytical stage, namely the standalone, gun-in-the-car inquiry
that Trujillo introduces.  Cf. Trujillo, 993 F.3d at 873 ("Even if the Mustang could have safely
been left parked in or around the entryway, . . . the deputies would have still been entitled to
remove the firearms visible from outside the car and to search for others, lest they 'fall into
untrained or perhaps malicious hands.'" (quoting Cady, 413 U.S. at 443)).  The Trujillo threshold
inquiry states in another way the question whether leaving the vehicle parked where it presents a
viable "alternative to impoundment,"  Sanders, 796 F.3d at 1250, namely, whether because of
safety or traffic concerns the car's being left there is not an alternative to impoundment.  Moreover,
the standalone, gun-in-the-car inquiry also implicates the same basic considerations of whether the
car can simply be left where it is: if a gun is visible through the window of the car, then leaving
the car there undisturbed is not a viable "alternative to impoundment," Sanders, 796 F.3d at 1250.
    Vandalism and theft concerns are apparently the only considerations pertinent to this third
factor that are not redundant with the threshold inquiry.  Cf. Ramos, 88 F.4th at 875 ("[T]his court
has concluded concerns relating to possible vandalism, and the municipal liability that could flow
therefrom, are properly considered at the third Sanders factor." (citing Venezia, 995 F.3d at 1179));
Venezia, 995 F.3d at 1175 n.1 ("Because the government asserts that the impoundment here was
justified exclusively by the risk of theft or vandalism, as opposed to a safety- or traffic-related
interest, we apply Sanders.").  Along with permitting a third person to retrieve the vehicle,
vandalism and theft then are the only considerations pertinent to analyzing whether police may
leave the vehicle where it is that go toward this third factor of the Sanders' second prong not also
seen at the threshold inquiry stage.  This largely redundant analysis then creates confusion as to
where in the analysis the Court and police are or ought to be.  Although vandalism and theft issues
do not inform the threshold traffic-and-safety inquiry, still those concerns are redundant with
Trujillo's standalone, gun-in-the-car concern: the gun-in-the-car concern is explicitly a vandalism
and theft concern, so this too rehearses the question whether leaving a vehicle where it is presents
a viable "alternative to impoundment."  Sanders, 796 F.3d at 1250.

department policy and so satisfied the first <u>Sanders</u> prong, failed on the five factors of the second

<u>Sanders</u> prong; the <u>Venezia</u> court, however, announced that it did not need to consider whether the

police's proffered community caretaking rationale was pretextual, because the court already

decided it was not reasonable:

> As discussed above, the vehicle in this case was not at unnecessary risk of theft or vandalism, and thus the officers lacked a reasonable community-caretaking rationale. The officers could not reasonably conclude that the vehicle would be unattended for a prolonged period of time based on their unsuccessful 9:00 P.M. attempt to call the vehicle's registered owner. And the vehicle's presence in the motel parking lot was no different than any other vehicle in the lot. For these two reasons, the officers' decision to impound the vehicle was not guided by a reasonable community-caretaking rationale as required under the second *Sanders* prong. The officers could no more impound Venezia's vehicle than they could impound any other vehicle at the motel, assuming its driver was unavailable and its registered owner could not be reached that night.
>
> It is unnecessary to decide whether the asserted community-caretaking rationale was also "pretextual." In fact, in this case, the evidence of pretext is scant. Yet, we held in *Sanders* that an asserted community-caretaking rationale must be both "reasonable" and "non-pretextual." *Id.* at 1248. The officers in this case were attempting to rely on their standardized policy when impounding the vehicle. That policy, however, as exercised here, simply did not grant the officers authority to do what the Fourth Amendment forbids—to impound a vehicle absent a reasonable community-caretaking rationale.

<u>Venezia</u>, 995 F.3d at 1182.  <u>Compare</u> <u>Woodard</u>, 5 F.4th at 1155 (stating, about <u>Sanders</u>' second

prong's five factors that "[w]e have identified five factors bearing on the possibility of pretext"),

<u>with</u> <u>Ramos</u>, 88 F.4th at 873 ("Application of the <u>Sanders</u> factors compels the conclusion that the

impoundment was unreasonable even if undertaken without any type of pretextual motive."), <u>with</u>

<u>id.</u> at 873 n.14 ("[I]t is clear the five <u>Sanders</u> factors bear on the existence of both pretext and

reasonableness. . . . <u>Sanders</u>' focus on both reasonableness and pretext is unusual, but not without

precedent." (citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 736 (2011)).   The Court, therefore,

understands the five <u>Sanders</u> prong-two factors as addressing both pretext and reasonableness, so that a court can treat the factors as addressing either one or the other or both simultaneously.[21]

The Tenth Circuit has sent mixed signals whether mixed-motive impoundments are permissible: some cases suggest that, if an impoundment is otherwise legal then the presence of an investigatory subjective motive does not invalidate the search, as <u>Trujillo</u> suggests:

> [E]ven if the district court had found that Skroch was motivated in part by an investigatory motive (it did not), that would still be insufficient ground to require suppression. *See Bertine*, 479 U.S. at 372 . . . (upholding inventory search where "there was no showing that the police, who were following standardized procedures, acted in bad faith or *for the sole purpose* of investigation" (emphasis added)); *Haro-Salcedo*, 107 F.3d at 771-72 (upholding impoundment in "multiple-motivation scenario," where district court found that one reason for officers' impoundment of vehicle was to hold it "for further investigation by the DEA"); *United States v. Sanchez*, 720 F. App'x 964, 970 (10th Cir. 2018)(unpublished)("[A] dual motive does not invalidate an otherwise lawful impound and inventory.").

<u>Trujillo</u>, 993 F.3d at 871.  Elsewhere, the Tenth Circuit suggests that it lacks an answer to the rule applicable in such dual-motive scenarios:

> The government argues that the district court shouldn't suppress the evidence if the police impounded the vehicle for dual motives, one proper (to comply with the standardized policy) and one improper (to investigate for criminality). But here, the police lacked a proper motive because the standardized policy did not apply. So the police did not harbor dual motives, and we need not address what the outcome would have been if they had.

---

[21]While the five factors address either or both considerations, the Court finds it most straightforward to treat the five factors as asking whether an impoundment is reasonable, so that the residual <u>Sanders</u> prong-two inquiry, <u>see</u> <u>Sanders</u>, 796 F.3d at 1250 (describing its prong-two factors as "non-exclusive"), asks whether an impoundment, even if reasonable, is nevertheless pretextual.  This is the most straightforward approach, because the five factors address objective-like features of an impoundment's circumstances: where it occurred, whether there were alternatives, whether the vehicle was involved in crime, etc.  Given, therefore, the authorization to treat the five factors as answering reasonableness in the first instance, <u>cf.</u> <u>Ramos</u>, 88 F.4th at 873 ("[T]he <u>Sanders</u> factors compel[] the conclusion that the impoundment was unreasonable even if undertaken without any type of pretextual motive."), the Court takes that opportunity.

Woodard, 5 F.4th at 1159 n.8.

Other Courts of Appeals have held explicitly that, so long as impoundment is objectively justifiable, the existence of subjective investigatory motives does not invalidate impoundment, and, to the Court's knowledge, no Court of Appeals holds otherwise:

> [R]egardless of Trooper Malone's motivations and beliefs, Trooper Malone was going to have the car towed no matter what. Snoddy was the sole occupant of the car, and the car would have been left out on the side of the highway . . . in the middle of the night. . . . "The Fourth Amendment permits impoundment decisions and inventory searches that are objectively justifiable . . . regardless of an officer's subjective intent."

United States v. Snoddy, 976 F.3d 630, 635-36 (6th Cir. 2020)(quoting United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001)).  See United States v. Johnson, 889 F.3d 1120, 1126 (9th Cir. 2018)("[T]he mere 'presence of a criminal investigatory motive' or a 'dual motive -- one valid, and one impermissible --' does not render an administrative stop or search invalid; instead, we ask whether the challenged search or seizure 'would . . . have occurred in the absence of an impermissible reason.'" (quoting United States v. Orozco, 858 F.3d 1204, 1213 (9th Cir. 2017)); United States v. Arrocha, 713 F.3d 1159, 1163-64 (8th Cir. 2013)("Although the disturbance calls gave the officers reason to suspect there might be a gun in Arrocha's car, when there is a valid reason to impound a vehicle, '[t]he presence of an investigative motive does not invalidate an otherwise valid inventory search.'" (quoting United States v. Garner, 181 F.3d 988, 991 (8th Cir. 1999)); United States v. Coccia, 446 F.3d 233, 240-41 (1st Cir. 2006)("'As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure.'" (quoting United States v. Rodriguez-Morales, 929 F.2d 780, 787 (1st Cir. 1991)); United States v. Castro, 166 F.3d 728, 734 (5th Cir. 1999)("[W]e reject the appellants' contention that Officer Nettles'

- 54 -

hidden motives invalidated what was an otherwise lawful impoundment carried out in accordance with the standard procedures of the Polk County Sheriff's Department.").  As of now, however, the Tenth Circuit has not answered explicitly this question, so a court should not assume that a impoundment motivated partially by investigatory concerns, although reasonable, is constitutionally permissible.

### 3.    Trujillo's Gun-In-Car Community-Caretaking Exception.

One last odd wrinkle appears in Trujillo, where the known presence of firearms in a stranded vehicle appears to offer another, independent ground for a search that precedes and can serve as the impetus for impoundment:

> The presence of firearms in an unoccupied vehicle under police control provides an additional ground for searching the vehicle, even when the vehicle itself is not a cause for concern at the time of the search. . . . In [United States v. Johnson, 734 F.2d 503 (10th Cir. 1984)("Johnson")] we applied Dombrowski to uphold a search under similar circumstances. The defendant was arrested after having been found "sitting in his car, highly intoxicated, with a .357 caliber magnum revolver in plain view on the passenger seat." 734 F.2d at 504. We held that officers were entitled to search the car, not only on the basis of the impoundment and accompanying inventory, but also on the ground that the officers needed to secure any additional firearms. See id. at 505 ("[Defendant]'s revolver in plain view clearly justified a search of the rest of the automobile for other weapons."). . . .

> In addition, the search of the Mustang was permissible for a proper reason other than the Opperman rationale. Even if the Mustang could have safely been left parked in or around the entryway, under Dombrowski and Johnson the deputies would have still been entitled to remove the firearms visible from outside the car and to search for others, lest they "fall into untrained or perhaps malicious hands." Dombrowski, 413 U.S. at 443, 93 S.Ct. 2523; see Johnson, 734 F.2d at 505. The district court rejected this rationale on the ground that Deputy Skroch had decided to impound Defendant's vehicle before noticing the firearms within it. See Trujillo II, 418 F. Supp. 3d at 876. But the Fourth Amendment does not govern unrealized intentions to search or seize, and Skroch certainly was concerned about the firearms by the time he commenced the impoundment.

Trujillo, 993 F.3d at 868-69, 873.  Trujillo clearly places this justification outside the Sanders framework, so this gun-in-a-car consideration represents yet another waystation in the Tenth Circuit's impoundment doctrine.[22]  Although not explicitly a basis for impoundment, the Cady-Trujillo rule permits searches that can precipitate an impoundment.

Together, these considerations state the whole of the Court's understanding of the Tenth Circuit's rules for the constitutional community-caretaking impoundment of vehicles: (i) is the vehicle obstructing traffic or threatening public safety; (ii) is the vehicle at the time of impoundment on public or private property -- if public, skip to prong two of Sanders, if private, proceed to prong one of Sanders; (iii) under prong one of Sanders, did the impoundment comply with departmental policy; (iv) under prong two of Sanders, analyze the five factors applicable there to determine if the impoundment was objectively justifiable -- (a) public or private property; (b) property owner's consent; (c) alternatives to impoundment; (d) vehicle owner's consent; and (e) implicated in crime -- then consider whether under the residual category the impoundment was impermissibly pretextual; and finally (v) Trujillo's gun-visible-through-the-window rule, which, while not explicitly an impoundment doctrine, justifies searching a vehicle under police control and can precipitate impoundment.

---

[22]This gun-in-the-car doctrine, which Trujillo makes clear is different from either its obstructing-traffic or threatening-public-safety considerations, is confusingly redundant both internally and with portions of the Sanders test.  Trujillo indicates that this gun-in-the-car consideration is separate and distinct from a concern about obstructing traffic or threatening public safety, but as noted above, see supra n.15, these inquiries can be redundant.  It is also redundant with the vandalism concerns pertinent to factor three of Sanders' second prong.  See supra n.20.

**ANALYSIS**

The discovery of evidence in Ulibarri's vehicle did not violate his Fourth Amendment rights. Each of the actions that APD took -- effecting a traffic stop, arresting Ulibarri, deciding to impound his vehicle, and searching it -- constitutionally are justified. For the sake of clarity, the Court analyzes the constitutionality of the events of May 13, 2021, in the order in which they occurred. The Court holds that each of these events constitutionally was permitted.

First, the Court holds that the traffic stop of Ulibarri's vehicle is constitutionally valid. Police possessed probable cause that Ulibarri violated state law and local ordinances against exhausts modified to produce excessive noise. In the alternative, police possessed reasonable suspicion sufficient to justify the stop.

Second, the Court holds that Ulibarri's arrest is constitutionally valid. APD officers did not violate Ulibarri's Fourth Amendment rights by checking his license and registration, learning that he had two outstanding bench warrants, and arresting him on that basis. Although the Court finds that APD possessed a subjective investigatory motive, the existence of that motive does not render the arrest invalid, because, under the principle of Whren v. United States, 517 U.S. 806, 813 (1996)("Whren"), the arrest is validated by the bench warrants' provision of probable cause. Officers are not required to permit Ulibarri to post bond on his warrants instead of arresting him.

Third, the Court holds that Ulibarri's car's search cannot be justified either under the search-incident-to-arrest doctrine, under the plain-view exception to the warrant requirement, or under the automobile exception to the warrant requirement.

Fourth, the Court holds that Ulibarri's vehicle's impoundment is constitutionally justified as a community-caretaking impoundment, because the vehicle was impeding traffic, because APD policy authorized the impoundment, and because the five <u>Sanders</u>, 796 F.3d 1241, prong-two factors support the impoundment's reasonableness.  Although there existed an investigatory motive, the Court holds the impoundment is a permissible dual or mixed motive impoundment.

Fifth, the Court holds that the inventory of Ulibarri's vehicle, although flawed, was constitutionally adequate.

Sixth, the Court holds that, in the alternative, the inevitable discovery doctrine supports upholding the evidence's discovery, even if the inventory was constitutionally inadequate, because the impoundment was lawful.

Seventh, the vehicle's search is justified independently on the basis that APD officers could search the vehicle for firearms they knew to be in the car once it was in their control.

In conclusion, the Court holds that each step in the sequence of events that led to the discovery of evidence in Ulibarri's vehicle is constitutionally justified.  The Court will, therefore, not suppress the evidence that APD officers discovered in Ulibarri's vehicle.

I.   **ULIBARRI'S TRAFFIC STOP IS CONSTITUTIONALLY PERMISSIBLE, BECAUSE, BASED ON THEIR OBSERVATIONS, APD OFFICERS POSSESSED PROBABLE CAUSE OR, IN THE ALTERNATIVE, REASONABLE SUSPICION, THAT ULIBARRI VIOLATED LAWS AGAINST INORDINATE VEHICLE <u>NOISE</u>.**

Perez and Elsman, who effected the traffic stop on Ulibarri, possessed information rising to probable cause or, in the alternative, to reasonable suspicion that Ulibarri was violating State and local laws prohibiting modified engine exhausts; this quantum of information justified the stop constitutionally.  "A traffic stop is a Fourth Amendment seizure 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  <u>United States v. Alcaraz-Arellano</u>, 441

F.3d 1252, 1257-58 (10th Cir. 2006)(quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)). Because a traffic stop is analyzed under the investigatory detention rubric that Terry v. Ohio, 392 U.S. 1, establishes, the stop requires only reasonable suspicion.  See Rodriguez v. United States, 575 U.S. 348, 354 (2015)("A seizure for a traffic violation justifies a police investigation of that violation. '[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called 'Terry stop' . . . than to a formal arrest.'" (quoting Knowles v. Iowa, 525 U.S. 113, 117 (1998))). What Perez and Elsman observed supplied them with probable cause, over and above reasonable suspicion, that Ulibarri committed a traffic crime, so the constitutional threshold is met. Accordingly, the first sequence in the events of May 13, 2021 -- the officers' stopping Ulibarri's car -- was constitutionally permissible.

**A.  THE TRAFFIC STOP IS JUSTIFIED CONSTITUTIONALLY ON THE BASIS OF PROBABLE CAUSE THAT ULIBARRI VIOLATED STATE LAW AND LOCAL ORDINANCES AGAINST DRIVING WITH MODIFIED EXHAUST ENGINES, ALTHOUGH PROBABLE CAUSE IS MORE THAN IS REQUIRED TO EFFECTUATE A TRAFFIC STOP.**

Although APD's stop of Ulibarri's vehicle requires only that the officers possess reasonable suspicion that criminal activity was ongoing, see Rodriguez v. United States, 575 U.S. at 354 ("'[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called 'Terry stop' . . . than to a formal arrest.'" (quoting Knowles v. Iowa, 525 U.S. at 117)), officers here possessed informed beliefs that exceeded that constitution minimum and amounts to probable cause that Ulibarri was violating state and local traffic laws.  "A traffic stop is justified at its inception if an officer has . . . probable cause to believe a traffic violation has occurred."  United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(quoting United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)).  An officer's subjective motivations do not contribute to the analysis -- and so long as there is probable cause that a defendant has violated the traffic laws, then

pretext does not detract from the validity of the search and seizure. See Whren, 517 U.S. at 813 ("[The Supreme Court's] cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.").

What Perez and Elsman observed provided sufficient information to establish probable cause that Ulibarri violated State and local laws against modified exhaust engines. Both State and local law require vehicles be equipped with mufflers that reduce vehicular noise and prohibit the use of modified mufflers that contribute to noise. See N.M.S.A. § 66-3-844(A) ("Every motor vehicle shall at all times be equipped with a muffler in good working order and in constant operation to prevent excessive or unusual noise, and no person shall use a muffler cutout, bypass or similar device upon a motor vehicle on a highway."); Albuquerque Code of Ordinances § 8-6-13(A), https://codelibrary.amlegal.com/codes/albuquerque/latest/albuquerque_nm/0-0-0-93717#JD_8-6-13 (last visited Jan. 1, 2024)("Albuquerque Code")("It shall be unlawful for any person to operate a motor vehicle if such vehicle is not equipped with a properly attached, operating muffler in good working order . . . sufficient to prevent excessive or unusual noise of the motor or to muffle or deaden the sound from the motor."); id. § 8-6-13(B) ("No person shall modify or change the exhaust muffler . . . of a motor vehicle in a manner such that the noise emitted by the motor vehicle is increased above that emitted by the motor vehicle as originally manufactured.").

Here, what Perez and Elsman observed suffices to supply probable cause to believe that Ulibarri violated traffic laws prohibiting the use of modified mufflers. On May 13, 2021, Perez and Elsman were downtown in Albuquerque having an outside conversation, when they overheard a very loud car engine sound from multiple blocks away. See FOF ¶ 1, at 3. They went in pursuit of the vehicle, and identified Ulibarri's car as the source of the noise and pulled over his vehicle.

See FOF ¶¶ 2-7, at 4.  Both officers had experience identifying vehicles with modified engine mufflers, and sound ordinance violations.  See FOF ¶ 4, at 4.  Perez and Elsman's training and experience, combined with their observation of the noise that Ulibarri's vehicle made, together suffices to supply probable cause that Ulibarri was in violation of state law, see N.M.S.A. § 66-3-844(A), and local ordinance, see Albuquerque Code § 8-6-13(A)-(B).  Accordingly, Perez and Elsman "had probable cause to believe that [Ulibarri] had violated the traffic code[, which] rendered the stop reasonable under the Fourth Amendment."  Whren, 517 U.S. at 819.

Ulibarri argues that state law does not authorize the arrest of a person on the basis of muffler violations.  See Tr. at 151:24-153:16 (Rivas, Court).  That state law does not authorize such arrest, however, is immaterial at this analytical juncture, because it is only the initial stop of his vehicle that must be valid: where "officers had probable cause to believe that petitioners had violated the traffic code[, t]hat rendered the stop reasonable under the Fourth Amendment." Whren, 517 U.S. at 819.  Although violating the state law and city ordinance can be the basis only for a citation and not for an arrest, see N.M.S.A. § 66-8-116(A) (noting that for an "improper equipment" violation such as Ulibarri's, the "penalty assessment" liability is $50.00), still the probable cause that Perez and Elsman possessed permitted them to pull over Ulibarri's vehicle. That they could not arrest Ulibarri does not matter at this point in the timeline.  The same goes for Ulibarri's suggestion that the stop on the basis of the muffler violation was invalid, because Perez and Elsman ultimately never wrote up Ulibarri for the muffler violation, see FOF ¶ 61, at 16; this argument also fails, because what matters at this point is only whether the officers, before pulling over Ulibarri for the muffler violation, believed justifiably that he violated the muffler law and ordinance, see Whren, 517 U.S. at 819.  Police officers are not permitted only to pull over a driver for traffic violations for which they ultimately issue traffic citations; so long as the stop initially is

justified, that the situation develops into something more serious and that the police officers decline later to impose liability for the traffic violation that initially justified the stop, does not render the stop invalid.

Ulibarri suggests that Perez and Elsman lacked constitutional justification to stop him because they were not certain that his vehicle possessed a modified engine that violated the law. See Tr. at 114:25-115:21 (Rivas).  He is correct that Perez and Elsman did not know at the time what Ulibarri's vehicle sounds like as originally manufactured, see FOF ¶¶ 4-5, at 4; because they did not know what the vehicle sounds like in an unmodified, as-manufactured state, Ulibarri suggests, Perez and Elsman did not have a sound basis to believe that Ulibarri's car's engine was modified, in violation of the law, see Tr. at 114:25-115:21 (Rivas).  He implies that, because Perez and Elsman may have been mistaken about the violation, then they lacked probable cause to effect the stop.

Ulibarri's suggestion lacks force, because it presumes that, if Perez and Elsman were mistaken factually that his car possessed a modified engine, then they would have lacked probable cause justifying a stop.  This assumption is incorrect, because it is black letter law that reasonable mistakes of fact can supply probable cause (and the lower quantum, reasonable suspicion), justifying a traffic stop.  See United States v. Nicholson, 721 F.3d 1236, 1238 (10th Cir. 2013)("[A]n officer's mistake of fact can . . . justify a probable cause or reasonable suspicion determination for a traffic stop."), abrogated on other grounds by Heien v. North Carolina, 574 U.S. 54 (2014).  See United States v. Cunningham, 630 F. App'x 873, 876 (10th Cir. 2015)(noting that a reasonable "mistake of law can . . . give rise to the reasonable suspicion necessary to uphold [a] seizure under the Fourth Amendment." (quoting Heien v. North Carolina, 574 U.S. at 57)). Ulibarri offers no sound reason to think that, even if Perez and Elsman were mistaken about the

relevant facts, that such a mistake was unreasonable.  Ulibarri is correct that, because Perez and Elsman never cited him for the muffler violation, it is unclear that his car indeed possessed an unlawful engine modification, see FOF ¶ 61, at 16.  This argument holds no water, however, for two reasons: first, as noted above, it is unimportant that Perez and Elsman did not ultimately cite Ulibarri for the traffic violation for which they pulled him over; second, Ulibarri's contention again presumes that it is constitutionally important that Perez and Elsman might have been mistaken. What matters constitutionally is not that they possibly were mistaken, but that, if they were mistaken, they were mistaken unreasonably.  Ulibarri, however, has offered no argument that such mistake would have been unreasonable, if in fact Perez and Elsman were mistaken about his engine's modifications.   Accordingly, the Court holds that Perez and Elsman's training, experience, and first-hand observations supplied them with probable cause, and that made the stop reasonable under the Fourth Amendment.

      **B.**     **THE TRAFFIC STOP IS JUSTIFIED ON THE BASIS OF REASONABLE SUSPICION THAT ULIBARRI VIOLATED STATE LAW AND LOCAL ORDINANCE AGAIST DRIVING VEHICLES WITH MODIFIED EXHAUST ENGINES, SATSIFYING THE THRESHHOLD INFORMATIONAL QUANTUM NECESSARY TO EFFECT A TRAFFIC STOP.**

In the alternative, if Perez and Elsman did not possess probable cause that Ulibarri was violating the muffler law and ordinance, then they possessed reasonable suspicion of those violations.  Reasonable suspicion is a lesser-included of probable cause: where the officers possess the greater constitutional quantum, probable cause, they necessarily also possess reasonable suspicion, the lesser constitutional quantum.  See Terry v. Ohio, 392 U.S. at 27 (holding that the reasonable suspicion required for an investigatory detention is less than the "probable cause [necessary] to arrest the individual for a crime").  Reasonable suspicion is all that is required to

stop a vehicle. See United States v. Ledesma, 447 F.3d 1307, 1312 (10th Cir. 2006)("A traffic stop is a seizure for Fourth Amendment purposes, and must be justified by reasonable articulable suspicion under the standards set forth in Terry v. Ohio . . . ."). As noted above, Perez and Elsman's training and experience, combined with what they observed first-hand, see FOF ¶¶ 1-7, at 3-4, supplied probable cause to believe Ulibarri was violating the traffic laws; that training, experience, and observation also supplied reasonable suspicion that justified the stop. Accordingly, there being at least reasonable suspicion to justify the stop, the traffic stop was constitutionally permissible.

II.     **PEREZ AND ELSMAN DID NOT VIOLATE ULIBARRI'S CONSTITUTIONAL RIGHTS BY ARRESTING ULIBARRI AFTER RUNNING A BACKGROUND CHECK ON HIM, BY IDENTIFYING THAT HE HAD OUTSTANDING ARREST WARRANTS, AND BY ARRESTING HIM ON THE BASIS OF THOSE WARRANTS, EVEN IF THE DECISION TO ARREST WAS BASED, IN PART, ON OTHER INVESTIGATORY INTERESTS.**

Perez and Elsman decided to arrest Ulibarri on the basis of his outstanding warrants, as permitted by the Constitution. At this second juncture in the sequence of events -- after the initial stop based on the muffler traffic code violation -- Perez and Elsman did not violate Ulibarri's constitutional rights by asking for his license, running a check on his identification in their computer system, identifying that he had warrants outstanding, and arresting on this basis. Even if the decision to arrest on the basis of the warrants, instead of permitting Ulibarri to pay his warrants off at the bonding window a few minutes' drive away, was partly driven by ulterior, investigatory motives, this does not vitiate the constitutionality of the stop. This is because the warrants for Ulibarri's arrest supplied all the probable cause officers needed to effect his arrest; indeed, Perez and Elsman were empowered to arrest Ulibarri on the basis of the muffler violation, so the warrants supplied more than enough probable cause to arrest.

After officers effect a traffic stop, they constitutionally may ask for the driver's license and registration and step away from the vehicle during the stop to run the driver's identification for outstanding warrants and to ascertain his or her criminal history.  See United States v. Mayville, 955 F.3d 825, 830 (10th Cir. 2020)("[A]n officer may run a background check on a motorist to check for warrants or criminal history even though the purpose of the stop had nothing to do with the motorist's history." (quoting United States v. Burleson, 657 F.3d 1040, 1046 (10th Cir. 2011))). Here, Perez and Elsman pulled over Ulibarri's vehicle and asked for his license, ran it against their database of outstanding warrants, and learned that Ulibarri had a warrant.  See FOF ¶ 18-26, at 6-7.  In taking these actions, they thereby did not violate Ulibarri's constitutional rights.

A judicial officer's issuance of an arrest warrant commands police officers to arrest a person and supplies the probable cause necessary to make that arrest.  See Illinois v. Gates, 462 U.S. 213, 239 (1983)(requiring that a warrant-issuing magistrate possess "a substantial basis for determining the existence of probable cause").  That probable cause determination justifies arrest on the basis of such relatively harmless crimes as missing a court date, and "once [an o]fficer . . . discover[s a] warrant, he ha[s] an obligation to arrest," because "'[a] warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'"  Utah v. Strieff, 579 U.S. 232, 240 (2016)(quoting United States v. Leon, 468 U.S. 897, 920 n.21 (1984)).  Even if there are other motives to arrest -- such as the possibility of discovering evidence of crimes unrelated to the offense for which the warrant issued -- an arrest based on the warrant is not unconstitutional.  See Devenpeck v. Alford, 543 U.S. 146, 153 (2004)("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (citing Whren,

517 U.S. at 812-13 (reviewing cases); Arkansas v. Sullivan, 532 U.S. 769 (2001))).  The existence

of an arrest warrant represents a judicial officer's independent determination that probable cause

exists, and such a determination is of great constitutional import; for example, the existence of a

warrant can attenuate the chain of causation to cure an otherwise unlawful detention.  See Utah v.

Strieff, 579 U.S. at 243 ("[D]iscovery of [an] arrest warrant attenuate[s] the connection between

[an] unlawful stop and the evidence seized from [a defendant] incident to arrest.").

Here, there existed two outstanding bench warrants for Ulibarri's arrest because he failed

to show up for two court dates in two separate State criminal cases; the charges in those cases may

have been relatively minor -- reckless driving offenses, and a firearm handling offense -- but still

Ulibarri failed to show up for court, resulting in the bench warrants.  See FOF ¶¶ 18-26, at 6-7.

These warrants represent judicial officers' commands to arrest Ulibarri and bring him into court,

and signify the existence of probable cause to arrest.  Cf. Utah v. Strieff, 579 U.S. at 240 ("'A

warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer

has a sworn duty to carry out its provisions.'" (quoting United States v. Leon, 468 U.S. at 920

n.21)).  Perez and Elsman, therefore, constitutionally were empowered to arrest Ulibarri on that

basis.[23]

---

[23]Although the arrest is justifiable based on the warrants, another justification for arrest lies
in the probable cause that Perez and Elsman possessed as to the traffic violation involving
Ulibarri's muffler.  Officers can effect a warrantless arrest of someone if the officer "has probable
cause to believe that an individual has committed even a very minor criminal offence in his
presence . . . ."  Atwater v. Lago Vista, 532 U.S. 318, 354 (2001).  Even if state law does not
authorize arrest for a particular offense, such an unauthorized arrest does not violate the Fourth
Amendment.  See United States v. Turner, 553 F.3d 1337, 1345 (10th Cir. 2009)("[W]hen police
officers have probable cause to believe a person has committed a crime in their presence, the
Fourth Amendment permits a warrantless arrest -- and a search incident to that arrest -- regardless

Even if Perez and Elsman had additional motives, the arrest is permissible.  When they initially stopped Ulibarri and asked for his ID, they learned that there were bullets in his vehicle's backseat.  See FOF ¶ 16-17, at 6.  Although he denied initially that he had a firearm, the bullets strewn across his backseat made the officers suspicious; Perez learned that Ulibarri had an outstanding warrant and stated to Elsman that he wanted to arrest Ulibarri, because Ulibarri may be involved in criminal activity: "I think I'm just gonna do it anyway, I'm gonna take [Ulibarri] out.  There were bullets in the car so he might have something."  FOF ¶ 27, at 8.  Additional motivations, i.e., to determine what "something" Ulibarri "might have," either on his person or in his vehicle, motivated the decision to arrest.  FOF ¶¶ 27-29, at 7-8.  That Perez and Elsman, however, subjectively possessed additional motivations to arrest Ulibarri does not vitiate the arrest's constitutionality, because the warrant supplies the probable cause necessary to validate the arrest.  See Devenpeck v. Alford, 543 U.S. at 153 (2004)("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the

---

of whether the crime qualifies as an arrestable offense under applicable state law." (citing Virginia v. Moore, 553 U.S. 164, 177-178 (2008))).

As discussed above, Perez and Elsman possessed probable cause that Ulibarri violated state and local rules against modified engine exhausts.  See supra Part I.A.  This probable cause for a minor offense committed in Perez and Elsman's presence justifies arrest like the seatbelt offense justifies arrest in Atwater v. Lago Vista, 532 U.S. at 354.  That the offense cannot be the basis for an arrest, see N.M.S.A. §§ 66-3-116(A), 844(A), does not make unconstitutional an arrest on that basis, see United States v. Turner, 553 F.3d 1337, 1345 (10th Cir. 2009)("[W]hen police officers have probable cause to believe a person has committed a crime in their presence, the Fourth Amendment permits a warrantless arrest -- and a search incident to that arrest -- regardless of whether the crime qualifies as an arrestable offense under applicable state law." (citing Virginia v. Moore, 553 U.S. at 177-178)).  Accordingly, even though the bench warrants provide a firm basis for Perez and Elsman's lawful arrest of Ulibarri, they also would have been constitutionally justified in arresting Ulibarri on the basis alone of the muffler offense.

known facts provide probable cause." (citing <u>Arkansas v. Sullivan</u>, 532 U.S. 769; <u>Whren</u>, 517 U.S. at 812-13)).  <u>See</u> <u>also</u> <u>Utah v. Strieff</u>, 579 U.S. at 240 ("'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'" (quoting <u>United States v. Leon</u>, 468 U.S. at 920 n.21)).

Accordingly, contrary to Ulibarri's argument, Perez and Elsman did not violate his rights by refusing to let him pay off the bond on his warrant.  Ulibarri's argues that Perez and Elsman should have simply permitted him to pay off his bond instead of arresting him, and violated his rights by taking that course of action; the bonding window at the Bernalillo County Metropolitan Court, at which Ulibarri could post the bond, was only a few blocks from where Perez and Elsman stopped Ulibarri, <u>see</u> FOF ¶ 36, at 10, so Ulibarri emphasizes that it would have been easy for Perez and Elsman to drive him there, instead of booking him, <u>see</u> MTS at 8.  He emphasizes moreover, that applicable policy directed that officers "will use the bonding window . . . to post a bond . . . or to resolve or quash a warrant in lieu of taking an arrested person to the . . . Metropolitan Detention Center when feasible."  FOF ¶ 31, at 9  Even if against department policy, Perez and Elsman's actions are not contrary to the Constitution.  Ulibarri's argument is equivalent to arguing that the decision to arrest, instead of to permit him to post bond, was based on an ulterior, investigatory motive and therefore invalid.  As discussed, however, even if Perez and Elsman's decision to arrest was based on ulterior motives, so long as there existed probable cause for the arrest -- here in the form of the outstanding bench warrants, <u>see</u> FOF ¶ 19-26, at 6-7 -- the arrest is valid.  <u>Cf.</u> <u>Devenpeck v. Alford</u>, 543 U.S. at 153 (2004)("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").  Accordingly, the decision not to permit Ulibarri to post

bond, even if it would have been an easy task to accomplish, does not violate Ulibarri's constitutional rights.  Accordingly, the arrest is valid.

## III.   NEITHER THE SEARCH-INCIDENT-TO-ARREST DOCTRINE, NOR THE PLAIN-VIEW DOCTRINE, NOR THE AUTOMOBILE EXCEPTION TO THE WARRANT REQUIREMENT JUSTIFIES THE SEARCH.

Before addressing explicitly Ulibarri's vehicle's impoundment, the Court reaches the following conclusions as to doctrinal bases upon which the search of Ulibarri's vehicle cannot be predicated.  First, the Court holds that the vehicle's search cannot be justified as a search incident to arrest, because, under the rule of Arizona v. Gant, 556 U.S. 332 (2009)("Gant"), Ulibarri's vehicle did not contain any evidence of his offense of arrest, and, at the time of arrest, Ulibarri was not within reaching distance of the areas in his vehicle that APD searched.  Second, Ulibarri's vehicle's search cannot be justified either under the plain-view exception to the warrant requirement or under the automobile exception to the warrant requirement, for essentially the same reason:  the search is not a plain-view exception search, because nothing visible through the window of Ulibarri's vehicle was of obvious criminal significance; the search is not an automobile exception to the warrant requirement, because APD officers lacked probable cause to believe that Ulibarri's vehicle contained evidence of criminal activity.  The Court will address, after addressing the vehicle's impoundment, the known presence of firearms in Ulibarri's vehicle, which had come under their control, and which justifies searching the vehicle.  See Section VII infra.  For now, however, the Court dispatches of these three doctrinal justifications that often justify the search of vehicles.

### A.   THE SEARCH INCIDENT-TO-ARREST DOCTRINE DOES NOT SUPPORT THE INVENTORY SEARCH OF ULIBARRI'S VEHICLE.

The search-incident to arrest doctrine does not justify constitutionally the search of Ulibarri's vehicle. The search-incident-to-arrest doctrine allows police officers to search the person of an arrestee whom officers have lawfully arrested and a closed container, like a backpack, on the arrestee's person. See United States v. Hunnicutt, 135 F.3d 1345, 1350 (10th Cir. 1998)(stating that the search-incident doctrine exists to "ensure officer safety and prevent the concealment or destruction of evidence"). In Gant, 556 U.S. at 351, the Supreme Court establishes that the search-incident doctrine, when officers arrest the driver of a vehicle and secure the driver in the officers' patrol car, will not permit officers to search the driver's vehicle unless the vehicle likely contains evidence of the offense of arrest:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. . . . In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence.

Gant, 556 U.S. at 343, 351.

Here, Ulibarri's lawful arrest permits Perez and Elsman to search his person, but not his vehicle. This conclusion is because the offense for which Perez and Elsman arrested Ulibarri -- the outstanding bench warrants -- did not have any additional evidence associated with it that Ulibarri's car would contain. See FOF ¶ 18-26, at 6-7. Ulibarri's car did not contain any evidence of his failure to show up for his past court date and of the associated bench warrants. Under the rule of Gant, therefore, Perez and Elsman could not search Ulibarri's vehicle upon Ulibarri's lawful arrest. See Gant, 556 U.S. at 351 ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of

the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest.").[24]

This doctrine, therefore, does not supply a constitutional justification for Ulibarri's vehicle's

search.

### B.   NEITHER THE PLAIN-VIEW EXCEPTION NOR THE AUTOMOBILE EXCEPTION TO THE WARRANT REQUIREMENT JUSTIFY THE SEARCH OF ULIBARRI'S VEHICLE.

For the sake of completeness, the Court holds that two other doctrines that frequently

justify police searches in the vehicle context -- the plain-view exception to the warrant requirement

and the automobile exception to warrant requirement -- do not justify APD's actions here.  The

plain-view exception does not apply, because the bullets that Perez and Elsman plainly could see

through the window of Ulibarri's vehicle were not of an obviously criminal character that triggers

that exception.  See Harman v. Pollock, 586 F.3d 1254, 1264 (10th Cir. 2009)("The plain view

doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access

to the object has some prior Fourth Amendment justification and who has probable cause to suspect

that the item is connected with criminal activity." (quoting  Harman v. Pollock, 446 F.3d 1069,

1087 (10th Cir. 2006))).  The automobile exception does not apply, because Perez and Elsman did

not possess probable cause to believe Ulibarri's vehicle contained evidence of criminal activity.

See United States v. Bradford, 423 F.3d 1149, 1159 (10th Cir. 2005)("Under the automobile

exception to the Fourth Amendment's warrant requirement, 'police officers who have probable

---

[24]The Court holds above that an alternative justification for the arrest is the muffler violation.  See supra n.23.  Although Perez and Elsman constitutionally could arrest Ulibarri for the muffler violation, per the rule of Atwater v. Lago Vista, 532 U.S. at 354, still they could not execute the vehicle search on this basis.  The car's hood, its undercarriage and the tailpipe would contain evidence of this offense of arrest -- i.e., evidence that the engine was inappropriately modified.  The officers here, however, searched primarily the vehicle's interior and trunk and only briefly under the vehicle's hood.  Accordingly, the search that the officers executed could not be based on incident to arrest if the offense of arrest is viewed as the muffler violation.

cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'" (quoting Florida v. Meyers, 466 U.S. 380, 381 (1984)(per curiam))).  The United States does not argue that these doctrines support the search, appropriately so, given that those doctrines have no purchase here.

The plain-view doctrine does not apply, because Perez and Elsman did not observe anything in Ulibarri's vehicle of obvious criminal significance.  The plain-view exception to the warrant requirement permits the search and seizure of items that appear obviously to police to be contraband or evidence of a crime, so long as police view the items from a vantage point they lawfully are permitted to be.  See Harman v. Pollock, 586 F.3d at 1264 ("The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." (quoting  Harman v. Pollock, 446 F.3d at 1087); United States v. Castorena-Jaime, 285 F.3d 916, 924 (10th Cir. 2002)("An item's incriminating nature is immediately apparent if 'the officer had probable cause to believe the object was contraband or evidence of a crime.' . . . A seizing officer need not . . . have an 'unduly high degree of certainty' [but rather a] 'practical, nontechnical probability that incriminating evidence is involved.'" (quoting United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996), then Texas v. Brown, 460 U.S. 730, 741 (1983))).  Here, Perez and Elsman lawfully were occupying their vantage point on the street, but what was plainly in view to them -- bullets strewn on the backseat of Ulibarri's vehicle, see FOF ¶ 16, at 6 -- were not obviously contraband or evidence of crime. Ulibarri was not, for example, a felon who could not possess lawfully a firearm or ammunition, and Perez and Elsman did not, at the time, believe that he had prior felony convictions, see FOF ¶ 24, at 8; nor did they possess any other reason to believe he could not possess lawfully

ammunition or a firearm, see FOF ¶ 25, at 8.  If they had known he lawfully could not possess a firearm or ammunition, then the evidence, plainly viewed through the car's window, would come under the exception.  See United States v. Castorena-Jaime, 285 F.3d at 924 ("A seizing officer need [possess only a] . . . 'practical, nontechnical probability that incriminating evidence is involved.'" (quoting United States v. Sanchez, 89 F.3d at 719).  Although the bullets' haphazard placement on Ulibarri's backseat suggested to Perez and Elsman that Ulibarri "might have something," FOF ¶ 27-29, at 8-9, that suspicion does not constitute the obviously criminal character required to trigger the plain-view exception to the warrant requirement.  Under the facts here, the plain-view doctrine, therefore, does not permit entry into Ulibarri's vehicle.

For essentially the same reason -- nothing known at the time to Perez and Elsman suggested strongly that Ulibarri's vehicle contained evidence of crime -- the automobile exception to the warrant requirement does not apply in this context to permit a search of Ulibarri's vehicle.  The automobile exception to the warrant requirement permits searches of vehicles that police possess probable cause to believe contain contraband or evidence of criminal activity.  See United States v. Bradford, 423 F.3d at 1159 ("Under the automobile exception to the Fourth Amendment's warrant requirement, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'" (quoting Florida v. Meyers, 466 U.S. at 381)).  Like the analysis under the plain-view exception, the only source of suspicion as to the possibly criminal contents of Ulibarri's car are the presence of ammunition strewn haphazardly over the vehicle's backseat -- that ammunition which led Perez to believe that "might have something."  FOF ¶ 27-29, at 8-9.  That suspicion does not amount to probable cause that Ulibarri's car contained contraband or evidence of crime.  Accordingly, the automobile exception to the warrant requirement cannot justify searching Ulibarri's car.

In sum, the Court concludes that neither the search-incident-to-arrest doctrine, nor the plain-view exception to the warrant requirement, nor the automobile exception to the warrant requirement supplies constitutional justification for Ulibarri's vehicle's search.  The Court turns now to the impoundment's constitutionality.

## IV.   THE IMPOUNDMENT OF ULIBARRI'S VEHICLE IS JUSTIFIED CONSTITUTIONALLY BY A REASONABLE, NON-PRETEXTUAL COMMUNITY-CARETAKING RATIONALE.

Ulibarri's vehicle's impoundment is constitutionally justified under the doctrinal framework unique to community-caretaking impoundments.  Cf. Sanders, 796 F.3d at 1244 n.1 ("Though impoundments and inventory searches often occur sequentially, they are subject to different legal standards.").  First, the Court holds that the first prong of the threshold inquiry that Trujillo, 993 F.3d 859, establishes authorizes Ulibarri's vehicle's impoundment, but that Trujillo's second prong does not.  Cf. Woodard, 5 F.4th at 1152 (describing the two antecedent inquiries as whether "(1) the car is blocking traffic, (2) the car is posing an imminent threat to public safety"); Venezia, 995 F.3d at 1175 n.1 ("We have recently held that our two-prong inquiry under Sanders does not apply to impoundments where there is a 'threat to public safety or traffic.' Because the government asserts that the impoundment here was justified exclusively by the risk of theft or vandalism, as opposed to a safety- or traffic-related interest, we apply Sanders." (quoting Trujillo, 993 F.3d at 872)).  Ulibarri's vehicle impeded traffic under the Tenth Circuit's broad conception of what constitutes a traffic impediment, so Trujillo's first threshold inquiry is satisfied; the Court holds, however, that Trujillo's second prong is not satisfied, because Ulibarri's vehicle was not threatening public safety.

In the alternative, the framework of Sanders, 796 F.3d 1241, authorizes the impoundment. Cf. Venezia, 995 F.3d at 1175 n.1 ("We have recently held that our two-prong inquiry under

Sanders does not apply to impoundments where there is a 'threat to public safety or traffic.' Because the government asserts that the impoundment here was justified exclusively by the risk of theft or vandalism, as opposed to a safety- or traffic-related interest, we apply Sanders." (quoting Trujillo, 993 F.3d at 872)).  Under Sanders' first prong, the Court holds that APD's impoundment policy authorized the impoundment; although the compliance-with-policy inquiry is not strictly necessary when, as here, the impoundment occurred on public property, cf. Venezia, 995 F.3d at 1178 (10th Cir. 2021)("The first prong of Sanders[, requiring compliance with a standardized policy,] is indeed specific to private property impoundments. . . . The factors describing community-caretaking functions under the second prong of Sanders, however, apply to "all community-caretaking impoundments." (quoting Sanders, 796 F.3d at 1249)(emphasis in Venezia, not in Sanders)), nonetheless the Court's conclusion about policy compliance contributes to the impoundment's reasonableness.  Sanders' second prong, which entails consideration of that prong's five factors, weighed together, leads to the conclusion that the impoundment was reasonable and objectively justified.  Cf. Ramos, 88 F.4th at 873 ("Application of the Sanders factors compels the conclusion that the impoundment was unreasonable even if undertaken without any type of pretextual motive.").  Under the pretext inquiry, which the Court understands as an inquiry posterior to the five-prong reasonableness inquiry, the Court holds that, although APD officers possessed a subjective investigatory motivation for the impoundment, the existence of that subjective motivation does not vitiate the impoundment's reasonableness, because the impoundment otherwise is reasonable and objectively justified under the circumstances.  The impoundment thus is permissible as a dual or mixed motivation impoundment.  Cf. Trujillo, 993 F.3d at 871 ("[E]ven if the district court had found that Skroch was motivated in part by an

investigatory motive[,] . . . . that would still be insufficient ground to require suppression."). For these reasons, the Court holds that Ulibarri's vehicle's impoundment is justified.

A. **THE FIRST PRONG OF <u>TRUJILLO</u>'S THRESHOLD INQUIRY AUTHORIZES IMPOUNDMENT, BECAUSE ULIBARRI'S VEHICLE WAS IMPEDING TRAFFIC.**

Considering the threshold inquiry that <u>Trujillo</u> establishes -- permitting impoundment solely based on a vehicle's obstructing traffic or threatening public safety -- the Court holds that the first prong authorizes impoundment. The Court holds that Ulibarri's vehicle was obstructing traffic, because improperly occupying a public parking spot comes within the Tenth Circuit's broad construction of traffic impediments. Accordingly, the threshold inquiry's first prong authorizes impoundment.

Ulibarri's vehicle was blocking traffic, so this part of <u>Trujillo</u>'s threshold inquiry supports impoundment. As discussed, as part of the threshold inquiry into whether impoundment is justifiable -- antecedent to the two-prong <u>Sanders</u> framework -- inquires whether the vehicle is obstructing the flow of traffic. See <u>Trujillo</u>, 993 F.3d at 869 (impoundment proper if vehicle "imped[es] traffic or threaten[s] public safety and convenience.'" (quoting <u>Opperman</u>, 428 U.S. at 368-69)(alterations the Court's); <u>Woodard</u>, 5 F.4th at 1152 (describing the two antecedent inquiries as whether "(1) the car is blocking traffic, (2) the car is posing an imminent threat to public safety"). <u>But see</u> n.12 <u>supra</u> (noting that <u>Trujillo</u> disavows that the threat need be imminent). The Tenth Circuit, interpreting the Supreme Court's <u>Opperman</u>, has given a broad reading to what constitutes traffic obstruction that can form the basis of a valid threshold-stage impoundment:

> It is important to recognize the breadth of what is encompassed by "efficient movement of vehicular traffic," "impeding traffic," and "public safety and convenience." [<u>Opperman</u>, 428 U.S.] at 369, 96 S.Ct. 3092. The impounded automobile in <u>Opperman</u> was in a lawful parking spot. Perhaps between 2:00 a.m. and 6:00 a.m. it was blocking street-maintenance work, but when it was impounded

the sin was parking overtime. A more recently arrived vehicle could have lawfully
parked there. It was not blocking the flow of traffic. As far as one can discern from
the Supreme Court opinion, the only way in which the vehicle was impeding traffic
was by reducing the number of available parking spots, perhaps requiring drivers
of other vehicles to waste time and slow traffic while searching for other places to
park.

Trujillo, 993 F.3d at 865.  Here, Ulibarri's poor parking job -- his car straddled two spaces blocked

out for metered parking, see FOF ¶ 8-9, at 3-4 -- comes within the wide scope for traffic

impediments that Trujillo describes.  Although the car would not prevent or even hinder any

vehicle that wanted to drive in either direction on Third Street, because Ulibarri's vehicle safely

was parked to the side of the road, the fact that Ulibarri's vehicle if left too long where it was

would be subject to ticketing and impound eventually, i.e., in blocking parking spaces that

other drivers could use, brings it within Trujillo's expansive understanding of what constitutes a

traffic obstruction.  See Trujillo, 993 F.3d at 865 ("It is important to recognize the breadth of what

is encompassed by 'efficient movement of vehicular traffic,' 'impeding traffic,' and 'public safety

and convenience.'" (quoting Opperman, 428 U.S. at 369)).

This impeding-traffic part of Trujillo's threshold inquiry is, therefore, alone sufficient to

authorize Ulibarri's car's impoundment.  Cf. Venezia, 995 F.3d at 1175 ("We have recently held

that our two-prong inquiry under Sanders does not apply to impoundments where there is a 'threat

to public safety or traffic.'" (quoting Trujillo, 993 F.3d at 872)).  Nonetheless, the Court will

continue to analyze the remaining bases for impoundment, under the Sanders two-prong test.

Although Trujillo's reading of Opperman explicitly authorizes the broad reading of traffic

obstruction, the Court is careful with such a result.  If any bad parking job, which could eventually

subject a vehicle to ticketing and towing, constitutes a traffic impediment authorizing Trujillo

impoundment, then it makes superfluous the remainder of the analysis in most situations; if a

parked car constitutes a traffic obstacle because it occupies space another vehicle could otherwise

occupy, then almost any vehicle stopped on a public way would satisfy that threshold inquiry.

Cars typically cannot park indefinitely on any public way, e.g., because of street sweeping or other

public functions that require, at some time, that any vehicle stopped on a public way be relocated.

Cf. Trujillo, 993 F.3d at 866 ("[W]e have . . . almost without exception, have upheld impoundment

of vehicles pulled over on roadways.").  If alone the eventuality of having to relocate or remove

such a vehicle makes the vehicle a traffic impediment, then rarely would any further analysis be

required, yet the Tenth Circuit has applied the analytically posterior, second Sanders prong inquiry

in such situations.  Cf. Kendall, 14 F.4th at 1122-24 (analyzing under Sanders' second prong the

impoundment of a vehicle from a public way).   Nonetheless, the Court holds that Trujillo's

impeding-traffic inquiry is sufficient to authorize impoundment, but will discuss how, in the

alternative, the remainder of the Tenth Circuit's doctrines also support impoundment.[25]

---

[25]Although Ulibarri's vehicle satisfies the impeding-traffic portion of the Trujillo threshold inquiry, it does not satisfy the second, public-safety threat portion, which therefore does not authorize a basis for impoundment.  As the Court notes above, it is unclear how to analyze the threatening-public-safety-and-convenience inquiry separate from the impeding traffic inquiry. Trujillo, itself, for example, suggests that the way the vehicle there threatened public safety was based on how it impeded the flow of traffic, dangerously so -- because of how the vehicle there was position in  the roadway, it could prevent the passage of, e.g., an ambulance, or it could be struck by another vehicle:

> [E]ven if some cars could have passed by the Mustang, that does not mean that the Mustang was not "impeding traffic or threatening public safety and convenience." *Opperman*, 428 U.S. at 368-69, 96 S.Ct. 3092. If passing by the Mustang would have been a tight squeeze, the necessary maneuver would slow progress and might lead to minor damage. And since incoming drivers would not be expecting a vehicle in the driveway, there was opportunity for a more serious collision with the dark Mustang parked to the side even if there was ample room for the other vehicle to pass it. The Mustang also would have made it difficult, if not impossible, for wider-bodied emergency vehicles such as ambulances or firetrucks to pass if needed within the complex.

Trujillo, 993 F.3d at 869-70.  In this way, Trujillo collapses the impeding-traffic inquiry and the threatening-public-safety inquiry, or at least treats them as informed by the same considerations.  Cf. Woodard, 5 F.4th at 1152 (listing as separate inquiries whether "(1) the car is blocking traffic, [and] (2) the car is posing an imminent threat to public safety").

As discussed above, see Section IV.A supra, the Court holds that Ulibarri's vehicle impeded the flow of traffic, and so the first portion of the Trujillo threshold test authorizes impoundment.  If the first and second parts of the Trujillo threshold test really are the same, then Ulibarri's vehicle, based on how it occupied spaces open for metered parking, would threaten public safety and convenience.  When a car occupies two spaces, after all, cars, desperate for a scarce downtown parking space, will try to cram another car into the shortened space, risking property damage to both vehicles.  If the car did not threaten public safety, it at least threatened "public . . . convenience," Trujillo, 933 F.3d at 869 (quoting Opperman, 428 U.S at 368), by occupying two spaces that two drivers might have occupied.

The presence of the known firearm in Ulibarri's vehicle presents another reason, hypothetically, to say that the vehicle threatened "public safety and convenience," Trujillo, 933 F.3d at 869 (quoting Opperman, 428 U.S. at 368): the presence of an unsecured firearm could threaten public safety because an unscrupulous vandal could steal the firearm and create danger thereby.  The Court, however, will not adopt the position that the presence of the unsecured firearm contributes to this second Trujillo threshold inquiry for two reasons.  First, Trujillo itself, which involved an unsecured firearm, did not analyze this fact as part of the threatening-public-safety-and-convenience inquiry, but instead puts that fact towards Trujillo's separate, gun-visible-through the window inquiry.  Compare Trujillo, 993 F.3d at 869 (including no mention of the gun visible through the defendant's car window in concluding that "[t]he hazard posed by Defendant's Mustang easily satisfies Opperman. . . ." (quoting Opperman, 428 U.S. at 369)), with id. at 873 ("In addition, the search of the Mustang was permissible [beyond] . . . the Opperman rationale . . . [because] the deputies would have still been entitled to remove the firearms visible from outside the car and to search for others, lest they 'fall into untrained or perhaps malicious hands.'" (quoting Cady, 413 U.S. at 443)).  Second, the Tenth Circuit elsewhere suggests that concerns about vandalism, and even threats to the public flowing therefrom, are not analyzed on this second Trujillo threshold inquiry, cf. Venezia, 995 F.3d at 1175 n.1 ("We have recently held that our two-prong inquiry under Sanders does not apply to impoundments where there is a 'threat to public safety or traffic.' . . . [Where] impoundment . . . was justified exclusively by the risk of theft or vandalism, as opposed to a safety- or traffic-related interest, we apply Sanders." (quoting Trujillo, 993 F.3d at 872)); Ramos, 88 F.4th at 875 ("[T]his court has concluded concerns relating to possible vandalism, and the municipal liability that could flow therefrom, are properly considered at the third Sanders factor."  (citing Venezia, 995 F.3d at 1179)).

Accordingly, because the gun unsecured in Ulibarri's car and subject to vandalism should not be considered as a reason, under the Trujillo threshold inquiry, that the car threatened public safety and convenience, there is no reason to say that Ulibarri's car satisfied this Trujillo inquiry: no other reason suggests itself that Ulibarri's car threatened public safety and convenience; it was not, e.g., on fire or in some other public-endangering condition.  Accordingly, although, as discussed above, see Section IV.A.1 supra, the first, impeding-traffic prong of the Trujillo threshold inquiry authorizes impoundment, the second Trujillo prong does not.  Nonetheless, and for the sake of completeness, the Court will address how Ulibarri's car's impoundment shakes out

**B.      THE <u>SANDERS</u> TWO-PRONG FRAMEWORK SUPPORTS THE IMPOUNDMENT OF ULIBARRI'S CAR, BECAUSE, ALTHOUGH NOT STRICTLY REQUIRED GIVEN THE VEHICLE'S LOCATION ON PUBLIC PROPERTY, THE IMPOUNDMENT COMPLIED WITH APD POLICY, SATISFYING THE FIRST <u>SANDERS</u> PRONG, AND THE FIVE-FACTOR INQUIRY OF THE SECOND <u>SANDERS</u> PRONG LEADS TO THE CONCLUSION THAT A REASONABLE, COMMUNITY-CARETAKING FUNCTION AUTHORIZED THE VEHICLE'S IMPOUNDMENT.**

The two-pronged <u>Sanders</u> inquiry supports impoundment here.  Although, as the Court notes above, the first prong of <u>Sanders</u> is not required when a vehicle, as here, is impounded from public property, the fact, per the first <u>Sanders</u> prong, that the impoundment complied with policy, is informative of the impoundment's reasonableness.  Accordingly, the Court analyzes the first prong, and concludes that it supports impoundment, even though <u>Sanders</u> does not strictly require it.

The second <u>Sanders</u> prong -- whether a reasonable and non-pretextual community caretaking function exists for the impoundment -- also supports Ulibarri's vehicle's impoundment.  As the Court discusses above, the Court's understanding of the five, explicitly enumerated factors of <u>Sanders</u>' second prong, is that they, together, decide whether the impoundment was reasonable -- <u>i.e.</u>, together the five factors of <u>Sanders</u>' second prong, together constitute an objective test for reasonableness.  The Tenth Circuit has at once said that the five factors help determine whether the impoundment was pretextual, <u>i.e.</u>, a subjective inquiry, <u>see</u> <u>Woodard</u>, 5 F.4th at 1155 (stating, about <u>Sanders</u>' second prong's five factors that "[w]e have identified five factors bearing on the possibility of pretext").  Elsewhere, the Tenth Circuit has said that, upon

---

under the rest of the Tenth Circuit's impoundment doctrine, and holds that the <u>Sanders</u> two-prong inquiry authorizes impoundment as well.

failure of the five second-prong factors, an impoundment is unreasonable, so there is no need to inquire about pretext.  See Venezia, 995 F.3d at 1182 (stating, after having analyzed the five factors, that "the officers' decision to impound the vehicle was not guided by a reasonable community-caretaking rationale as required under the second Sanders prong. . . . It is unnecessary to decide whether the asserted community-caretaking rationale was also 'pretextual.'  In fact, in this case, the evidence of pretext is scant."); Ramos, 88 F.4th at 873 ("Application of the Sanders factors compels the conclusion that the impoundment was unreasonable even if undertaken without any type of pretextual motive.").  But see id. at 873 n.14 ("[I]t is clear the five Sanders factors bear on the existence of both pretext and reasonableness. . . . Sanders' focus on both reasonableness and pretext is unusual, but not without precedent." (citing Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011)).  This latter approach is more straightforward: the five second-prong factors indicate whether the impoundment was reasonable, while a free-floating residual inquiry asks whether the officers were motivated by impermissible pretext.  Here the five second-prong factors authorize as objectively reasonable Ulibarri's vehicle's impoundment.  See infra Section IV.B.2.a.

Inquiring, as a residual matter about the presence of pretext, the Court holds that although APD officers did possess an investigatory, subjective motive, that this does not invalidate the otherwise lawful impoundment.   The Tenth Circuit has at times approved mixed-motive impoundments.  Compare Trujillo, 993 F.3d at 871 ("[E]ven if the district court had found that Skroch was motivated in part by an investigatory motive[,] . . . that would still be insufficient ground to require suppression." (citing Haro-Salcedo, 107 F.3d at 771-72 (upholding impoundment in "multiple-motivation scenario," where district court found that one reason for officers' impoundment of vehicle was to hold it "for further investigation by the DEA"); United States v. Sanchez, 720 F. App'x 964, 970 (10th Cir. 2018)(unpublished)("[A] dual motive does

Case 1:21-cr-01826-JB   Document 113   Filed 03/14/24   Page 82 of 130

not invalidate an otherwise lawful impound and inventory.")), with Woodard, 5 F.4th at 1159 n.8

("[H]ere, the police lacked a proper motive because the standardized policy did not apply. So the

police did not harbor dual motives, and we need not address what the outcome would have been if

they had.").   Moreover, several federal Courts of Appeals have expressly held that the presence

of an investigatory motive does not invalidate an otherwise constitutionally authorized

impoundment; no Court of Appeal, to the Court's knowledge, holds otherwise. See United States

v. Snoddy, 976 F.3d 630, 635-36 (6th Cir. 2020)("[R]egardless of Trooper Malone's motivations

and beliefs, Trooper Malone was going to have the car towed no matter what.  Snoddy was the

sole occupant of the car, and the car would have been left out on the side of the highway . . . in the

middle of the night. . . . 'The Fourth Amendment permits impoundment decisions and inventory

searches that are objectively justifiable . . . regardless of an officer's subjective intent.'" (quoting

United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001))); United States v. Johnson, 889 F.3d

1120, 1126 (9th Cir. 2018)("[T]he mere 'presence of a criminal investigatory motive' or a 'dual

motive -- one valid, and one impermissible --' does not render an administrative stop or search

invalid; instead, we ask whether the challenged search or seizure 'would . . . have occurred in the

absence of an impermissible reason.'" (quoting United States v. Orozco, 858 F.3d 1204, 1213 (9th

Cir. 2017))); United States v. Arrocha, 713 F.3d 1159, 1163-64 (8th Cir. 2013)("Although the

disturbance calls gave the officers reason to suspect there might be a gun in Arrocha's car, when

there is a valid reason to impound a vehicle, '[t]he presence of an investigative motive does not

invalidate an otherwise valid inventory search.'" (quoting United States v. Garner, 181 F.3d 988,

991 (8th Cir. 1999))); United States v. Coccia, 446 F.3d 233, 240-41 (1st Cir. 2006)("'As long as

impoundment pursuant to the community caretaking function is not a mere subterfuge for

investigation, the coexistence of investigatory and caretaking motives will not invalidate the

seizure.'" (quoting <u>United States v. Rodriguez–Morales</u>, 929 F.2d 780, 787 (1st Cir. 1991)));

<u>United States v. Castro</u>, 166 F.3d 728, 734 (5th Cir. 1999)("[W]e reject the appellants' contention

that Officer Nettles' hidden motives invalidated what was an otherwise lawful impoundment

carried out in accordance with the standard procedures of the Polk County Sheriff's Department.").

Accordingly, the Court holds that although there was present a subjective, investigatory motive,

the impoundment was objectively reasonable, as consideration of the second <u>Sanders</u> prong's five

factors leads the Court to conclude.

> **1.      Ulibarri's Vehicle's Impoundment Complied With APD Policy, Which Argues in Favor of the Impoundment's Reasonableness, Even Though, Because Ulibarri's Vehicle Was Impounded on Public Property, This Inquiry is Not Strictly Required.**

Ulibarri's vehicle's impoundment complied with APD policy, and this compliance

counsels in favor of holding that the impoundment is reasonable and objectively justified.  The

<u>Sanders</u> framework for assessing a vehicle impoundment's constitutionality does not require that

the impoundment and search comply with police standardized procedures when, as here, the

vehicle's impoundment occurs on public property, rather than on private property.

> Impoundment of a vehicle located on private property . . . is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale. . . . <u>Opperman</u>[, however,] establishes that if a vehicle is obstructing or impeding traffic on public property, it can be impounded regardless of whether the impoundment is guided by standardized procedures.

<u>Sanders</u>, 796 F.3d at 1248-49 (citing <u>Opperman</u>, 428 U.S. at 369); <u>Venezia</u>, 995 F.3d at 1178 ("The

first prong of <u>Sanders</u> is indeed specific to private property impoundments. . . . The factors

describing community-caretaking functions under the second prong of <u>Sanders</u>, however, apply to

"<u>all</u> community-caretaking impoundments." (quoting <u>Sanders</u>, 796 F.3d at 1249)(emphasis in

<u>Venezia</u>, but not in <u>Sanders</u>)).  Nonetheless, compliance with standardized procedures indicates

that officers acted reasonably: that officers acted by-the-book counsels in favor of holding that the impoundment and search was constitutionally permissible.  See Sanders, 796 F.3d at 1248-49 ("Bertine makes the existence of standardized criteria the touchstone of the inquiry into whether an impoundment is lawful."); Woodard, 5 F.4th at 1159 n.8 (suggesting that police would possess "a proper motive" if their "standardized policy . . . appl[ied]"); Kendall, 14 F.4th at 1122 n.2 (taking the time to analyze Sanders' first, compliance-with-policy prong despite noting that it is not strictly required). Officers' actions make more sense when considered in relation to existing police protocol and goes a way toward indicating their reasonableness.

Here, APD SOPs authorized Ulibarri's vehicle's impoundment and inventory search.  SOP § 2-48 permits APD officers to impound a vehicle located within city limits when they have arrested the vehicle's driver:

> 1.      Department personnel may order the impoundment of any vehicle within the municipal county limits, without prior notice to the owner or operator of the vehicle, when certain criteria are met, including, but not limited to:
>
>> a.      The vehicle is being driven unsafely under the City's ordinances, consistent with ROA 1994, § 8-5-2-4;
>>
>> b.      The vehicle driver has been incapacitated, hospitalized, or arrested;
>>
>> c.      The vehicle cannot be released to the co-owner who is listed in the Motor Vehicle Division (MVD) vehicle registration or the vehicle's Certificate of Title;
>>
>> d.      The vehicle has been abandoned, vandalized, or involved in a collision and damaged to the extent that it is inoperable;
>>
>> e.      The vehicle is in violation of the City of Albuquerque's Traffic Code and documented attempts to contact the owner have failed; or

    f.  The vehicle is needed for evidence processing in a criminal investigation.

APD SOP § 2-48-4(A)(1), at 1-2.  APD policy also requires that officers document the towing and the justification therefor.  See APD SOP § 2-48-4(B)(1)(b), at 2 ("When it becomes necessary to tow a vehicle, Department personnel shall . . . [d]ocument the justification for the towing of the vehicle in a Uniform Incident Report and on the Tow-in report unless the tow is at the owner's request. . . .").  Policy provides discretion for officers to cancel a tow truck they have called to the scene in certain circumstances, as when a tow truck cannot arrive within thirty minutes; notably, the towing-cancellation policy does not provide that a tow order should be canceled in the event a person who is not the vehicle's co-owner arrives to take custody of the vehicle on behalf of the vehicle's owner.  See APD SOP § 2-48-4(B)(6), at 5 ("Cancellation of Towing Services: Department personnel have the discretion to cancel a tow truck if circumstances so dictate, for certain situations, including, but not limited to, if the tow truck is not properly equipped for the job, or if the tow truck cannot arrive within thirty (30) minutes.").

   Perez and Elsman's decision to impound complied with these APD protocols.  Ulibarri's vehicle was located within Albuquerque municipal limits.  See FOF ¶¶ 1, 8, at 3-5.  Perez and Elsman validly arrested Ulibarri on the basis either of his existing bench warrants or on the basis of the traffic violation.  See Section II supra, at 64-68.  Accordingly, their SOPs thereby authorized them to impound the vehicle, see APD SOP § 2-48-4(A)(1)(b) ("Department personnel may order the impoundment of any vehicle within the municipal county limits . . . when . . . [t]he vehicle driver has been . . . arrested. . . .").  Although the Tow-In Report that Perez and Elsman prepared is not perfect, because certain portions of those documents lack information, nevertheless, the essential facts of those documents are filled in, namely the rationale for impoundment, in

satisfaction of policy.  <u>See</u> FOF ¶ 62, at 16; Tow-In Report at 1 (listing "ARREST" as the "reason" for which Ulibarri's vehicle is catalogued on the Tow-In Report); APD SOP § 2-48-4(B)(1)(b), at 2 ("When it becomes necessary to tow a vehicle, Department personnel shall . . . [d]ocument the justification for the towing of the vehicle in a Uniform Incident Report and on the Tow-in report unless the tow is at the owner's request. . . .").  Moreover, although Ulibarri's mother arrived to retrieve Ulibarri's vehicle, she had done so after the tow truck had arrived, <u>see</u> FOF ¶ 60, at 16, at 10; APD policy gives officers discretion to cancel an impoundment, but does not require that they do so under such circumstances, so it did not violate policy to decline to call off the impoundment and release the car to her.  <u>Cf.</u> APD SOP § 2-48-4(B)(6), at 5 ("Cancellation of Towing Services: Department personnel have the discretion to cancel a tow truck if circumstances so dictate, for certain situations, including, but not limited to, if the tow truck is not properly equipped for the job, or if the tow truck cannot arrive within thirty (30) minutes.").  Ulibarri has not asserted, for example, that his mother is a co-owner of the vehicle, so that not to discharge the vehicle to her violates policy.  <u>Cf.</u> APD SOP § 2-48-4(A)(1)(c), at 2 (providing for impoundment when "[t]he vehicle cannot be released to the co-owner who is listed in the Motor Vehicle Division (MVD) vehicle registration or the vehicle's Certificate of Title").

The Court notes, moreover, that -- aside from the police's impoundment policy -- local Albuquerque city ordinances authorize impoundment here.  Albuquerque's code authorizes impoundment because Ulibarri was lawfully arrested, could not immediately provide someone to take custody of the vehicle, and the vehicle could not park there indefinitely, and, alternatively, it is reasonable that the vehicle should be removed when -- the only car on the street that night -- it would be a prime target for vandalism:

> Any municipal police officer . . . may order the impoundment of any vehicle within the municipal corporate limits, without prior notice to the owner or operator thereof, . . . [w]hen the driver or person in control of a vehicle is lawfully taken into custody by a police officer, and the person is unable to immediately provide for the custody or removal of the vehicle, and the vehicle is left as described elsewhere in this division (A), or the location of the vehicle is such that a reasonable person would believe that its owner would desire its relocation or removal.

Albuquerque Code § 8-5-2-4(A)(7).  See id. § 8-5-2-4(A)(2) (authorizing impoundment "[w]hen any vehicle is parked or left standing upon a street, alley, or public way in such a position as to obstruct the normal movement of traffic or in such a condition as to create a hazard to other traffic"); id. § 8-5-2-4(A)(10) (authorizing impoundment "[w]hen any vehicle is parked or left standing where prohibited by ordinance or other state or local law[, but n]o vehicle may be removed pursuant to this division unless signs are posted giving notice of its removal at least 24 hours prior to the removal").  Therefore, local law, in addition to departmental policy, authorized impoundment.

That Ulibarri's vehicle's impoundment thus was by-the-book suggests its reasonableness and propriety.  See Sanders, 796 F.3d 1241, 1248-49.  Therefore, although, because the impoundment occurred on public property, Sanders does not require compliance with standardized policy, the fact that it complies in this case militates in favor of finding a proper community-caretaking rationale for the officers' actions.  Cf. United States v. Taylor, 592 F.3d 1104, 1108 (10th Cir. 2010)(requiring that officers not impound a car "in bad faith or for the sole purpose of investigation").

2.    **Under Sanders' Second Prong, a Reasonable, Non-Pretextual Community-Caretaking Rationale Supports Ulibarri's Vehicle's Impoundment.**

A reasonable, non-pretextual community-caretaking rationale justifies Ulibarri's vehicle's impoundment, satisfying Sanders' second prong, which applies to impoundments from public

property.  Each of the five enumerated factors either suggest that the decision to impound was reasonable, or do not cut sufficiently strongly against the conclusion that the impoundment was reasonable: (i) the vehicle was impounded from public property; (ii) because the vehicle was impounded from public property, officers needed no property owner's consent; (iii) there did not exist reasonable alternatives to impoundment; (iv) although Ulibarri did not consent to the impoundment, this factor does not strongly suggest that the impoundment was unreasonable; and (v) the vehicle was not implicated in a crime.  As the Court describes above, consideration of the five enumerated second-prong factors leads to the conclusion that the impoundment objectively was justifiable.   The catch-all, residual inquiry as to pretext suggests that, although the impoundment was reasonable and so objectively justified, there was some subjective investigatory motive.  Under the Court's understanding of the applicable doctrines, however, a mixed-motive impoundment is not impermissible under the Fourth Amendment.

> ### a.   The Five Enumerated Factors of Sanders' Second Prong Lead to the Conclusion that the Decision to Impound Objectively Was Justifiable.

As the Court has described, the five enumerated Sanders prong-two factors are best approached as constituting an objective inquiry: whether, as a community-caretaking impoundment, a car's impoundment objectively was reasonable.  See Venezia, 995 F.3d at 1182 (stating, after having analyzed the five factors that, "the officers' decision to impound the vehicle was not guided by a reasonable community-caretaking rationale as required under the second Sanders prong. . . . It is unnecessary to decide whether the asserted community-caretaking rationale was also 'pretextual.'  In fact, in this case, the evidence of pretext is scant."); Ramos, 88 F.4th at 873 ("Application of the Sanders factors compels the conclusion that the impoundment was unreasonable even if undertaken without any type of pretextual motive.").  But see id. at 873

n.14 ("[I]t is clear the five <u>Sanders</u> factors bear on the existence of both pretext and reasonableness.

. . . <u>Sanders</u>' focus on both reasonableness and pretext is unusual, but not without precedent."

(citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 736)).   Considering the five factors, the Court concludes

that Ulibarri's vehicle's impoundment objectively was justified and reasonable as a community-

caretaking impoundment.   As the Court will discuss, <u>see</u> Section IV.B.2.b <u>infra</u>, although there

were subjective investigatory motives, those do not make unconstitutionally pretextual the

impoundment which was otherwise reasonable and so lawful.

> **i.**    **<u>Sanders</u>'  First  Factor  Does  Not  Suggest
> Unreasonableness Because APD Impounded Ulibarri's
> Vehicle When It Was Located on a Public Street.**

Factor one asks whether the vehicle, when impounded, was located on private or public

property.  <u>See</u> <u>Venezia</u>, 995 F.3d at 1178 (noting that the impoundment of vehicles from private

property suggests pretext because "[p]ublic safety and convenience are less likely to be at risk").

Although the Court has noted its view that this first factor rehashes an earlier analytical step, <u>see</u>

n.17 <u>supra</u>, the Tenth Circuit has consistently reaffirmed the importance of the issue and the

conclusion that police can impound vehicles from public roadways.   While it is presumptively

unreasonable to impound vehicles from private property, <u>e.g.</u>, in businesses' parking lots, motel

parking lots, or private residences' driveways, <u>cf.</u> <u>Woodard</u>, 5 F.4th at 1152 ("The Fourth

Amendment imposes 'heightened requirements on police who seize vehicles from private

property.'" (quoting <u>Sanders</u>, 796 F.3d at 1249)), the opposite is true of impoundments on public

property, which the Court understands to be presumptively reasonable.  <u>Cf.</u> <u>Trujillo</u>, 993 F.3d at

866 ("[W]e have . . . almost without exception, have upheld impoundment of vehicles pulled over

on roadways. . . . [In <u>United States v. Ibarra</u>, t]he sole exception to our general approval of

impoundment of vehicles stopped on a roadway[,] . . . [impoundment] did not meet any of the

criteria for impoundment under Wyoming state law [and] the driver . . . was not arrested.").  The Court understands the fact that an impoundment occurred on public property, therefore, to be a strong factor in favor of the impoundment's propriety.  Here, Perez and Elsman arrested Ulibarri on a public street in downtown Albuquerque, and Ulibarri's vehicle was towed from this public location, see FOF ¶ 8, at 4-5; id. ¶ 60, at 16.  The first factor, therefore, suggests strongly that the impoundment was reasonable.

### ii.  Sanders' Second Factor Does Not Apply Because the Vehicle Was Impounded From Public Not Private Property.

Factor two asks whether, if the vehicle is on private property, whether police consulted the property's owner.  See Sanders, 796 F.3d at 1251 (noting that failing to consult a private property owner from which a vehicle is impounded suggests pretext if "there is no evidence in the record that the police consulted the owners of the parking lot about the vehicle remaining where it was").  Because Perez and Elsman towed the car form a public street, there was no property owner to consult to see whether the vehicle could not be left where it was.  This second prong-two factor therefore does not apply.

### iii.  Sanders' Third Factor Cuts in the United States' Favor, Because Alternatives to Impoundment, Although They Existed, Did Not Require that APD Decline to Impound Ulibarri's Vehicle.

As to factor three -- often the most contested factor and the one that the Court views as the linchpin of most Sanders analyses -- Ulibarri argues that there are three "alternative[s] to impoundment" that Perez and Elsman could have opted for over impounding his vehicle.  Sanders, 796 F.3d at 1250.  Perez and Elsman constitutionally need not have exhausted every possible opportunity, so long as Perez and Elsman considered the reasonable alternatives.  See Woodard, 5

F.4th at 1158 ("[T]he officers need not 'take every measure possible' to avoid a finding that an impoundment is a pretext for a criminal investigation. . . . But here, the officers' failure to consider reasonable alternatives shows the actual motive for the impoundment: The police wanted an excuse to search the car." (citing Woodard, 5 F.4th at 1167(Eid, J., dissenting))).   First, he argues that the officers could have permitted him to pay off the bond and drive off with his vehicle; second, he argues that the officers could simply have left the vehicle parked where it was; and third, the officers could have permitted Ulibarri's mother to retrieve his vehicle.   For the following reasons, none of these three options are alternative courses of action that make unconstitutionally pretextual the impoundment and inventory of Ulibarri's vehicle.

> **I.    Permitting Ulibarri to post bond and drive away his vehicle was not an available alternative to impoundment because Perez and Elsman already had decided they would not permit Ulibarri to post bond and instead would arrest him.**

First, Ulibarri's suggestion -- that, instead of impounding his vehicle, Perez and Elsman could have permitted him to post bond on his bench warrants at the bonding window and to then drive off his vehicle -- is inapposite at this analytical juncture.   As discussed above, see supra Part II, at 64-68, the decision not to permit Ulibarri to post bond at the bonding window contributes primarily to the decision-to-arrest constitutional analysis: after deciding to arrest Ulibarri instead of permitting him to post bond, it no longer was an option to drive off the vehicle and let Ulibarri post bond.   Permitting him to post bond and drive off was an "alternative," Sanders, 796 F.3d at 1250, not to impoundment but rather to arrest in the first place -- having already decided to arrest Ulibarri, the question only was what to do with his car.   Cf. Woodard, 5 F.4th at 1151-52 ("The police had authority to stop the car in order to serve Mr. Woodard with the protective order and execute the warrant for public intoxication. Once Mr. Woodard pulled in front of the QuikTrip

store, however, the police had to decide what to do with the car."). That Perez and Elsman opted not to permit Ulibarri to post bond and drive off is not a scenario that presents an alternative, the choice of impoundment over which suggests the impoundment is unreasonable.

> **II.    Leaving Ulibarri's car parked where it was on the street did not present a viable "alternative to impoundment," because the car impeded traffic, contained a gun which presented grave safety concerns should the car become subject to theft, and was at risk of vandalism.**

APD could not have left his vehicle where it was parked on the street, because the vehicle, which Perez and Elsman knew contained a firearm, could safely be left unattended.  As the Court has discussed above, see nn.14, 20, 25 supra, this inquiry appears to collapse into several other inquiries that appear in the Tenth Circuit's impoundment doctrines.   For example, police sometimes cannot leave a vehicle where it was because it would be unsafe to do so: this is both a reason to say, under Sanders' prong-two third factor, that leaving the vehicle where it was not a viable "alternative to impoundment," Sanders, 796 at 1152, and a reason to say, under either of the Trujillo's two threshold inquiries, that the vehicle "imped[es] traffic or threaten[s] public safety and convenience,'" Trujillo, 993 F.3d at 869 (quoting Opperman, 428 U.S. at 368-69)(alterations the Court's); moreover, that a vehicle contains a dangerous item like a firearm that could be subject to vandalism is both a reason to say that, under Sanders' prong-two third factor, that simply leaving the vehicle undisturbed where it was not a viable "alternative to impoundment," Sanders, 796 F.3d at 1152, and a reason, under Trujillo's gun-in-the-car doctrine, that officers can enter the vehicle to secure the dangerous item therein, see Trujillo, 993 F.3d at 873 ("Even if the Mustang could have safely been left parked in or around the entryway, . . . the deputies would have still been entitled to remove the firearms visible from outside the car and to search for others, lest they 'fall

into untrained or perhaps malicious hands.'" (quoting Cady, 413 U.S. at 443)).  Nonetheless, the

Court, in ways that are duplicative with earlier and later parts of the analysis, proceeds to articulate

why leaving Ulibarri's vehicle undisturbed where it was did not constitute a viable "alternative to

impoundment," Sanders, 796 F.3d at 1152, under this third Sanders prong-two factor.

Perez and Elsman could not simply leave Ulibarri's vehicle where it was because it

impeded traffic.  Like the discussion above, see Section IV.A supra, at 75-79, Ulibarri's vehicle

impeded traffic by occupying spots that other vehicles could take up, see FOF ¶¶ 8-9, at 3-4, even

if it would not have prevented another drive from traverses Third Street, see FOF ¶ 10, at 5.

Because of how the car impeded traffic, Perez and Elsman could not simply leave the car there, so

it was not an "alternative to impoundment." Sanders, 796 F.3d at 1152.  Cf. Kendall, 14 F.4th at

1123 ("Nor was it a reasonable option for officers to leave the vehicle where it was. . . . [T]he

'vehicle was stopped on a public street, and subject to public traffic laws,' and '[b]ecause of its

location, there was no person whom the police could consult about watching over the car.'"

(quoting record on appeal)).

Moreover, vandalism concerns are a reason that Perez and Elsman could not leave the car

where it was, particularly given that it contained a firearm.  See Venezia, 995 F.3d at 1180 ("[A]n

abandoned vehicle on a public highway may be at risk of theft or vandalism, and thus may be

impounded under the community-caretaking doctrine."); Ramos, 88 F.4th at 875 ("[T]his court

has concluded concerns relating to possible vandalism, and the municipal liability that could flow

therefrom, are properly considered at the third Sanders factor." (citing Venezia, 995 F.3d at 1179)).

Although this analysis rehashes analyses that the Court engages in later under Cady-Trujillo's gun-

in-the-car doctrine, see Section VII infra, at 129-32, nevertheless, vandalism concerns point to a

critical feature about Perez and Elsman's knowledge of Ulibarri's car's contents at this point: Perez

and Elsman strongly suspected, and Ulibarri confirmed as he was being placed in their patrol car, that Ulibarri's vehicle contained a firearm.  See FOF ¶¶ 16-17, at 6; id. ¶ 37, at 10.  It would not be safe to leave unattended on a public street a vehicle that Perez and Elsman knew contained a firearm, subject to potential vandalism and theft.   Vandalism concerns were particularly heightened given that Ulibarri's car would have been the only car parked in the area: no other car was parked on either that block of Third Street or the next, see FOF ¶ 11, at 5, so Ulibarri's car would have been a sitting duck, ripe for the plundering.  Cf. Venezia, 995 F.3d at 1181 ("[T]he risk of theft or vandalism to a particular vehicle is greater where . . . overnight parking is unusual, or where the vehicle would be out of place or conspicuous.").  Leaving Ulibarri's car parked where it was, therefore, did not present a viable "alternative to impoundment."  Sanders, 796 F.3d at 1250.  That Perez and Elsman declined to leave overnight Ulibarri's car, which they knew contained a firearm, parked as the only car on the street where it would be subject to vandalism argues in favor of the impoundment's reasonableness.

### III.   Permitting Ulibarri's mother to retrieve the car did not present a viable "alternative to impoundment."

Last, Ulibarri's argument that an alternative to impoundment existed in having his mother drive away the vehicle is unavailing, because officers are not required to await the arrival of a third person to retrieve stopped vehicles.  Ulibarri emphasizes that he repeatedly requested that Perez and Elsman permit his mother to retrieve his vehicle, and he notes that she did later arrive on the scene to take custody of the vehicle.  See FOF ¶¶ 44-45, at 14; id. ¶ 53, at 15; id. ¶ 60 at 16.  Perez and Elsman were not obligated to await, however, the arrival of Ulibarri's mother to begin effecting the impoundment of the car because they did not know how long it would take her to arrive and whether she lawfully could take possession of the vehicle.  See Colorado v. Bertine,

479 U.S. at 374 ("'The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less restrictive' means.'" (quoting Illinois v. Lafayette, 462 U.S. 640, 647 (1983))).  That his mother later appeared is of little consequence because the relevant time frame for analysis is the earlier point in time when Ulibarri's arrest occurred and the decision as to disposing of his vehicle was made.  Cf. United States v. Woodard, 5 F.4th at 1158 (emphasizing that the pertinent facts are those known to the police "when [they] . . . decided to impound the car").  In Tenth Circuit cases that have faulted police officers' decision not to wait for a third person to arrive to retrieve the car, the vehicle often was located on private property and it was daytime.  See Woodard, 5 F.4th at 1158 (noting that officers improperly "refused out-of-hand" to permit a third person to "pick up the car[, a]nd at roughly 8:00 in the morning, there was nothing to suggest an imminent risk of vandalism," at a private parking lot where the vehicle was parked); Sanders, 796 F.3d at 1251 ("[P]olice impounded Sanders' vehicle without offering her the opportunity to make alternative arrangements, even though she stated that she was willing to have someone pick up the vehicle on her behalf, and Hussey offered to find someone to pick it up for her."); Venezia, 995 F.3d at 1180 ("The officers only began to contact Cuello by telephone after 9:00 P.M. [and] gave up . . . by 9:45 P.M. . . . , when the vehicle was impounded.  The officers' unsuccessful, late-night attempts to call Cuello do not establish that the vehicle would have been left at the motel indefinitely.").

In contrast to these cases, Ulibarri's arrest occurred near midnight on a public street with no one to account for the vehicle.  Although Woodard faults the officers there for "refus[ing] out-of-hand" to permit a third party to collect the defendant's vehicle, that case does not require explicitly that officers explain to a defendant why they are refusing to permit a third person to collect the vehicle; United States v. Woodard, instead of suggesting that officers must explain to

the defendant why they will not permit a third person to collect the car, instead requires that officers posses an explanation.  Cf. United States v. Woodard, 5 F.4th at 1157 ("[W]e have no idea why the police would have rejected Mr. Woodard's request -- out-of-hand -- to contact someone else to pick up or move the car.").  Here, Perez and Elsman did not explain fully to Ulibarri why his mother could not retrieve the car, but they provide one to the Court: they did not know how long they would have to wait and did not know whether Ulibarri's mother, if and when she arrived, lawfully would be able to operate the vehicle, particularly one that had an illegally modified muffler and that had a firearm in it.  See FOF ¶ 44, at 14; id. ¶ 53, at 15; id. ¶ 60, at 16.  Typically, the person who could take control of the property has been immediately on hand to take possession of the property, where the Tenth Circuit has said that a valid alternative to impoundment existed in having the third person take control thereof.  Cf. United States v. Braxton, 61 F.4th at 836-37 ("Gay appeared less than 30 seconds after Braxton called out for his 'girl,' Gay twice asked to take the backpack, and the officers curtly rejected her requests. . . . [T]he alternative to impoundment of giving the backpack to Gay weighs heavily against finding a reasonable community-caretaking rationale."); Ramos, 88 F.4th at 878 (holding that having the defendant's mother retrieve his vehicle was an available alternative impoundment because impounding officers knew the mother and "knew [she] lived in very close proximity" to the impoundment site).

Here, unlike the rare situation in Ramos, Perez and Elsman did not know Ulibarri's mother or where she lived, and thus had no idea how long it could take her to get there.  Cf. Ramos, 88 F.4th at 878 ("Frederick is a small town and Ramos was well-known. [Officer] Puentes had known both Ramos and [Ramos' mother] Juanes since he was a child; [Officer] Rodriguez had known Juanes his entire life. Both officers knew Juanes lived in very close proximity to the Hop & Sack [where the vehicle was impounded].").  That Ulibarri's mother did arrive later at the time the tow-

truck arrived, see FOF ¶ 60, at 16, does not mean that the decision to impound at the time it was made was inappropriate or that it was unreasonable not to call off the impoundment once Ulibarri's mother arrived.  Cf. Ramos, 88 F.4th at 878 ("[T]here is nothing in the record to indicate it would have been more time consuming for Puentes to call Juanes as an alternative to impounding the truck.").

Finally, to permit the vehicle to drive away would be to permit an ongoing vehicular violation given the muffler violation of state and local law.  See N.M.S.A. § 66-3-844(A); Albuquerque Code § 8-6-13(A)-(B).  Cf. Kendall, 14 F.4th at 1123 ("[E]ven if Kendall proved ownership and some licensed driver had been available, he or she still would not have been able to drive the car away because the vehicle lacked adequate taillights and was not insured. That means that no one could have legally operated the vehicle that night."); United States v. Cartwright, 630 F.3d 610, 616 (7th Cir. 2010)("[N]o one could have lawfully driven Golliday's car from the scene, as it did not have the functional license plate lamp required by Indiana law. . . . In the absence of such a lamp, the car was not lawfully operable.").

In conclusion, no viable alternative existed to impounding Ulibarri's vehicle.  This third contested Sanders factor, therefore, counsels in favor of holding reasonable the impoundment of Ulibarri's car.

### iv.   Sanders' Fourth Factor Argues in Ulibarri's Favor, Because the Vehicle was Not Implicated in a Crime Beyond a Traffic Offense.

Ulibarri's vehicle was implicated in a crime, but because the crime was only a traffic offense, the fourth Sanders factor does not favor Ulibarri's vehicle's impoundment and inventory. See Sanders, 796 F.3d at 1250; Kendall, 14 F.4th at 1124 (describing as a "Sanders factor[] that favor[s] Kendall" that "the vehicle was not implicated in any crime other than traffic offenses").

The United States contends that Ulibarri's vehicle was implicated in a crime because of its modified muffler, i.e., the traffic offense initially that justified the stop. This situation is not the paradigmatic "implicated in a crime" setting in which the driver uses his vehicle to transport drugs, so that seizing the vehicle is appropriate. Sanders, 196 F.3d at 1250. To permit impoundment substantially on the basis that Ulibarri's vehicle presented a non-dangerous ongoing traffic violation is far removed from permitting impoundment because a vehicle was used to transport drugs, but two features are important under this analysis: (i) Ulibarri's arrest could be based constitutionally on the traffic offense; and (ii) the traffic offense at issue, the muffler modification, is such that the vehicle would contain evidence thereof not apparent from the outside.

First, as the Court holds above, Perez and Elsman could have arrested Ulibarri on the basis of the traffic violation, see supra n.23, so the traffic violation is a crime of arrest, that, if the vehicle contains evidence thereof, could support the fourth factor. Cf. Venezia, 995 F.3d at 1182 ("The fourth Sanders factor weighs against impoundment because impounding Venezia's vehicle would not have provided further evidence of the traffic violations or outstanding warrant for which Venezia was arrested."). Second, the vehicle may contain "further evidence of the traffic violation[]" at issue here. Venezia, 995 F.3d at 1182. Unlike an arrest for speeding or failure to use a turning signal -- ephemeral traffic offenses of which an inspection of the offending vehicle would reveal no additional evidence -- Ulibarri's vehicle would contain further evidence of the traffic offense here: a check under the hood, under the vehicle's body, or of the exhaust tailpipe would reveal further information of the possible muffler modification. See N.M.S.A. § 66-3-844(A); Albuquerque Code § 8-6-13(A)-(B). These two considerations cut in favor of the implicated-in-a-crime fourth factor.

As noted, however, it is not clear that the fourth factor can lie alone on a traffic violation. See Kendall, 14 F.4th at 1123-24 (noting that the fourth factor favors the defendant where "the vehicle was not implicated in any crime other than traffic offenses").  The Court disagrees then with the contrary conclusion reached by the Honorable Kea W. Riggs,  United States District Judge for the District of New Mexico.  See United States v. Pena, No. 1:23-CR-00748-KWR, 2023 WL 8258541, at *9 (D.N.M. Nov. 29, 2023)(Riggs, J.)("Expired registration plates or validating stickers are not permitted to be displayed; violations constitute a misdemeanor.  [See NMSA 1978, § 66-3-18]. . . . This Court finds the vehicle was implicated in a crime and therefore, this factor weighs in favor of impoundment.").  To say that a non-dangerous traffic violation alone cuts in favor of impoundment goes a way toward the parade of horribles that Ulibarri hypothesizes: officers routinely could arrest drivers and tow vehicles based solely on, e.g., missing taillights. See Reply at 4.  ("Officers do not impound vehicles on the spot anytime the driver has committed a traffic violation, even if that violation interferes with the car's safety. . . .  '[A] standardized policy of impounding all vehicles whose owners receive traffic citations' would be unreasonable." (quoting Sanders, 796 F.3d at 1249-50)).  Where the ultimate "touchstone of the Fourth Amendment is reasonableness," Florida v. Jimeno, 500 U.S. at 250, such conduct would be unreasonable.  Because the considerations pertinent to this factor cuts against impoundment, this fourth Sanders factor favors Ulibarri.

> ### v.     Sanders' Fifth Factor Favors Ulibarri Because He Did Not Consent to Perez and Elsman's Impounding His Vehicle.

The fifth factor, whether Ulibarri consented to the towing of his vehicle, also is largely uncontested and favors Ulibarri.  See Sanders, 796 F.3d at 1250.  The United States is correct in averring that Ulibarri never withheld explicitly his consent to have his vehicle towed.  See FOF

¶ 15, at 17; Response at 13.  That Ulibarri, however, did not explicitly withhold consent does not mean that he consented to the impoundment.  Cf. United States v. Guerrero, 472 F.3d 784, 789-90 (10th Cir. 2007)("Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.").  Perez and Elsman never asked Ulibarri if he consented to their towing the vehicle.  See FOF ¶ 15, at 17.  It is safe to assume that Ulibarri did not want his vehicle towed, because, even in the absence of the vehicle's containing evidence of criminal activity, a vehicle's impoundment creates headache and expenses for the vehicle's owner.  The Court, therefore, will not interpret Ulibarri's silence as consent to his vehicle's impoundment.

### vi.  Weighing All the Factors Together Leads to the Conclusion That the Impoundment Was Reasonable.

Having addressed each of the five Sanders prong two factors, the Court weighs them, and holds that the five factors together lead to the conclusion that the impoundment was reasonable and objectively justified.  Cf. Ramos, 88 F.4th at 879 (stating that the court "weigh[s] all factors together").  The first and third factors cut in favor of impoundment: the vehicle was impounded from a public way, and so presumptively can be impounded, see Section IV.B.2.a.i supra, at 89; and, critically, there was no reasonable alternative to impoundment, see Section IV.B.2.a.iii supra, at 90-97.  Because the second, consent-of-private-property owner factor does not apply, see Section IV.B.2.a.ii supra, at 90, the factors cutting against impoundment are that Ulibarri did not consent, see Section IV.B.2.a.v supra, at 99-100, and that the vehicle was implicated only in an ongoing traffic offense, see Section IV.B.2.a.iv supra, at 97-99.  The weightier factors one and three argue for impoundment: impoundments from public streets are, in effect, presumptively reasonable, see Trujillo, 993 F.3d at 866 ("[W]e have . . . almost without exception, have upheld

impoundment of vehicles pulled over on roadways. . . . [In <u>United States v. Ibarra</u>, t]he sole exception to our general approval of impoundment of vehicles stopped on a roadway[,] . . . [impoundment] did not meet any of the criteria for impoundment under Wyoming state law [and] the driver . . . was not arrested."), and that there was no alternative to impoundment is, in most contexts, the whole ballgame, <u>cf.</u> <u>Woodard</u>, 5 F.4th at 1151-52 ("Once Mr. Woodard pulled in front of the QuikTrip store . . . the police had to decide what to do with the car.").  Rarely will a driver want their car towed, so lack of consent is not a unique feature in many impoundment situations, and, for that reason, the Court does not afford great weight to the fifth factor; the fourth factor, that the vehicle was not implicated in any non-traffic offense, as a factor does not outweigh the more substantive first and third factors.  The impoundment was reasonable and objectively justified.  <u>Cf.</u> <u>Ramos</u>, 88 F.4th at 873 ("Application of the <u>Sanders</u> factors compels the conclusion that the impoundment was unreasonable even if undertaken without any type of pretextual motive."); <u>Venezia</u>, 995 F.3d at 1182 (stating, after having analyzed the five factors that, "the officers' decision to impound the vehicle was not guided by a reasonable community-caretaking rationale as required under the second <u>Sanders</u> prong. . . . It is unnecessary to decide whether the asserted community-caretaking rationale was also 'pretextual.'").  <u>But</u> <u>see</u> <u>Ramos</u>, at 873 n.14 ("[I]t is clear the five <u>Sanders</u> factors bear on the existence of both pretext and reasonableness. . . . <u>Sanders</u>' focus on both reasonableness and pretext is unusual, but not without precedent." (citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 736 (2011)).  The Court turns next to whether there exists pretextual investigatory motives that could undercut Ulibarri's vehicle's impoundment's reasonableness.

> **b.      The Residual Inquiry under <u>Sanders</u>, which Addresses Exclusively the Presence of an Invalidating Investigatory Motive, Does Not Lead to the Conclusion that the Impoundment was Invalid, Because, Although There Was Present an Investigatory Motive, That Does Not Vitiate the Impoundment's Validity Because It Coexisted With an Otherwise Valid <u>Impoundment Rationale</u>.**

Although there was present an investigatory motive to the impoundment, the presence of the investigatory motive does not invalidate the search overall, because the Fourth Amendment does not prohibit dual motive or mixed motive impoundments. Although the five <u>Sanders</u> prong-two factors inform both objective reasonableness and subjective pretext, <u>Ramos</u>, 88 F.4th at 873 n.14 ("[I]t is clear the five <u>Sanders</u> factors bear on the existence of both pretext and reasonableness. . . . <u>Sanders</u>' focus on both reasonableness and pretext is unusual, but not without precedent." (citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 736), the Tenth Circuit also has authorized approaching the five factor inquiry as a matter alone of objective reasonableness, <u>see</u> <u>Ramos</u>, 88 F.4th at 873 ("Application of the <u>Sanders</u> factors compels the conclusion that the impoundment was unreasonable even if undertaken without any type of pretextual motive."). The Court therefore, approaches <u>Sanders</u> free-standing residual inquiry, <u>see</u> <u>Sanders</u>, 796 F.3d at 1250 (noting that its five factors are "non-exclusive"), as informing us whether there exists a pretextual motive that undercuts the impoundment's overall validity.

APD possessed an investigatory motive, but that does not make the impoundment overall unconstitutionally pretextual. Here, Perez and Elsman possessed a subjective investigatory motive -- explaining his decision to arrest Ulibarri, Perez states, "I think I'm just gonna do it anyway, I'm gonna take [Ulibarri] out. There were bullets in the car so he might have something." FOF ¶ 27-29, at 8-9. Perez testified that, by this statement, he meant only that Perez and Elsman should be cautious when arresting Ulibarri, because Ulibarri "might have" a weapon,

Case 1:21-cr-01826-JB   Document 113   Filed 03/14/24   Page 103 of 130

but the Court does not credit that explanation, see Tr. at 26:4-27:15 (Perez, Fontanez); on the Court's interpretation of the lapel camera footage, Perez' statement is offered as an explanation why Perez wanted to arrest Ulibarri, not as a reason to exercise caution in effecting the arrest, see FOF ¶¶ 27-29, at 9-9.  Perez and Elsman wanted to learn what "something" Ulibarri "might have." FOF ¶ 27-29, at 8-9.  By that statement, Perez and Elsman did not mean only what Ulibarri "might have" on his person, but also what Ulibarri "might have" in his car.  See FOF ¶ 27-29, at 8-9.  There is no intellectually honest way to interpret this statement other than that Perez and Elsman possessed an investigatory motive for the arrest and subsequent impoundment.  The Court, however, holds above that, upon consideration of Sanders prong two's five factors, the impoundment objectively was justifiable and reasonable.  The question then is whether the presence of the impermissible motive invalidates the otherwise valid impoundment, i.e., whether the dual or mixed motive impoundment is impermissible.

The mixed impoundment here is not impermissible.  The Supreme Court suggests that the presence of an investigatory motive will not necessarily render invalid a vehicle's impoundment. See Bertine, 479 U.S. at 372 (upholding inventory search where "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation" (emphasis added)).  The Tenth Circuit has sent mixed signals whether dual motive impoundments are permissible; the Tenth Circuit has said, seemingly explicitly, that mixed motive impoundments are constitutional, yet elsewhere has suggested that it lacks a doctrinal position on the matter.  Compare Trujillo, 993 F.3d at 871 ("[E]ven if the district court had found that Skroch was motivated in part by an investigatory motive[,] . . . . that would still be insufficient ground to require suppression." (citing Haro-Salcedo, 107 F.3d at 771-72 (upholding impoundment in "multiple-motivation scenario," where district court found that one reason for officers'

- 103 -

impoundment of vehicle was to hold it "for further investigation by the DEA"); United States v. Sanchez, 720 F. App'x 964, 970 (10th Cir. 2018)(unpublished)("[A] dual motive does not invalidate an otherwise lawful impound and inventory."))), with Woodard, 5 F.4th at 1159 n.8 ("[H]ere, the police lacked a proper motive because the standardized policy did not apply. So the police did not harbor dual motives, and we need not address what the outcome would have been if they had.").

The statement in Trujillo indicating that mixed motive impoundments are permissible accords with several other Courts of Appeals' explicit holdings that mixed motive impoundments are permissible; no Court of Appeals, to the Court's knowledge, holds the opposite position. See United States v. Snoddy, 976 F.3d at 635-36 (6th Cir. 2020)("'The Fourth Amendment permits impoundment decisions and inventory searches that are objectively justifiable . . . regardless of an officer's subjective intent.'" (quoting United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001)); United States v. Johnson, 889 F.3d 1120, 1126 (9th Cir. 2018)("[T]he mere 'presence of a criminal investigatory motive' or a 'dual motive -- one valid, and one impermissible --' does not render an administrative stop or search invalid; instead, we ask whether the challenged search or seizure 'would . . . have occurred in the absence of an impermissible reason.'" (quoting United States v. Orozco, 858 F.3d 1204, 1213 (9th Cir. 2017)); United States v. Arrocha, 713 F.3d 1159, 1163-64 (8th Cir. 2013)("Although the disturbance calls gave the officers reason to suspect there might be a gun in Arrocha's car, when there is a valid reason to impound a vehicle, '[t]he presence of an investigative motive does not invalidate an otherwise valid inventory search.'" (quoting United States v. Garner, 181 F.3d 988, 991 (8th Cir. 1999)); United States v. Coccia, 446 F.3d 233, 240-41 (1st Cir. 2006)("'As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives

will not invalidate the seizure.'" (quoting <u>United States v. Rodriguez–Morales</u>, 929 F.2d 780, 787 (1st Cir. 1991)); <u>United States v. Castro</u>, 166 F.3d 728, 734 (5th Cir. 1999)("[W]e reject the appellants' contention that Officer Nettles' hidden motives invalidated what was an otherwise lawful impoundment carried out in accordance with the standard procedures of the Polk County Sheriff's Department.").

The Court holds that the presence of the investigatory motive does not invalidate the otherwise reasonable impoundment.  There is no evidence that Perez and Elsman operated with "bad faith." <u>United States v. Taylor</u>, 592 F.3d at 1108.  Perez and Elsman did not abuse the lawful authority that they otherwise possessed under the circumstances to impound Ulibarri's car from a public roadway after Ulibarri's arrest.  To the extent, however, that mixed-motive impoundments are not per se permissible and may require additional analysis, <u>cf.</u> <u>Woodard</u>, 5 F.4th at 1159 n.8 ("[W]e need not address what the outcome would have been if [police] had [dual motives]."), the Court notes that the United State Court of Appeals for the Ninth Circuit usefully has suggested that courts should consider whether, in the absence of the impermissible motive, the impoundment still would have occurred,  <u>see</u> <u>United States v. Johnson</u>, 889 F.3d at 1126 ("[W]e ask whether the challenged search or seizure 'would . . . have occurred in the absence of an impermissible reason.'" (quoting <u>United States v. Orozco</u>, 858 F.3d at 1213)).  This rule essentially sets up a but-for-causation or multiple-sufficient-causes inquiry.

The Court holds that the mixed motive impoundment was not impermissible, because, as discussed, the decision to impound was reasonable under <u>Sanders</u>' second prong's five factors, <u>see</u> Section IV.B.2.a <u>supra</u>, at 88-101, and, taking the lead which the Ninth Circuit suggests, the impoundment would have occurred regardless of the impermissible investigatory motive.  As noted, the impoundment was reasonable and objectively justified.  APD policy permitted the

- 105 -

impoundment, see Section IV.B.1 supra, at 83-87; the vehicle was on public property, meaning police presumptively could impound it cf. Trujillo, 993 F.3d at 866 ("[W]e have . . . almost without exception, have upheld impoundment of vehicles pulled over on roadways."); Section IV.B.2.a.i supra, at 89; and there was no viable alternative to impoundment, because there were no persons immediately present to take custody of the vehicle, leaving the vehicle where it was as not an option, and allowing Ulibarri to pay off his bond and drive off also was not an option, see Section IV.B.2.a.iii supra, at 90-97. For these reasons, balanced against the fact that Ulibarri did not want his vehicle towed, see Section IV.B.2.a.v supra, at 99-100, and that the vehicle only was implicated in a traffic offense, see Section IV.B.2.a.iv supra, at 97-99, the impoundment was reasonable, see Section IV.B.2.a.vi supra, at 100-01.

Although APD wanted to know what possible criminal evidence Ulibarri's vehicle contained, that investigatory motive does not invalidate the search, because the impoundment would have occurred absent it. Even if Ulibarri were arrested for, for example, drunk driving, and no investigatory motive arose, impoundment would be proper: he was on a public street, no one was around to take immediate possession of the vehicle, and policy would authorize it. Impoundment would be proper and would occur irrespective of investigatory motives.

   i.  **That Ulibarri's Arrest Is A <u>Whren</u> Arrest Does Not Mean That The Subsequent Impoundment Cannot Be <u>Upheld As A Permissible Mixed Motive Impoundment</u>.**

That Ulibarri's arrest is a <u>Whren</u> arrest, i.e., a seizure for which there existed probable cause unrelated to officers' subjective investigatory motive, complicates analysis of the dual-motive impoundment's validity. See <u>Whren</u>, 517 U.S. at 819 (holding that where "officers had probable cause to believe that petitioners had violated the traffic code[, t]hat rendered the stop reasonable under the Fourth Amendment" despite the officers' ulterior investigatory motive);

Devenpeck v. Alford, 543 U.S. at 153 ("[A]n arresting officer's state of mind . . . is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (citing Whren, 517 U.S. at 812-13; Arkansas v. Sullivan, 532 U.S. 769)).  The Court here turns to a proposition that Ulibarri offers in his briefing: "[T]he officers' conduct throughout the encounter belies the pretextual nature of the search. . . . [T]heir decision to arrest him appeared to be predicated on their desire to search the car. . . . The Tenth Circuit has made clear that such behavior is 'powerful evidence of pretext.'"  Reply at 7 (quoting Woodard, 5 F.4th at 1158-59).  The way that statement is phrased -- the decision to arrest was "predicated on [a] desire to search the car," Reply at 7 -- speaks in the first instance to the lawfulness of Ulibarri's arrest, and, as such, is an incorrect statement of law.  As a statement about an arrest's lawfulness, it is incorrect, because it does not matter why officers wanted to arrest Ulibarri, so long as they had probable cause to do so.  See Devenpeck v. Alford, 543 U.S. at 153 ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (citing Whren, 517 U.S. at 812-13; Arkansas v. Sullivan, 532 U.S. 769)).  Only an arrest based subjectively on, e.g., race or ethnicity is impermissible, and that constraint comes not from the Fourth Amendment but from the Equal Protection Clause of the United States Constitution.  See Whren, 517 U.S. at 813 ("We of course agree . . . that the Constitution prohibits selective enforcement . . . based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.").

Accordingly, why APD arrested Ulibarri does not matter, so long as they had lawful authority to effectuate the arrest. As discussed above, see supra Section II, at 64-68, they possessed such authority based on the outstanding bench warrant for Ulibarri's arrest, see Utah v. Strieff, 579 U.S. at 240 ("'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'")(quoting United States v. Leon, 468 U.S. at 920 n.21)). There could be no argument, therefore, that Ulibarri's arrest, based on the bench warrant, is unlawful, even if APD wanted to search his person. The issue here, however, is whether the outcome differs when the search is of his vehicle, pursuant to an impoundment based purely on administrative functions. Put another way, the issue is whether the subjective investigatory motive that, under Whren, does not invalidate an objectively justified arrest, nevertheless "carries through," so to speak, to corrupt as impermissibly pretextual the impoundment of an arrestee's vehicle. The Court answers "no" to these questions.

Ulibarri's arrest necessitated his vehicle's impoundment, and the bench warrant authorized his arrest while a subjective investigatory interest motivated it: Perez could have let Ulibarri post bond, but decided to arrest Ulibarri instead because "he might have something," FOF ¶ 27-29, at 8-9. Absent the subjective investigatory motive, APD may not have arrested Ulibarri based on his bench warrants and instead may have permitted him to post bond. It is not a stretch to say that the investigatory motive was a but-for cause of the arrest. The Whren principle authorizes this situation. Cf. Devenpeck v. Alford, 543 U.S. at 153 ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (citing Whren, 517 U.S. at 812-13; Arkansas v. Sullivan, 532 U.S. 769)).

The analytical problem is that an investigatory motive was a but-for cause of the arrest, and the arrest, in turn, was a but-for cause of the impoundment.  The issue that Ulibarri's statement in his briefing gets at -- "their decision to arrest him appeared to be predicated on their desire to search the car. . . . The Tenth Circuit has made clear that such behavior is 'powerful evidence of pretext,'"  Reply at 7 (quoting Woodard, 5 F.4th at 1158-59) -- is whether, because an investigatory motive was a but-for cause of the arrest that necessitated the vehicle's impoundment, whether the impoundment in turn is unlawful.  In the dual-motive analysis, the Court notes again that the but-for cause approach to mixed motive cases that the Ninth Circuit takes: in a sense, in the context of impoundments preceded by Whren arrests, the impoundment arguably would not occur without the investigatory motive, because there would be no arrest absent the subjective investigatory motive.  Cf. United States v. Johnson, 889 F.3d at 1126 ("[W]e ask whether the challenged search or seizure 'would . . . have occurred in the absence of an impermissible reason.'" (quoting United States v. Orozco, 858 F.3d at 1213)).

Indeed, Whren itself anticipates this kind of problem: "[W]e [have] never held, outside the context of inventory search or administrative inspection[,] . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment."  517 U.S. at 812.  One federal district court has opined that the Whren principle cannot be applied to impoundments.  See United States v. Sanchez, 535 F. Supp. 2d 216, 224 (D. Mass. 2008)(Gertner, J.)(stating that Whren "cannot be applied to impoundment decisions without doing violence to [the] constitutional protection" that "the decision to impound be made 'on the basis of something other than a suspicion of evidence of criminal activity'" (quoting Bertine, 479 U.S. at 375)).

A police officer effecting the Whren arrest of a vehicle's driver may possess investigatory suspicions extending not only to the arrestee's person, but also to the arrestee's vehicle.  On one

view, therefore, no impoundment could follow a <u>Whren</u> arrest, because the subjective motive that precipitated the driver's seizure incurably corrupts the subsequent impoundment.  This approach would not permit dual or mixed motive impoundments -- authorized by objective circumstances but motivated by impermissible investigatory motives -- a result which, on one reading, <u>Whren</u> approves.  <u>Whren</u> states that, in "the context of inventory search or administrative inspection," the Supreme Court has held that "an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment."  517 U.S. at 812.  This statement could be read to mean that the existence of an ulterior investigatory motive wholly compromises an administrative search or seizure, <u>i.e.</u>, that there can be no mixed or dual motive administrative searches and seizures such as impoundment.

Ulibarri cites to <u>Woodard</u> for his proposition.  <u>Woodard</u> also involves a <u>Whren</u> arrest: officers there arrested the defendant on an outstanding misdemeanor warrant, but they really wanted him for something else, <u>i.e.</u>, they possessed probable cause as to one offense, but subjectively a desire to investigate a separate offense motivated them in effecting the arrest:

> [T]he search . . . stemmed from a call complaining to the police about Mr. Evan Jamon Woodard.  The caller said that Mr. Woodard was fighting a huge drug case, may have smoked PCP, had three previous gun cases, and violated a protective order.  After talking to the caller, the police discovered that Mr. Woodard had an outstanding warrant for misdemeanor public intoxication.  With this information, the police looked for Mr. Woodard, planning to serve him with the protective order and execute the warrant. . . .
>
> Police officers found Mr. Woodard in Tulsa, Oklahoma, at about 8:00 a.m. and initiated a traffic stop.  Mr. Woodard pulled into a parking lot at a QuikTrip convenience store and stopped there.  The police told Mr. Woodard to get out of the car, arrested him based on the warrant, and took his cellphone.  Mr. Woodard then asked if he could call someone to pick up the car.  One of the police officers responded "I don't think so," and the police decided to impound the car.

Two officers then opened the front doors and began to search the car. One officer looked in the panel on the driver's side door and on the floor under the driver's seat, saying that Mr. Woodard was "fighting a huge drug case." Defendant's Mot. to Suppress, Exh. 4 (body camera). The other officer replied that Mr. Woodard liked PCP. As the officer replied, he opened the center console.

One officer commented that he was looking for verification of car insurance, expressing doubt that Mr. Woodard had insured the car. After seeing no verification in the center console, he eventually found proof of an old insurance policy in the glove compartment. By then, however, another officer had found marijuana, cocaine, a digital scale, and a gun.

With that evidence, the police obtained a warrant allowing access to text messages on Mr. Woodard's cellphone. Those text messages provided evidence of drug dealing.

Woodard, 5 F.4th at 1150-51.  The arrest in Woodard itself was constitutionally permissible.  See Woodard, 5 F.4th at 1151-52 ("The police had authority to stop the car in order to serve Mr. Woodard with the protective order and execute the warrant for public intoxication. Once Mr. Woodard pulled in front of the QuikTrip store, however, the police had to decide what to do with the car.").

While the impoundment would not have occurred without the arrest -- an arrest which investigatory interests subjectively motivated -- Woodard does not suggest that the impoundment was impermissible solely on the basis of this pre-arrest investigatory interest, i.e., based on the but-for chain of causal factors that began with the desire to investigate Woodard on the drug dealing allegations.  Instead, several other considerations made the impoundment of Woodard's car unconstitutional: it failed Sanders' first, compliance-with-policy prong and failed Sanders second prong's five factors.  See Woodard, 5 F.4th at 1155 ("The government bore the burden to justify the search, . . . and failed to satisfy this burden by showing the commission of an offense on a public way [as police policy required]. We thus conclude that the Tulsa policy did not authorize impoundment of the car."); id. at 1155-59 (finding that the impoundment failed on each

of prong two's five factors).  Although Woodard treats the failure on the five factors as a matter of pretext rather than reasonableness, cf. Woodard, 5 F.4th at 1155 ("We have identified five factors bearing on the possibility of pretext. . . . In reviewing these factors de novo, we conclude that every factor points to pretext [here]."), the Court understands that under the second-prong five factors' inquiry, Woodard's car's impoundment was not reasonable and not objectively justifiable, cf. Ramos, 88 F.4th at 873 ("Application of the Sanders factors compels the conclusion that the impoundment was unreasonable even if undertaken without any type of pretextual motive."). Because there was no permissible basis for impoundment, Woodard explicitly states that it had no occasion to consider the dual or mixed motive scenario.  See Woodard, 5 F.4th at 1159 ("[T]he police lacked a proper motive because the standardized policy did not apply. So the police did not harbor dual motives, and we need not address what the outcome would have been if they had.").

The circumstances in Woodard differ from those here, which present a true mixed or dual motive scenario: APD policy and objective considerations support impoundment, but an investigatory motive precipitated the arrest that precipitated the impoundment.  Ulibarri's case represents a classic dual or mixed motive scenario.  As the Court notes above, the Tenth Circuit in Trujillo asserts that mixed and dual motive impoundments are permissible.  See Trujillo, 993 F.3d at 871 ("[E]ven if the district court had found that Skroch was motivated in part by an investigatory motive[,] . . . . that would still be insufficient ground to require suppression.").  A number of other Courts of Appeals also state explicitly that mixed or dual motive impoundments are permissible. See United States v. Snoddy, 976 F.3d at 635-36; United States v. Johnson, 889 F.3d at 1126; United States v. Arrocha, 713 F.3d at 1163-64; United States v. Coccia, 446 F.3d at 240-41; United States v. Castro, 166 F.3d at 734.  Although Wren could be read to say that the presence of any subjective, investigatory motive in the conducting of what should be an administrative search or

seizure is impermissible, see Whren, 517 U.S. at 812 (stating that, in "the context of inventory search or administrative inspection," the Supreme Court has held that "an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment"); United States v. Sanchez, 535 F. Supp. 2d at 224 (stating that Whren "cannot be applied to impoundment decisions without doing violence to [the] constitutional protection" that "the decision to impound be made 'on the basis of something other than a suspicion of evidence of criminal activity'" (quoting Bertine, 479 U.S. at 375)), that statement must be contrasted with Bertine's suggestion that mixed or dual motive impoundments are constitutionally permissible, so that the presence of an investigatory motive will not invalidate an otherwise valid impoundment, see Bertine, 479 U.S. at 372, 107 S.Ct. 738 (upholding inventory search where "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation").  Impoundments that follow Whren arrests should not be an exception to the rule that dual or mixed motive impoundments are permissible, but Ulibarri's proposal would produce that result.

The subjective, investigatory motive that is a but-for cause of a valid Whren arrest should not be understood to make invalid an otherwise permissible impoundment.  If it were otherwise, then no impoundment could occur after a driver's valid Whren arrest regardless where the arrest occurs.  Rarely, one would think, do the subjective investigatory motives that a police officer possesses when effecting the Whren arrest of a vehicle's driver extend only to investigating what the driver has on his person and not also what is contained in the vehicle; in effecting a driver's Whren arrest, the arresting officer likely has suspicions extending both to the arrestee's person and also to the arrestee's vehicle.  If the Court follows to its logical conclusion Ulibarri's suggestion -- that the initial investigatory motive for the arrest incurably corrupts the subsequent

impoundment -- then never could impoundment follow the Whren arrest of a vehicle's driver, regardless of the vehicle's location at the time of arrest.  For example, police officers would have to leave parked precariously on the side of a busy highway a vehicle whose driver they arrested on the basis of an outstanding bench warrant, but in whom they really were interested because the driver is a known gang member.  If the impoundment is impermissible, because -- as a but-for causal root -- there is a subjective investigatory motive, then for any Whren arrest of a vehicle's driver, the vehicle could never be impounded.

Where the Whren principle permits the arrest of a vehicle's driver on the basis, objectively, of probable cause as to one offense, while a desire to investigate another offense subjectively motivates the arresting officers, officers should not be wholly hamstrung to leave the driver's vehicle in a position where otherwise impoundment would be appropriate, e.g., on the side of a busy highway.  If the but-for investigatory root could be said to corrupt irreparably the ultimate impoundment, then in every Whren arrest, the car should be left on the side of the road, with officers powerless to do anything.  Where the ultimate test of the Fourth Amendment is reasonableness, the Court should not reach that unreasonable result.  Cf. United States v. McHugh, 639 F.3d at 1260 ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978))).

To escape this analytical knot, it may be useful to consider whether the impoundment would be permissible if the driver's arrest were not a Whren arrest.  It is helpful to consider, for example, whether impoundment would be permissible, if police arrest the driver for drunk-driving, without any additional investigatory motivation.  Following the Ninth Circuit's reasoning, this removes the investigatory element as a but-for link in the causal chain, and asks whether the impoundment still would have occurred under the circumstances, i.e., whether other causes are

sufficient to compel the impoundment decision result.  See United States v. Johnson, 889 F.3d at 1126 ("[W]e ask whether the challenged search or seizure 'would . . . have occurred in the absence of an impermissible reason.'" (quoting United States v. Orozco, 858 F.3d at 1213)).  Cf. Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1739 (2020)("[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause. . . . Often, [however,] events have multiple but-for causes.").  Here, had Ulibarri's arrest not been a Whren arrest, but a drink-driving arrest, police could have impounded his car from where it was located.

Although an investigatory root precipitated Ulibarri's arrest and, in turn, the impoundment, still the impoundment otherwise was lawful following Ulibarri's lawful arrest.  As the Court discusses above, the impoundment was reasonable, because it was according to APD policy, it occurred on public property, the vehicle could not be left where it was, and no one was readily available to retrieve the car.  This is properly a mixed or dual motive impoundment, and, accordingly, the impoundment is valid.  See Trujillo, 993 F.3d at 871 ("[E]ven if the district court had found that Skroch was motivated in part by an investigatory motive[,] . . . . that would still be insufficient ground to require suppression."); United States v. Snoddy, 976 F.3d at 635-36 ("'The Fourth Amendment permits impoundment decisions and inventory searches that are objectively justifiable . . . regardless of an officer's subjective intent.'" (quoting United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001)); United States v. Johnson, 889 F.3d 1120, 1126 (9th Cir. 2018)("[T]he mere 'presence of a criminal investigatory motive' or a 'dual motive -- one valid, and one impermissible --' does not render an administrative stop or search invalid; instead, we ask whether the challenged search or seizure 'would . . . have occurred in the absence of an impermissible reason.'" (quoting United States v. Orozco, 858 F.3d 1204, 1213 (9th Cir. 2017)); United States v. Arrocha, 713 F.3d 1159, 1163-64 (8th Cir. 2013)("Although the disturbance calls

gave the officers reason to suspect there might be a gun in Arrocha's car, when there is a valid reason to impound a vehicle, '[t]he presence of an investigative motive does not invalidate an otherwise valid inventory search.'" (quoting United States v. Garner, 181 F.3d 988, 991 (8th Cir. 1999)); United States v. Coccia, 446 F.3d 233, 240-41 (1st Cir. 2006)("'As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure.'" (quoting United States v. Rodriguez–Morales, 929 F.2d 780, 787 (1st Cir. 1991)); United States v. Castro, 166 F.3d 728, 734 (5th Cir. 1999)("[W]e reject the appellants' contention that Officer Nettles' hidden motives invalidated what was an otherwise lawful impoundment carried out in accordance with the standard procedures of the Polk County Sheriff's Department.").   The investigatory motive for Ulibarri's lawful arrest should not be fatal to the ultimate impoundment which was reasonable under the Tenth Circuit's impoundment doctrines.

## V.   THE INVENTORY SEARCH EXCEPTION TO THE WARRANT REQUIREMENT PERMITS THE EVIDENCE'S CONSTITUTIONAL DISCOVERY.

The impound being lawful, the subsequent inventory search of Ulibarri's vehicle is also permissible, because, although the search was not flawless, nevertheless, APD followed standardized procedures and the search existed to secure the vehicle and its contents.   The Court emphasizes again that the analyses for impoundments and inventories are distinct, see Sanders, 796 F.3d at 1244 n.1 ("Though impoundments and inventory searches often occur sequentially, they are subject to different legal standards."), and the inventory of Ulibarri's vehicle satisfies the analysis pertinent to inventories.   "[I]nventory searches are . . . a well-defined exception to the warrant requirement of the Fourth Amendment." Kendall, 14 F.4th at 1124 (quoting Bertine, 479 U.S. at 371).   An inventory must be guided by standardized protocols and must be aimed at

securing a vehicle and its contents.  See United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992)(holding that an inventory search "does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents'" (quoting Opperman, 428 U.S. at 372-73)).  Officers executing an inventory search cannot engage in a roughshod, boundless search to uncover evidence, see United States v. Edwards, 632 F.3d at 644 ("An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence . . . ." (quoting United States v. Haro-Salcedo, 107 F.3d at 772-73), but officers possess some discretion to act within the bounds of established protocol, see Florida v. Wells, 495 U.S. 1, 4 (1990)("[I]n forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion." (no source given for quotation)))).  What matters particularly is that the areas within a vehicle searched should be consistent with a goal of protecting the vehicle's content; officers cannot, for example, tear up a vehicle's cushions or deconstruct its frame on an asserted basis of attempting to inventory it.  See Kendall, 14 F.4th at 1127 ("Removing interior panels of the car simply because something might be hidden within smacks of a police search for contraband rather than an administrative search for the purpose of 'protecting the car and its contents.'" (quoting Opperman, 428 U.S. at 373)).

That an inventory produces a list that is not hyper-detailed is not fatal to the inventory's validity, see United States v. Lopez, 547 F.3d 364, 370 (2d Cir. 2008)(rejecting the proposition that "the search . . . failed to meet the [constitutional] requirement that the objective of the search must be to produce an inventory[, b]ecause the search . . . did not result in a complete list of the contents of the car"), and even the failure to list bold-face items on an inventory list does not the search is invalid as an inventory, see United States v. Anderson, 56 F.4th 748, 760-61 (9th Cir.

2022)("[A]ny gaps in the deputies' inventory are much less significant than the gaps in the inventory . . . in <u>Bertine</u> (failing to list over $1000 in cash, contraband, and multiple other items of value), or the inventory . . . in <u>Garay</u> (listing only firearms), both of which were . . . valid inventory searches." (citing <u>Colorado v. Bertine</u>, 479 U.S. 367, 383 (1987)(Marshall, J., dissenting);  <u>United States v. Garay</u>, 938 F.3d 1108, 1110 (9th Cir. 2019))), <u>reh'g en banc granted,</u> 75 F.4th 984 (9th Cir. 2023).

As with dual- or mixed-motive impoundments, dual- or mixed-motive inventory searches are not per se impermissible.  See <u>Trujillo</u>, 993 F.3d at 871 (noting that <u>Bertine</u> upholds inventory searches where not "in bad faith or <u>for the sole purpose of investigation</u>" and that the Tenth Circuit has held that 'a dual motive does not invalidate an otherwise lawful impound and inventory'" (quoting <u>Bertine</u>, 479 U.S. at 372, then <u>United States v. Sanchez</u>, 720 F. App'x at 970)); <u>United States v. Snoddy</u>, 976 F.3d at 635-36 ("'The Fourth Amendment permits impoundment decisions and inventory searches that are objectively justifiable . . . regardless of an officer's subjective intent.'" (quoting <u>United States v. Kimes</u>, 246 F.3d 800, 805 (6th Cir. 2001))); <u>United States v. Johnson</u>, 889 F.3d 1120, 1126 (9th Cir. 2018)("[T]he mere 'presence of a criminal investigatory motive' or a 'dual motive -- one valid, and one impermissible --' does not render an administrative stop or search invalid).

Here, APD's search of the vehicle conformed largely to APD policy.  Two policies are pertinent, and the search complied essentially with both.  First, APD's impoundment policy provided that an impounded vehicle's interior should inventoried first, and provided authority to open any container that could be opened without harm.  See APD SOP § 2-48-4(B)(d), at 3.  It requires that, upon impounding a vehicle, officers shall:

    d.  Inventory the entire vehicle, including the vehicle trunk, glove box, truck bed, truck boxes, and all sealed and locked containers within, except when:

      i.  There are many containers to be searched, which may monopolize an employee's time; or

      ii.  It appears that attempts to access a locked container may cause damage to the container resulting in a significant liability to the City.

APD SOP § 2-48-4(B)(d), at 3. Another APD SOP also describes, in greater detail, inventory searches, and provides essentially the same rule, namely that, in inventorying a vehicle, officers should open any receptacle that can be opened without harm:

    E.  Vehicle Inventory Search

      1.  When Department personnel request that a vehicle is towed under state law or City ordinance, an inventory search of the vehicle shall be conducted to protect an individual's property, the officer, and others, as well as the Department from claims of lost or damaged property resulting from the seizure of the vehicle or items. Sworn personnel shall use the following criteria when an inventory search is conducted . . .

      d.  Inventory searches shall be conducted at or near the time the vehicle was lawfully placed within police custody, and include the entire passenger compartment, glove box, trunk, and containers without damaging the property. Containers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is consistent with Department SOP; and

      e.  An inventory search shall be documented and become part of the Uniform Incident Report.

      i.  If the vehicle is towed, an inventory search shall be conducted and shall be documented on the Tow-In Report.

APD SOP § 2-71-4(E), at 6-7.   Here APD officers engaged in just those actions: they looked throughout the vehicle and opened what containers they could without harm.   See FOF ¶¶ 52-59, at 14-15.   In particular, opening the backpack in which APD found cash, a rifle, and the narcotics that Ulibarri seeks to suppress complied with APD policy of opening sealed containers that could be opened without harm.   FOF ¶ 52, at 14.   Accordingly, the search was guided by standardized criteria that it complied with.   Cf. United States v. Lugo, 978 F.2d at 636 (holding that an inventory search "does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'" (quoting Opperman, 428 U.S. at 372-73)).

Although the inventory search had its flaws -- officers did not immediately begin inventorying the vehicle's contents and they did not produce a detailed inventory list of the vehicle -- nevertheless, these flaws are not fatal to the search's validity as an inventory search. Ulibarri emphasizes that the manner in which officers searched his car belie the narrative that it was regimented, by-the-book inventory search.   See MTS at 12; Reply at 8.   He instead characterizes their conduct as a general "rummaging."   MTS at 12.   It is true to some extent that the officers' conduct could be described as "rummaging."   United States v. Edwards, 632 F.3d 633, 644 (10th Cir. 2001)(quoting United States v. Haro-Salcedo, 107 F.3d 769, 772-73 (10th Cir. 1997)).   See United States v. Edwards, 632 F.3d at 644 ("An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence . . . ." (quoting United States v. Haro-Salcedo, 107 F.3d at 772-73)).   For example, Elsman opens the glove compartment, looks inside, reaches his hand in and shifts around the contents to see what that revealed, then closed the glovebox again after that brief search.   See FOF ¶ 52-59, at 14-15.   Other officers looked under the seats.   See FOF ¶ 52-59, at 14-15.   After a minute or two, one officer retrieved from under the

driver's seat a firearm.  See FOF ¶ 52-59, at 14-15.  No officer, during this phase of the search, takes notes on the vehicle's contents so as to devise an inventory thereof.  See FOF ¶ 52-59, at 14-15.

Although this portion of the search in some respects looks like an impermissible "general rummaging," United States v. Edwards, 632 F.3d at 644 (quoting United States v. Haro-Salcedo, 107 F.3d at 772-73), two features explain constitutionally APD's conduct.  First, officers knew that the vehicle contained a firearm, see FOF ¶ 16-17, at 6; id. ¶ 37, at 10, so they appropriately looked about first throughout the car to locate the weapon.  Second, as a matter of first securing the vehicle, APD could perform a rough pass search of the vehicle; the Constitution does not require they immediately whip out their clipboards and start jotting notes.  Cf. United States v. McHugh, 639 F.3d at 1260 ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398).  Police officers may perform an inventory search of a vehicle out on the street, rather than at a secured garage location, see Kendall, 14 F.4th 1116, 1120-21, 1124-28 (describing officers' inventory search of the vehicle before tow trucks arrived, and finding not constitutional problem therewith), so it makes sense that in the more fluid environment of a public way, officers first would want to do a rough-pass search on the car for any objects of obvious importance, such as weapons.  This conduct during the search does not undercut totally the proposition that the inventory had, among its purposes, caretaking, contents-securing purpose.

Second, that the inventory search did not ultimately produce a detailed list is not fatal to the search's validity as an inventory search.  For one, a search does not fail to comprise a valid inventory search solely because the manifest it produces is not hyper detailed.  Ulibarri, however, is correct that the officers did not produce a complete inventory of the vehicle's contents; the

standardized inventory form that Perez and Elsman filled contained a number of boxes where nothing was filled in.  See FOF ¶ 62-63, at 16-17.  Indeed, the Tow-In Report lists in its "Notes" field only items of criminal significance found in Ulibarri's vehicle: "1 LOADED HANDGUN LOCATED UNDER THE DRIVER SEAT . . . 1 LOADED RIFLE LOCATED ON THE REAR PASSENGER SEAT . . .  [and] PARAPHERNALIA [sic] COLLECTED BY OFFICER ON SCENE."  FOF ¶ 63, at 17; Tow-In Report at 1.  This inventory list does not list other items found in Ulibarri's vehicle, i.e., such as the more than $10,000.00 cash, along with personal effects of his.  See FOF ¶ 62-63, at 16-17.  But that APD did not ultimately produce an explicit list -- and even left off such big-ticket items as the cash found -- does not mean the search cannot be characterized as one designed to take stock of the contents of the vehicle: the limitations that the inventory search doctrine imposes are concerned more with where in the car the police search, than actually the list officers produce in the end.  Cf. Kendall, 14 F.4th at 1127 ("Removing interior panels of the car simply because something might be hidden within smacks of a police search for contraband rather than an administrative search for the purpose of 'protecting the car and its contents.'" (quoting Opperman, 428 U.S. at 373)).

The inventory search that APD conducted of Ulibarri's vehicle was proper, because the Fourth Amendment supplies some leeway when it comes to the details of an inventory search.  The execution of a valid inventory search is not a "totally mechanical" enterprise, so some variation in the execution thereof does not render unlawful the search.  Florida v. Wells, 495 U.S. 1, 4 (1990).  Federal courts have recognized that the failure to produce an inventory list, while problematic, does not undermine the overall validity of the search.  Cf. United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998)("Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function. . . .  This does not mean that

inventory searches are always unreasonable when standard procedures are not followed, however."

(citing <u>Opperman</u>, 428 U.S. at 374-75; <u>United States v. Woolbright</u>, 831 F.2d 1390, 1394 (8th Cir.

1987))).  Courts also have rejected constitutional claims based on an inventory listing a vehicle's

contents with allegedly insufficient granularity.  See <u>United States v. Lopez</u>, 547 F.3d 364, 370

(2d Cir. 2008)(rejecting the proposition that "the search . . . failed to meet the [constitutional]

requirement that the objective of the search must be to produce an inventory[,] [b]ecause the search

. . . did not result in a complete list of the contents of the car"); <u>United States v. Anderson</u>, 56 F.4th

748, 760-61 (9th Cir. 2022)("[A]ny gaps in the deputies' inventory are much less significant than

the gaps in the inventory . . . in <u>Bertine</u> (failing to list over $1000 in cash, contraband, and multiple

other items of value), or the inventory . . . in <u>Garay</u> (listing only firearms), both of which were . . .

valid inventory searches." (citing <u>Bertine</u>, 479 U.S. at 383 (Marshall, J., dissenting);  <u>United States</u>

<u>v. Garay</u>, 938 F.3d at 1110)), <u>reh'g en banc granted,</u> 75 F.4th 984 (9th Cir. 2023).  As the Honorable

Judith C. Herrera, United States District Judge for the United States District Court for the District

of New Mexico, explains:

> Defendant is correct that officers failed to make a written inventory. The inventory section of the Tow-In Report is entirely blank, even though SOP § 2-48-2(D)(3) required officers to list the inventoried property. However, the Court does not agree that this is proof of a general rummaging because officers undertook the search pursuant to standardized procedures. In *United States v. Richardson*, 229 F.3d 1145 (Table), 2000 WL 1273425, *2 (4th Cir. Sept. 5, 2000), officers found narcotics under the hood of the defendant's truck during a lawful inventory search but, like here, produced no inventory.
>
> Rejecting the defendant's Fourth Amendment challenge, the Fourth Circuit held that because the officers initiated the inventory search in accordance with established policy, "the failure to complete an inventory list does not render suspect either the motive for conducting the search or the reasonableness thereof." Id.
>
> Similarly, in Bertine the Supreme Court upheld the inventory search of the defendant's vehicle even though it was characterized as "slip-shod." 479 U.S. at 369, 107 S.Ct. 738. The inventorying officer failed to list numerous valuable items

- 123 -

found in the defendant's vehicle, including credit cards, money, and an envelope
marked "rent." *Id.* at 383, 107 S.Ct. 738 (Marshall, J., dissenting). The illegal drugs
found in the defendant's back appeared on a property form completed later by a
different officer. *Id.* Here, officers failed to complete the Tow-In Form, that much
is clear. But these cases convince the Court that such a failure did not necessarily
amount to a general rummaging because officers lawfully impounded Defendant's
vehicle in the first place and otherwise followed APD's standard procedures.

United States v. Maestas, 416 F. Supp. 3d 1278, 1288-89 (D.N.M. 2019)(Herrera, J.).   Here,

although the inventory did not fully conform to protocol insofar as producing an inventory list is

concerned, nevertheless, the conduct was guided and ultimately could be characterized as one

aimed at securing a vehicle's contents.

Critically, this search was not so roughshod that it went beyond the scope afforded APD

as an inventory search -- APD did not, e.g., tear up the seats of Ulibarri's vehicles or dismantle its

frame, actions that cannot be explained on a theory that the search was to inventory the vehicle's

contents.  Cf. Kendall, 14 F.4th at 1127.  United States v. Maestas, 416 F. Supp. 3d at 1289. APD

did not search any portion of the vehicle that their policies would have them search - closed

containers, etc. -- and they found the evidence that Ulibarri seeks to suppress in a backpack resting

behind the passenger seat, see FOF ¶¶ 52-59, at 14-15.

Finally, as discussed, although the Court holds that there existed a subjective investigatory

motive for the impoundment and vehicle search alongside a legitimate, non-investigatory motive,

the existence of dual motives, as with the impoundment, does not condemn the inventory search's

propriety.  See Trujillo, 993 F.3d at 871 (noting that Bertine upholds inventory searches where not

"in bad faith or for the sole purpose of investigation" and that the Tenth Circuit has held that 'a

dual motive does not invalidate an otherwise lawful impound and inventory'" (quoting Bertine,

479 U.S. at 372, then United States v. Sanchez, 720 F. App'x at 970); United States v. Snoddy,

976 F.3d at 635-36 ("'The Fourth Amendment permits impoundment decisions and inventory

searches that are objectively justifiable . . . regardless of an officer's subjective intent.'" (quoting United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001)); United States v. Johnson, 889 F.3d 1120, 1126 (9th Cir. 2018)("[T]he mere 'presence of a criminal investigatory motive' or a 'dual motive -- one valid, and one impermissible --' does not render an administrative stop or search invalid).

## VI.   THE INEVITABLE DISCOVERY DOCTRINE WOULD PERMIT THE ADMISSION OF THE SEIZED EVIDENCE, BECAUSE A PROPERLY CONDUCTED SEARCH, FOLLOWING THE LAWFUL IMPOUNDMENT OF ULIBARRI'S VEHICLE, WOULD HAVE DISCOVERED THE EVIDENCE HERE.

Even if the search in fact conducted was improper, the inevitable discovery doctrine would save the APD's actions, because a properly conducted inventory search following the vehicle's lawful impoundment would have revealed the evidence.  See United States v. Sitlington, 527 F. App'x 788, 792 (10th Cir. 2013)("We have repeatedly applied the inevitable discovery doctrine to cases involving, as here, an improper inventory search that was preceded by a lawful impoundment." (citing United States v. Haro-Salcedo, 107 F.3d at 773-74; United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992); United States v. Ibarra, 955 F.2d 1405, 1410 (10th Cir. 1992).

Even if the Court were to hold that APD officers did not properly execute an inventory search, a properly executed inventory search would have discovered the evidence of Ulibarri's narcotics distribution.  APD found the narcotics that Ulibarri seeks to suppress in the pocket of a closed backpack pocket resting on the floor behind the passenger seat, a backpack that, in compliance with their policies, see APD SOP § 2-48-4(B)(d), at 3 (requiring that, for impounded vehicles, officers should "[i]nventory the entire vehicle, including the vehicle trunk, glove box, truck bed, truck boxes, and all sealed and locked containers within"); APD SOP § 2-71-4(E), at 6-7 ("Inventory searches shall . . . include the entire passenger compartment, glove box, trunk, and

containers without damaging the property.  Containers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is consistent with Department SOP. . . .”), APD was able to open without damaging the backpack, see FOF ¶ 52-59, at 14-15.   Cf. United States v. Trujillo, 341 F. Supp. 3d 1280, 1286 (D.N.M. 2018)(Vázquez, J.)(“Where a standardized, reasonable policy is in place and police do not abuse their discretion, inventory searches of even locked containers do not violate an individual's Fourth Amendment right to be free of unreasonable searches or seizures.” (citing Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739; Opperman, 428 U.S. 364; Wells, 495 U.S. 1)); APD SOP § 2-71-4(E)(1)(d), at 7 (“Inventory searches shall . . . include the entire passenger compartment, glove box, trunk, and containers without damaging the property. Containers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is consistent with Department SOP. . . .”).  The narcotics found in Ulibarri's vehicle was not, for example, hidden behind a panel of the vehicle's frame, such that no proper inventory search would have revealed it.   Cf. Kendall, 14 F.4th at 1127 (“Removing interior panels of the car simply because something might be hidden within smacks of a police search for contraband rather than an administrative search for the purpose of ‘protecting the car and its contents.’” (quoting Opperman, 428 U.S. at 373)).  Accordingly, even if the Court held that the inventory search was flawed constitutionally, the inevitable discovery doctrine would supply an independent basis to deny Ulibarri's MTS.

## VII. CADY-TRUJILLO'S FREE-STANDING GUN-IN-THE-CAR DOCTRINE PROVIDES AN ADDITIONAL JUSTIFICATION FOR SEARCHING THE VEHICLE.

One final justification for upholding constitutionally the evidence's discovery is based on Trujillo's interpretation of Cady as establishing a freestanding gun-in-the-car doctrine. This doctrine justifies searching Ulibarri's vehicle before the impoundment, because Ulibarri's vehicle contained a firearm that vandals could steal and use to cause mischief. The Cady-Trujillo gun-in-car doctrine authorizes a search to find guns in a vehicle under police control:

> The presence of firearms in an unoccupied vehicle under police control provides an additional ground for searching the vehicle, even when the vehicle itself is not a cause for concern at the time of the search. In Dombrowski, Chester Dombrowski, a Chicago police officer, crashed his car while drunk. See 413 U.S. at 435-36. After arresting Dombrowski, . . .local police officers had the vehicle towed to a privately owned tow yard. Id. at 436, 443. Believing that Chicago police officers were required to have their service weapons with them at all times and not having found a gun on Dombrowski's person when he was arrested, an officer went to the tow yard and, following standard procedures, searched the car for the gun, discovering instead bloody clothing and other evidence of a murder. See id. at 437.

> Recognizing the legitimacy of police "community caretaking functions," id. at 441, the Court held that the decision to search the car was reasonable because of the need to "protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands," *id*. at 443. . . . The court noted that the vehicle "was not parked adjacent to the dwelling place of the owner . . . nor simply momentarily unoccupied on the street." Id. at 446-47; see Chavez, 985 F.3d at 1244-45 (car with firearm was parked by residence of car's owner at end of private dirt road).

> In [United States v. Johnson, 734 F.2d 503 (10th Cir. 1984)] . . . [t]he defendant was arrested after having been found "sitting in his car, highly intoxicated, with a .357 caliber magnum revolver in plain view on the passenger seat." 734 F.2d at 504. We held that officers were entitled to search the car, not only on the basis of the impoundment and accompanying inventory, but also on the ground that the officers needed to secure any additional firearms. *See id.* at 505 ("[Defendant]'s revolver in plain view clearly justified a search of the rest of the automobile for other weapons.").

Trujillo, 993 F.3d at 868-69. Although Trujillo does not state explicitly that officers can open closed containers in this search for known and additional firearms in a vehicle, Cady authorizes such a search. See Cady, U.S. at 435-36 (holding constitutional a search officers of the vehicle's

interior and the vehicles closed trunk based on the searching officers' belief that there may be a firearm in the car).

Here, officers knew Ulibarri's car contained a gun and, independently of the decision to impound, could search the car for that gun after they took control over the car upon Ulibarri's arrest. Perez and Elsman saw bullets in Ulibarri's vehicle and decided to arrest him, at which time he confirmed that there was a firearm in the vehicle. See FOF ¶¶ 16-17, at 6; id. ¶ 37, at 10. Trujillo's interpretation of Cady authorizes Perez and Elsman then to search the car to find and secure the firearm that Trujillo indicated was under the driver's seat and to search the vehicle's interior for other firearms the vehicle might contain; this authority includes the authority to open closed receptacles that might contain a firearm. Cf. Trujillo, 993 F.3d at 873 ("[Defendant]'s revolver in plain view clearly justified a search of the rest of the automobile for other weapons." (quoting United States v. Johnson, 734 F.2d at 505)). APD officers had authority, therefore, to open the backpack that they found sitting on the vehicle's floor behind the passenger seat to search for firearms that the car may contain besides the firearm they already knew was in there. See FOF ¶ 52-59, at 14-15. In opening that backpack, they found the evidence that Ulibarri seeks to suppress -- guns, cash, and narcotics. See FOF ¶ 52-59, at 14-15. This Trujillo-Cady doctrine, therefore, authorizes the search that revealed the evidence that Ulibarri seeks to suppress. Accordingly, aside from the impoundment-and-inventory justifications described above, see Sections IV-VI supra, at 73-126, the gun-visible-in-the-car justification provides an independent constitutional justification for the actions that APD took.

In conclusion, each step in the short series of events of May 13, 2021, is constitutionally permissible. The traffic stop of Ulibarri's vehicle is constitutionally permissible, because officers' possessed either of two constitutionally sufficient quanta of information, i.e., both reasonable

suspicion and the higher probable cause quantum.  See Sections I.A-B supra, at 58-64.  The decision to arrest Ulibarri is constitutionally justified, because the arrest is based on the bench warrant.  See Section II supra, at 64-68.  The search-incident-to-arrest, plain-view exception, and the automobile exception to the warrant requirements do not apply.  See Sections III supra, at 68-73.  The impoundment of Ulibarri's vehicle is constitutionally permissible as a non-investigatory community-caretaking impoundment both because the Trujillo impeding-traffic threshold inquiry authorized impoundment, see Section IV.A supra, at 75-79, and because, in the alternative, the Sanders framework authorizes impoundment, because a reasonable caretaking justification authorizes mixed motive impoundments, see Section IV.B supra, at 79-116.  Subsequent to this community-caretaking impoundment, the inventory search is proper, see Section V supra, at 116-25, and, even if improper, in the alternative, the inevitable discovery doctrine would rehabilitate the evidence's discovery's constitutionality, see Section VI supra, at 125-26.  Last, in the alternative, after police arrested Ulibarri, the Cady-Trujillo gun-in-car doctrine permits searching the vehicle, revealing the evidence at issue.  See Section VII supra, at 126-29.  In conclusion, each of officers' actions in this, in total, twenty-minute sequence are constitutionally justified.  The Court will not suppress the evidence discovered in Ulibarri's vehicle.

   **IT IS ORDERED** that: (i) the evidence that APD recovered from Ulibarri's vehicle is not suppressed; and (ii) the Motion to Suppress, filed September 26, 2022 (Doc. 50), is denied.

UNITED STATES DISTRICT JUDGE

- 129 -

*Counsel:*

Alex M. M. Uballez
  United States Attorney
Niki Tapia-Brito
Eva Mae Fontanez
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Irma Rivas
Martin Juarez
  Assistant Federal Public Defenders
Federal Public Defender Office
Albuquerque, New Mexico

    *Attorneys for the Defendant*